**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------

In re:                                          :   **Case No. 19-_____ (_____)**
                                                :   **Chapter 11 (Main Case)**
**GOOD SAMARITAN LUTHERAN HEALTH**              :   **Case No. 19- _____ (_____)**
**CARE CENTER, INC. d/b/a BETHLEHEM**           :
**COMMONS CARE CENTER, et al.[1],**             :
                                                :   **Joint Administration Pending**
                            **Debtors.**        :

--------------------------------------------------------------------

## DECLARATION OF LARAINE FELLEGARA
## IN SUPPORT OF FIRST DAY RELIEF

### INTRODUCTION

I, Laraine Fellegara, hereby declare the following under penalty of perjury:

1.      I am the Chief Executive Officer of The Lutheran Care Network ("**TLCN**").
Since 1996, TLCN has been the parent company of Good Samaritan Lutheran Health Care
Center, Inc. ("**Good Samaritan**") and Kenwood Manor, Inc. ("**Kenwood**"), each a debtor and
debtor-in-possession in the above-captioned Chapter 11 Cases, as hereinafter defined (each a
"**Debtor**", and collectively, the "**Debtors**"). TLCN is the sole member of a number of not-for-
profit corporations, such as the Debtors, that provide a spectrum of senior living services. I have
been employed by TLCN for thirteen years, am above eighteen years of age and am competent to
testify.

2.      Pursuant to certain services agreements, between TLCN and each of the Debtors
(collectively, the "**Service Agreements**" and each a "**Service Agreement**"), I have overseen the
administration and assisted in the financial oversight of each of the Debtors for approximately

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are: Good Samaritan Lutheran Health Care Center, Inc. d/b/a Bethlehem Commons Care Center (0663)
and Kenwood Manor, Inc. (8178).

4330690v.9

five years.  Thus, I am familiar with the business, financial affairs and books and records of the Debtors.

3.      I have been a Certified Public Accountant for thirty-six years and hold a Master of Business Administration degree from Iona College. I have more than forty years of financial and accounting experience, as well as significant experience working with senior care facilities.

4.      I submit this declaration to assist this Court and the parties-in-interest in understanding: (a) the circumstances leading to the commencement of these Chapter 11 cases, including the Debtors' prepetition sale efforts; (b) the business and capital structure of the Debtors; and (c) the Debtors' prepetition debt.

5.      Additionally, I submit this declaration in support of: (a) the Debtors' petitions for relief under the United States Bankruptcy Code (the "**Bankruptcy Code**"), filed on the date hereof (the "**Petition Date**"); and (b) the "first day" relief the Debtors have requested pursuant to the motions and applications also filed on the date hereof.

6.      Except as otherwise indicated herein, all facts set forth in this declaration are based on my personal knowledge, my discussions with members of the Debtors' management team and the Debtors' advisors, as well as my review of the relevant documents and information concerning the Debtors' operations, financial affairs, and refinancing and sale efforts.  If called upon to testify, I would testify competently to the facts set forth herein.

## BACKGROUND

### A.    The Good Samaritan Village

7.    The Debtors, together with a senior apartment facility (the "**Senior Apartment**"), operate on one campus in a quiet, peaceful, country-like setting known as Good Samaritan Village (the "**Village**").  The Village comprises approximately 10.46 acres (the "**Property**") and provides a continuum of care in three separate facilities: (a) independent senior housing; (b) an adult home providing assistance with day-to-day activities; and (c) a full skilled nursing and rehabilitation center that offers short-term rehabilitation and long-term care.

### (i)    Good Samaritan

8.    Debtor, Good Samaritan, operates a 120-bed nonprofit skilled nursing facility (the "**SNF**") certified by the New York State Department of Health (the "**DoH**") under Article 28 of the Public Health Law. Good Samaritan's mission, as stated in its Certificate of Incorporation filed November 14, 1972, is to plan, construct, erect, build, acquire, alter, reconstruct, rehabilitate, own, maintain and operate a nursing home project pursuant to the terms and provisions of the Public Health Law.

9.    As of the Petition Date, Good Samaritan employs 154 employees (the "**SNF Employees**") and has an occupancy of 84%.  Good Samaritan holds the operating certificate for the SNF and also owns the building and the approximately 6.5-acre parcel of real property that the SNF occupies (the "**SNF Real Property**"). Good Samaritan historically has experienced low reimbursement rates from federal payors and residents on Medicaid, which comprise a substantial percentage of its residents.

4330690v.9

10.    For in excess of fifteen years, Good Samaritan has been party to a collective bargaining agreement with 1199SEIU United Healthcare Workers East (the "**Union**"), which expired on December 31, 2018 (the "**GS CBA**").  The GS CBA covers: (a) all full-time and regular part-time service and maintenance employees, including diet aides, ward clerks, transportation aides/certified nursing assistants ("**C.N.A.s**"), nursing rehab aides/C.N.A.s, activities aides./C.N.A.s, nurse aids, housekeepers, porters, environmental services assistants, support aides, laundry workers, maintenance personnel, first cook, second cook, relief cook, licensed practical nurses, and C.N.A. trainees; and (b) in most cases, any employee hired to work one-fifth or more of the work week or a per diem employee who works more than fifty-two shifts within a period of twenty-six weeks.  The GS CBA originally was executed on April 15, 2015. Through various extensions, the GS CBA was extended through December 31, 2018, and expired at 11:59 p.m. on such date.

11.    During the 2018 fiscal year, in accordance with the GS CBA, GS paid an average of approximately: (a) $267,000 a month in wages; (b) $61,000 a month in welfare benefits; and (c) $27,000 a month in pension benefits.  The welfare benefits provided to employees pursuant to the GS CBA include medical, dental, and life insurance benefits. Since the expiration of the GS CBA, Good Samaritan has continued to honor the majority of its obligations under the GS CBA. As of the Petition Date, is current in its wage obligations but is in arrears with respect to certain benefit obligations in the approximate aggregate amount of $504,000.00

(ii)    **Kenwood**

12.    Kenwood operates a 66-bed, DoH-certified adult home (the "**KM Home**," and together with the SNF, the "**Debtors' Facilities**").  Kenwood's mission, as stated in its certificate of consolidation, filed March 3, 1972, is: (a) to promote the individual, collective, spiritual and

4

physical welfare of Lutheran and non-Lutheran men and women through the ministry of Christian love and mercy; and (b) to operate and maintain a home for the aged in Albany, New York.

13.    As of the Petition Date, Kenwood employs 42 employees (the "**KM Employees**" and together with the GS Employees, the "**Employees**") and has an occupancy rate of 71.2%. Kenwood holds the operating certificate for the KM Home and also owns the building and the approximately 1.7-acre parcel of real property that the KM Home occupies (the "**KM Real Property**," and together with the SNF Real Property, the "**Debtors' Real Property**").   The Debtors' Facilities and the Debtors' Real Property shall be referred to hereinafter as the "**Sale Assets**."

14.    For in excess of fifteen years, Kenwood, like Good Samaritan, has been a party to a collective bargaining agreement with the Union, that expired as of December 31, 2018 (the "**KM CBA**" and together with the GS CBA, the "**CBAs**").   The KM CBA covers: (a) all full-time and regular part-time service and maintenance employees, including diet aides, housekeepers, clerical workers, courtesy associates, resident service aides, medical technicians, courtesy car drivers, first cook, second cook and licensed practical nurses; and (b) any employee hired to work one-fifth or more of the work week.

15.    During the 2018 fiscal year, pursuant to the KM CBA, Kenwood paid an average of approximately: (a) $45,000 a month in wages; (b) $12,000 a month in welfare benefits; and (c) $5,000 a month in pension benefits.  The welfare benefits provided to employees pursuant to the KM CBA include medical, dental, and life insurance benefits. Since the expiration of the KM CBA, Kenwood has continued to honor the majority of its obligations under the KM CBA. As of

the Petition Date, is current in its wage obligations, but is in arrears with respect to certain benefit obligations in the approximate aggregate amount of $91,786.00.

### (iii)    The Senior Apartment

16.    The Debtors' Facilities share a campus with their non-debtor affiliate, Good Samaritan Senior Apartment Development Fund Company, Inc., (the "**Apartment Development Company**"), which operates an apartment for senior residents (the "Senior Apartment"). The Senior Apartment is a 36-bed independent living facility funded through a ninety-nine year loan from the New York State Housing Trust Fund. A portion of this loan is forgiven every year so long as the owner of the Senior Apartment continues to meet the requirement of assisting indigent residents.

17.    The owner of the Senior Apartment holds the operating certificate for the Senior Apartment and also owns the building and the approximately 2.5-acre parcel of land upon which it sits. Although there are no longer any shared services among the entities, the Senior Apartment is physically connected to the SNF by a permanent structure.

### B.    The Debtors' Sources of Revenue

18.    The Debtors' revenue is derived from fees received through the operation of the Debtors' Facilities.

19.    For 2018, Good Samaritan's payor mix was approximately ten percent private, five percent Medicare, eighty-two percent Medicaid, and three percent other. The daily rate for each of these categories is between $335.00 and $340.00 for private payor residents, between $193.60 and $204.00 for Medicaid residents, and between $220.00 and $546.00 for residents paying through either Medicare or by other means.

6

20.    To date, for 2019, Good Samaritan's payor mix has been approximately fourteen percent private, eight percent Medicare, seventy-three percent Medicaid, and five percent other. The daily rate for each of these categories is between $335.00 and $340.00 for private payor residents, between $183.90 and $198.90 for Medicaid residents, and between $220.00 and $650.00 for residents paying through either Medicare or by other means.

21.    For 2018, Kenwood's payor mix was approximately fifteen percent private, sixty-six percent on a sliding fee scale (the "**Sliding Fee Scale**"), and nineteen percent Social Security. To pay according to the Sliding Fee Scale means rent is based on the resident's income level. The average daily payment per resident in each category has been $120.00 for private, $72.00 for sliding scale, and $40.00 for Social Security.

22.    To date, for 2019, Kenwood's payor mix was approximately nine percent private, sixty-seven percent on a Sliding Fee Scale and twenty-four percent Social Security. The average daily payment per resident in each category has been $120 for private, $68 for sliding scale, and $41.00 for Social Security.

23.    The top referral sources for the Debtors' Facilities are: St. Peter's Hospital in Albany NY; Albany Medical Center in Albany, NY; Albany Memorial Hospital in Albany, NY; and Ellis Hospital in Schenectady, NY.

## C.    The Debtors' Corporate Governance and Facility Oversight

24.    TLCN is the sole member of each of the Debtors and the owner of the Apartment Development Company. The Debtors and the Apartment Development Company share a board of directors that is distinct from TLCN's board and the boards of directors of TLCN's other related entities.

4330690v.9

25.    TLCN's mission, among others, is to: (a) promote, protect and provide for the physical and spiritual needs of the residents and other persons served by its several subsidiaries, by seeking sources of financing to be used by those subsidiaries in the discharge of their various functions and, when necessary, guaranteeing or coordinating cross guarantees among subsidiaries to secure such financing and by continuously searching for and evaluating and proposing to the appropriate subsidiary further opportunities for providing service to the population of persons already served and a greater service population; (b) serve as a link for transfer and communication of guidance and resources – both human and financial – to its subsidiaries and the persons they serve; and (c) receive, accept, hold, invest, reinvest and administer any funds, gifts, bequests, devises, contributions and property of any sort, whether real, personal, tangible or intangible, without limitation as to amount or value, and to use, disburse or donate the income or principal thereof for exclusively charitable purposes, in such manner as, in the judgment of the Board of Directors of TLCN, shall promote the purposes of the corporation.

26.    TLCN and each of the Debtors is a party to a Services Agreement which was renewed as of January 1, 2019.  The services provided to the Debtors by TLCN under their respective Services Agreement are largely back-office services, including: (a) accounting, auditing and cash management services; (b) obtaining and maintaining adequate insurance; (c) preparing payroll and submitting payroll and tax reports to governmental agencies; (d) human resources functions; (e) handling fringe benefits and maintaining pension compliance; (f) providing information technology services and assistance with software and hardware needs, and (g) providing pastoral and ministry services.  From time-to-time, when the Debtors had insufficient funds to pay their expenses, TLCN has paid expenses on behalf of the Debtors, such

4330690v.9

as workmen's compensation insurance, legal fees, phone and communication fees, postage, and supplies (the "**Expense Advances**").

27.     Pursuant to their respective Services Agreement, each of the Debtors is obligated to repay TLCN for these Expense Advances. As of the Petition Date, Good Samaritan owes TLCN approximately $2.8 million as reimbursement for the Expense Advances, and Kenwood owes TLCN approximately $170,000.00 as reimbursement for Expense Advances. Additionally, pursuant to its respective Services Agreement, Good Samaritan is required to pay TCLN monthly fees of $35,416.67 (for a total of $425,000 annually), plus expenses, and Kenwood is required to pay TCLN monthly fees of $6,250 (for a total of $75,000 annually), plus expenses.

28.     Due to the financial condition of the Debtors, Good Samaritan has not made any payments to TLCN under its Services Agreement since December 2013, and Kenwood has not made any payments to TLCN under its Services Agreement since December 2014. As of the Petition Date, approximately $7.2 million is accrued and unpaid under the Good Samaritan Services Agreement, and approximately $600,000.00 is accrued and unpaid pursuant to Kenwood's Services Agreement.

### D.     The Debtors' Capital Structure and Primary Obligations

#### (i)     The Debtors' Assets and Liabilities

29.     As of the Petition Date, the Debtors' combined assets aggregate approximately $8.0 million, and their combined liabilities aggregate approximately $15.5 million. The Debtors' liabilities as of the Petition Date may be categorized as follows: secured debt of approximately $4.5 million ($4.0 million owed to Amalgamated Bank and $500,000 owed to TLCN); and, unsecured debt of approximately $11.0 million.

4330690v.9

(ii)    **Amalgamated Prepetition Secured Creditor Facility and Mortgage**

30.    The Debtors and Amalgamated Bank ("**Amalgamated**") are parties to a credit agreement dated as of March 31, 2004 (as amended, restated, modified, or supplemented from time to time, the "**Prepetition Credit Agreement**"), pursuant to which Amalgamated made a term loan to the Debtors in the original principal amount of $6,800,000, as evidenced by a promissory note of even date (the "**Prepetition Note**").  The Debtors are jointly and severally liable for the obligations under the Prepetition Credit Agreement and Prepetition Note.

31.    To secure the Debtors' performance of their obligations under the Prepetition Note, the Debtors and Amalgamated entered into a security agreement dated as of March 31, 2004 (as amended, restated, modified, and/or supplemented, the "**Prepetition Security Agreement**") and a Mortgage Consolidation, Modification and Spreader Agreement dated as of March 31, 2004 (as amended, restated, modified, and/or supplemented, the "**Prepetition Mortgage**" and, together with the Prepetition Credit Agreement, the Prepetition Note and the Prepetition Security Agreement, the "**Prepetition Loan Documents**"), pursuant to which Amalgamated has a first priority security interest in and liens on substantially all of the Debtors' assets. The loan evidenced by the Prepetition Loan Documents shall be referred to as the "**Prepetition Secured Facility**".

32.    Further, in consideration of the Prepetition Secured Facility, in December, 2016, Good Samaritan and Amalgamated entered into a Deposit Account Pledge Agreement (as amended, restated, modified, and/or supplemented, the "**Pledge Agreement**"), pursuant to which Good Samaritan pledged $279,294.96 to Amalgamated (the "**Pledge Amount**") as additional collateral to secure the Debtors' obligations under the Prepetition Secured Facility. Prior to the

10

Petition Date, the Pledge Amount was used to pay monthly amounts due under the Prepetition

Loan Documents. The balance of the Pledge Amount as of the Petition Date is $0.

33.    The maturity date of the Prepetition Secured Facility was July 2, 2018 (the

"**Maturity Date**"), and the Debtors failed to make the payment due to Amalgamated on that

date. By letter dated July 3, 2017, Amalgamated sent the Debtors a notice of default and a

reservation of rights with respect to their default under the Loan Documents.

34.    For the majority of the months between the Maturity Date and the Petition Date,

the Debtors made monthly payments of principal plus interest to Amalgamated in the amount of

$46,549.00. Some of these payments were made by deductions from the Pledge Amount. As of

the Petition Date, the amount due under the Note is approximately $4,200,000.00.

35.    TLCN guaranteed the Debtors' obligations under the Prepetition Loan

Documents, as evidenced by an Absolute, Unconditional and Unlimited Continuing Guaranty,

dated December 8, 2015.

### (iii)    TLCN Prepetition Subordinated Secured Facility

36.    For several years, the Debtors' monthly expenses have almost invariably

exceeded their revenue by amounts ranging from $25,000.00 to $300,000.00. Just prior to the

Petition Date, TLCN made a subordinated secured term loan to the Debtors in the original

principal amount of $500,000.00 (the "**TLCN Subordinated Secured Loan**") to fund the costs

of these Chapter 11 cases, as well as certain operational costs.

37.    The TLCN Subordinated Secured Loan is evidenced by a balloon mortgage note

dated as of November 20, 2019, as amended (the "**Balloon Mortgage Note**"), whereby the

11

Debtors agreed to repay the principal balance and all accrued interest on the later of: (a) nine months after the commencement of these Chapter 11 Cases; or (b) the sale of the Debtors' assets (the "**TLCN Loan Maturity Date**").

38.     Interest is accruing on the Balloon Mortgage Note at the fixed rate of seven percent (7.00%) per annum on a 360-day year basis.  Interest is only due and payable on the TLCN Loan Maturity Date.

39.     The TLCN Subordinated Secured Loan is secured by a second-priority lien against the Debtors' Real Property, evidenced in part by a Fixed Rate Balloon Mortgage filed in the land records of Albany County, New York.  The TLCN Subordinated Secured Loan is subordinate to Amalgamated's liens and repayment rights.

### (iv)     Related Parties' Unsecured Loans to the Debtors

40.     TLCN has made unsecured loans to the Debtors from time-to-time that have been essential to the Debtors' ability to protect and preserve their residents' welfare, maintain their day-to-day operations, and continue their missions.

41.     Generally, these related-party unsecured loans have come through TLCN to the Debtors (the "**Related-Party Unsecured Loans**"). In each case, the applicable boards of directors approved the lending and borrowing as fair, reasonable and in each corporation's best interest. Proper corporate record keeping was maintained with respect to all Related-Party Unsecured Loans.

4330690v.9

42.     As of the Petition Date, approximately $2.0 million is owed to TLCN by Good Samaritan on account of Related-Party Unsecured Loans and approximately $1.9 million is owed by Kenwood to Good Samaritan on account of the Related-Party Unsecured Loans.

### (v)     Trade Debt

43.     The Debtors estimate that they owe approximately $7.2 million in unsecured trade debt to vendors and other creditors as of the Petition Date.

## EVENTS LEADING UP TO CHAPTER 11

### A.     The First Bankruptcy Counsel and CRO

44.     In or about January 2019, the Debtors retained bankruptcy counsel (the "**First Bankruptcy Counsel**") to assess their financial situation and make a recommendation as to whether filing for bankruptcy protection would be in the best interests of the Debtors, their residents and their creditors.  Ultimately, the First Bankruptcy Counsel determined that seeking protection under chapter 11 of the Bankruptcy Code would be the best means for the Debtors to obtain relief from their overly burdensome CBAs and allow them to successfully market and effectuate the sale of their assets. Accordingly, the Debtors retained the First Bankruptcy Counsel to represent them in bankruptcy cases and, on the recommendation of their First Bankruptcy Counsel, the Debtors retained a Chief Restructuring Officer ("**CRO**").

45.     Several months after the retention of the First Bankruptcy Counsel and the CRO, the Debtors were not engaged in negotiations with a potential purchaser of their assets, had not obtained a commitment for debtor-in-possession financing, and were rapidly running out of money.  In or about May 2019, the First Bankruptcy Counsel and the CRO ceased working for the Debtors.

4330690v.9

B.    **The Sale**

(i)    **Marketing the Debtors' Assets**

46.    The Debtors have been exploring a sale of substantially all of their assets (the "**Sale Assets**") for several years and have been experiencing unsustainable losses for more than a year. Shortly after the First Bankruptcy Counsel and the CRO were retained, they established an electronic data room containing key information for interested parties to conduct due diligence regarding the Sale Assets. While there have been numerous interested purchasers, and the Debtors have engaged in intense, arms-length negotiations regarding term sheets and sale documents, the Debtors have not been able to sell the Sale Assets. Specifically, over the past several years, the Debtors have obtained two executed asset purchase agreements (including the one the Debtors imminently will be submitting to this Court for approval), have negotiated an asset purchase agreement with another potential purchaser that ultimately was not signed, and have obtained multiple executed letters of intent, that did not progress to sale documentation. Unfortunately, as time passed, the purchase price for the Debtors' assets has diminished.

47.    A primary reason cited by each of the potential purchasers for not moving forward with their purchase of the Sale Assets is that the benefits afforded to workers under the Debtors' CBAs are excessive and materially inconsistent with the benefits afforded to workers at similar care facilities in the Debtors' geographic region. As a prerequisite to their purchase of the Sale Assets, several of these interested parties attempted to negotiate with the Union to modify the employer obligations under the CBA, but they were unsuccessful. Similarly, the Debtors have had several meetings with the Union and attempted unsuccessfully to negotiate relief under the CBAs. Accordingly, despite their interest in owning the Sale Assets, potential

4330690v.9

purchasers refused to move forward with their purchase due to what they expressed to be the Debtors' overly burdensome CBAs.

48.     Finally, in May 2019, the Debtors retained Blueprint Healthcare Real Estate Advisors, LLC ("**Blueprint**") on an exclusive basis to market the Sale Assets for a three-month period.  Blueprint has a national platform, and according to its website, was named the 2018 market leader in the seniors housing and care space.  Chris Hyldahl, the Executive Managing Director and Co-Founder of Blueprint, personally worked with the Debtors.  According to Blueprint's website, Mr. Hyldahl has closed more than $3 billion of seniors housing transactions.

49.     Within a week of its engagement, Blueprint identified a buyer for the Debtors' assets, and the parties engaged in extensive negotiations and shared numerous drafts of sale documents throughout Blueprint's engagement.  Sometime in mid-August 2019, negotiations between the potential purchaser and the Debtors turned to the CBAs and broke down.

50.     Blueprint was not able to deliver any other potential purchaser of the Sale Assets by the time its contract expired at the end of August 2019.  At the close of Blueprint's engagement, the one interested purchaser identified by Blueprint had not executed a term sheet or a contract to purchase the Sale Assets, and the Debtors had incurred exorbitant legal fees going back-and-forth with the potential purchaser on numerous draft sale documents.

51.     Once Blueprint's contract expired, the Debtors began calling upon previously interested purchasers to determine whether any of them remained interested in purchasing the Sale Assets.  Centers Health Care ("**Centers**") stated that it remained interested in purchasing the Sale Assets but would not assume the Debtors' obligations under the CBAs.

4330690v.9

### (ii)    The Sale Agreements

52.    Following approximately three (3) months of negotiation, the Debtors and Centers have agreed upon terms pursuant to which Centers or a related entity (the "**Purchaser**") will purchase the Sale Assets. The agreement between the Purchaser and each Debtor, is set forth in three separate documents (the "**Sale Agreements**"). The Sale Agreements are being submitted to the Court for approval imminently, and include: (a) the Asset Purchase Agreements, one for each Debtor, pursuant to which the Purchaser will purchase the Debtors' Facilities; (b) the Purchase and Sale Agreements, one for each Debtor, pursuant to which the Purchaser will purchase the Debtors' Real Property; and (c) the Receivership Agreements, one for each Debtor, pursuant to which the Purchaser will be appointed under New York State Law to serve as the receiver for the Debtors' Facilities after the entry of the Sale Order and prior to obtaining authority from the DoH and the AG to transfer title to the Debtors' Facilities.

53.    Pursuant to the Sale Agreements, the Purchaser will pay the aggregate price of $7.5 million (the "**Purchase Price**") to acquire the Sale Assets. The essential contingencies to the closing of the sale are: (a) entry of an Order by the Bankruptcy Court, in form and substance satisfactory to the Purchaser, approving the sale and the Sale Agreements (the "**Sale Order**"); (b) the rejection by the Debtors of the CBAs prior to the entry of the Sale Order; and (c) the approval of the DoH and the AG to the transfer of ownership of the Debtors' Facilities to the Purchaser.

54.    While the Purchaser is ready, willing and able and would like to, immediately take title to the Sale Assets, and the Debtors need to transfer the Sale Assets promptly before they run out of money, the asset transfer approval processes to be undertaken by the DoH and the AG could take from several months to a couple years to complete. In this case, we expect the

16

approval process will be expedited since it is my understanding that the owners of Centers own/operate more than thirty senior housing and nursing care facilities within the State of New York.  However, the Debtors do not have the commitment of the DoH or the AG to a timeframe within which they will rule upon the request to transfer title to the Sale Assets, and it is anticipated that the Debtors will run out of funding shortly after the Sale Order is entered. Accordingly, the Purchaser has agreed to provide funding to the Debtors through its appointment as a receiver by the DoH.

### (iii)    The Receivership Agreement

55.    The period between the date the Sale Order is entered and approval to transfer title is issued by the DoH and the AG will be referred to hereinafter as the ("**Interim Period**"). The Debtors' DIP Facility is not sufficient to fund operations through the Interim Period, assuming the Interim Period continues for more than a month or so.  Accordingly, the Purchaser has agreed to fund the Debtors' operations during the Interim Period, through its appointment as a receiver for the Facilities.   It is my understanding that such appointment will allow the Purchaser to operate the Debtors' Facilities for its own account, including: (a) paying the Debtors' expenses with Purchaser funds to the extent such expenses exceed the revenue generated by the Debtors' Facilities, and enjoying any profits achieved through the operation of the Debtors' Facilities during the receivership; (b) conducting the day-to-day operations of the Debtors, including interactions with the Debtors' employees, suppliers, and regulatory authorities.   While I understand it is an unusual request in a bankruptcy case to seek the appointment of a receiver that will have essentially all of the rights and obligations of an owner prior to paying the purchase price to acquire title to the debtors' assets, it is essential in this case,

4330690v.9

given the dire financial condition of the Debtors and the length of time the DoH and the AG could take to approve the transfer of title to the Purchaser.

56.     Given the amount of financing Amalgamated is willing to extend to the Debtors post-petition and the time it will take the regulatory authorities to approve the transfer of title to the Sale Assets, it is my opinion that the Debtors will not be able to continue operations during the Interim Period unless the Purchaser funds the Debtors' operations.

### (iv)    The DIP Facility

57.     As a consequence of a complaint filed against TLCN by the New York State Office of the Attorney General in or about August 2014, TLCN has modified its practices with respect to related party funding transactions.  Without such related party loans, the Debtors have been suffering from a severe liquidity crisis, which ultimately resulted in their bankruptcy filings. The First Bankruptcy Counsel and the CRO attempted to obtain debtor-in-possession financing from various sources, and ultimately received a term sheet from one lender that contained substantially more burdensome terms than the DIP Facility, defined hereinafter, and engaged in substantial negotiations with another lender, yet they were unable to ultimately obtain financing.

58.     Recently, the Debtors have succeeded in obtaining the prepetition TLCN Subordinated Secured Loan to fund retainers for the Debtors' bankruptcy professionals and a commitment from Amalgamated (the "**DIP Lender**") to provide debtor-in-possession financing through the use of cash collateral and a new loan (the "**DIP Facility**"). The DIP Facility is conditioned upon, among other things, the Debtors having an executed agreement for the sale of substantially all of their assets. Given the Debtors' current financial condition, financing

18

arrangements and capital structure, the Debtors were unable to obtain financing from sources other than Amalgamated on better terms than those reflected in the DIP Facility.

59.     Under the DIP Facility, the DIP Lender will provide the Debtors with a delayed draw term loan in an amount not to exceed $1,000,000, which will be released weekly based upon a budget provided by the Debtors the prior week.  To secure repayment of the DIP Facility, Amalgamated will receive a first priority security interest in substantially all of the Debtors' assets and a super priority administrative claim.  As adequate protection for Amalgamated's prepetition secured claim, Amalgamated will receive monthly adequate protection payments.

60.     The DIP Loan Documents contain milestones that the Debtors must meet which, if violated, would constitute a breach of the DIP Facility, as follows:

A.   December 13, 2019 - entry of Interim DIP Order

B.   January 10, 2010 - filing of Schedules and Statement of Financial Affairs

C.   January 24, 2020 - entry of the final DIP Order

D.   January 24, 2020 - entry of an Order approving the sale of the Debtors' assets

E.   February 6, 2020 - Purchaser's submission of an application to the DoH and the AG for authority to transfer title to the Sale Assets from the Debtors to the Purchaser.

F.   February 6, 2020 - filing by the Debtors of a disclosure statement and plan of reorganization

G.   March 16, 2020 - entry of an Order approving the Debtors' disclosure statement.

H.   April 20, 2020 - entry of an order approving the Debtors' plan of reorganization

I.   June 22, 2020 - effective date of the Plan.

J.   December 13, 2020 – payment in full to DIP lender of the Obligations and the obligations under the Amalgamated Prepetition Loan.

4330690v.9

61.     Given the Debtors' efforts to obtain financing and locate a buyer for their assets and given the dire financial condition in which the Debtors find themselves, the Debtors, in consultation with their present professionals, as well as the First Bankruptcy Counsel and the CRO, have determined that the sale of the Debtors' assets as soon as possible is critical.  I believe that the filing of these chapter 11 cases, the incurrence of the indebtedness under the DIP Facility and the sale to the Purchaser pursuant to the Sale Agreements offer the best option for the Debtors to preserve and protect their residents' safety and welfare, preserve jobs and maximize the value of the Debtors' estates.

62.     The Debtors have filed or will file a number of "first day" motions, seeking the entry of orders granting various forms of relief (the "**First Day Motions**").  I believe the requested relief is necessary to enable the Debtors to operate with minimal disruption during their Chapter 11 Cases and will lead to the best outcome for the Debtors, their residents, their estates, their creditors and other parties-in-interest. I respectfully submit that the relief requested by the First Day Motions outlined below should be granted.

## THE FIRST DAY MOTIONS

**A.**     *Motion of Debtors for the Entry of an Order (I) Scheduling an Expedited Hearing on First Day Motions and (II) Approving the Form and Manner of Notice Thereof* (the "**Expedited Hearing Motion**")

66.     Pursuant to the Expedited Hearing Motion, the Debtors seek the entry of an order: (a) scheduling an expedited hearing on the First Day Motions; and (b) approving the form and manner of notice thereof.

67.     The relief requested in the First Day Motions is essential to maintaining the viability of the Debtors' Facilities, the welfare of their residents and the preservation and maximization of the value of the Debtors' estates. Accordingly, I believe that the First Day

Motions involve matters that require an expedited, emergency hearing, and that the Court should schedule an expedited hearing to consider the First Day Motions.

**B.**    *Motion of Debtors for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* (the "**Joint Administration Motion**")

63.    Pursuant to the Joint Administration Motion, the Debtors seek the joint administration of the Chapter 11 Cases for procedural purposes only. Many of the motions, hearings and other matters involved in the Chapter 11 Cases will affect both of the Debtors. Moreover, the Debtors are jointly and severally liable under the Prepetition Loan Documents and the DIP Facility, are parties to substantially similar CBAs with the same Union, have substantially similar executed agreements for the sale of their assets, share many of the same unsecured creditors, have the same parent company and operate as part of the Village. Therefore, I believe the joint administration of these cases will avoid  unnecessary duplicative pleadings and will conserve time and expense for the Debtors and their estate.  Accordingly, I believe the Court should approve the joint administration of these Chapter 11 Cases.

**C.**    *Motion of Debtors for Entry of an Order Authorizing the Filing of a Consolidated Mailing Matrix* (the "**Consolidated Mailing Matrix Motion**")

64.    Pursuant to the Consolidated Mailing Matrix Motion, the Debtors seek the entry of an order authorizing them to file one consolidated mailing matrix. The Debtors are affiliated companies that operate separate care facilities on a single campus. Many of the creditors and other parties-in-interest are common to both Debtors.  These creditors would receive duplicate copies of the pleadings filed in the Debtors' cases if the Debtors are required to file individual mailing matrixes, which could result in creditor confusion and which would be inefficient and unnecessarily costly to the Debtors. Accordingly, I believe the Court should authorize the Debtors to file one consolidated mailing matrix.

4330690v.9

**D.**    *Motion of Debtors for Entry of an Order Authorizing Procedures to Maintain and Protect Confidential Resident Information* (the "**Patient Confidentiality Motion**")

68.    Pursuant to the Patient Confidentiality Motion, the Debtors seek the entry of an order authorizing the implementation of procedures to protect confidential information of their residents, as required by the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**").

69.    In the ordinary course of their businesses, the Debtors have access to and receive "protected health information" and data relating to their residents, that the Debtors are required to maintain confidential pursuant to HIPAA. Some of these residents potentially hold claims against the Debtors, and it is my understanding that under the Bankruptcy Code, they are required to be listed on the Debtors' mailing matrixes and bankruptcy schedules, and they are entitled to receive notice of motions, hearings and other events in these Chapter 11 Cases.

70.    In an effort to comply with HIPAA and the Bankruptcy Code, the Debtors propose certain procedures to maintain the confidentiality of their residents during the pendency of these Chapter 11 Cases.

71.    I believe the privacy procedures proposed by the Debtors and the relief requested in the Patient Confidentiality Motion appropriately balance the need to maintain confidential patient information under HIPAA with the need for adequate notice and disclosure under the Bankruptcy Code. Accordingly, I believe the Court should approve the Patient Confidentiality Motion.

**E.**    *Motion of Debtors Seeking Entry of Interim and Final Orders (A) Authorizing the Payment of Prepetition Workforce Claims for Wages, Salaries, Compensation, and Reimbursable Expenses, (B) Confirming Debtors' Right to Continue Employee Benefit Plans and Programs and Honor Prepetition Obligations Relating Thereto, (C) Prohibiting the Discontinuation of Employee Benefits Absent Further Order of the Court, and (D) Granting Related Relief* (the "**Workforce Motion**")

72.    Pursuant to the Workforce Motion, the Debtors request authority to honor certain prepetition obligations with respect to their workers and to continue their employee benefits postpetition, including honoring certain benefits earned prepetition.

73.    As of the Petition Date, Good Samaritan employs approximately: eleven full-time salaried employees; two part-time salaried employees; sixty-two full-time hourly employees; and, twenty-six hourly part-time employees (the "**Good Samaritan Employees**").    As of the Petition Date, Kenwood Manor employs approximately: two full-time salaried employees; seventeen full-time hourly employees; and, three hourly part-time employees (collectively, "**Kenwood Manor Employees**" and together with the Good Samaritan Employees (the "**Employees**")

74.    The Debtors also regularly utilize the services of temporary workers (the "**Temporary Workers**", and together with the Employees, the "**Workforce**") to fulfill certain duties on a short-term basis. As of the Petition Date, Good Samaritan employs approximately forty-nine Temporary Workers, and Kenwood Manor employs approximately twenty-one Temporary Workers.

75.    The Temporary Workers fill certain critical and immediate staffing needs of the Debtors and allow the Debtors to have a flexible labor pool to meet their operational needs in a cost-effective manner. The Temporary Workers are a reliable and cost-efficient component of the Debtors' operations. The Debtors pay some of these Temporary Workers directly, and others are paid through employment agencies.    With respect to those who are paid directly by the

4330690v.9

Debtors, their compensation is included in the respective Debtor's regular payroll, as described below.

76.    In the ordinary course of business, the Debtors incur payroll obligations to their Employees, comprised generally of salaries and wages. As of the Petition Date, the Debtors were current with respect to their salary and wage obligations to their Employees.

77.    The Debtors utilize two payroll cycles, pursuant to which Good Samaritan Employees and Kenwood Manor Employees are paid on an alternating biweekly basis. Employees are paid on a Friday (the "**Pay Date**") for the prior two weeks through the preceding Saturday (the "**Employee Compensation Obligations**", and together with the Temporary Workers compensation, the "**Workforce Compensation Obligations**"). Good Samaritan's average payroll obligation per cycle is approximately $189,000 and Kenwood Manor's average payroll obligation per cycle is approximately $30,000. The last Pay Date before the Petition Date was for Good Samaritan on December 6, 2019, covering the period of November 17, 2019 – November 30, 2019. The last Pay Date before the Petition Date for Kenwood Manor was the previous Friday, November 29, 2019, for the period of November 10, 2019 – November 23, 2019. As of the Petition Date, the Debtors owe approximately $164,000.00 in accrued and unpaid Workforce Compensation Obligations, which will be payable in the ordinary course of business on the next regular Pay Date, representing approximately $128,000. 00 due to Good Samaritan Employees and any Temporary Workers for the period of December 1, 2019 to the Petition Date and $36,000.00 due to Kenwood Manor Employees and any Temporary Workers for the period of November 24, 2019 to the Petition Date. None of the Employees or Temporary Workers is owed more than $ 13,650.00 in Workforce Compensation Obligations.

78.    The Debtors seek authority to pay the prepetition Workforce Compensation

Obligations in the ordinary course of business on the next Pay Date, which will occur postpetition. In addition, the Debtors seek authority (a) to cause prepetition checks or electronic payment requests issued in payment of prepetition Employee Compensation Obligations to be honored, and (b) to reissue any check or electronic payment request issued on account of prepetition Workforce Compensation Obligations that has not been honored.

79.     Prior to the Petition Date, in the ordinary course of business, the Debtors reimburse Employees for reasonable and legitimate expenses incurred on behalf of the Debtors in the scope of the Employee's employment ("**Reimbursable Expense Obligations**"). In all cases, reimbursement is contingent on the Debtors' determination that the charges are for legitimate, reimbursable business expenses.

80.     The Debtors process reimbursement claims on a rolling basis.  As of the Petition Date, the Debtors have paid all Reimbursable Expense obligations that have been submitted to them. It is possible that there are Reimbursable Expense Obligations outstanding as of the Petition Date in instances where Employees have not yet submitted reimbursement requests to the Debtors. To avoid harming Employees who incurred Reimbursable Expense Obligations prepetition, the Debtors request authority to satisfy all prepetition Reimbursable Expense Obligations, if any.

81.     For each pay period, the Debtors routinely deduct certain amounts directly from Employees' pay, certain pre-tax and after-tax amounts payable pursuant to the Employees' benefit plan programs, policies and arrangements, such as, an Employee's share of the cost of health care benefits, insurance premiums, 401k contributions, legally-ordered deductions, and Union dues (collectively, the "**Benefits Deductions**"). The Debtors remit the Benefit Deductions to the appropriate third-party recipients and/or retain them on account of "self-insured" benefit

and insured benefit programs, as appropriate.

82.     Additionally, the Debtors are required by law to withhold from Employees' pay, amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "**Employee Withholding Taxes**"), and to remit same to the applicable taxing authorities. The Debtors are required to make matching payments from their own funds for, among other things, social security and Medicare taxes and to pay, based on a percentage of gross payroll, state, and federal unemployment insurance, employment training taxes, and state disability insurance contributions (the "**Employer Payroll Tax Obligations**," and together with Employee Withholding Taxes, the "**Payroll Tax Obligations**"). The amounts withheld in satisfaction of the Payroll Tax Obligations are transferred to the appropriate payees.

83.     In the ordinary course of business, on a monthly basis the Debtors withhold Union dues in the approximate amount of $4,950.00 from the wages of member Employees (the "**Dues Deductions**") and remit those amounts to the Union. As of the Petition Date, the Debtors have paid all withheld Dues to the Union.

84.     The Debtors offer their Employees paid time off ("**PTO**"), paid sick days ("**Sick Leave**"), holiday pay ("**Holiday Pay**"), and paid personal days ("**Personal Days**", and together with PTO, Holiday Pay, and Sick Leave, the "**Facility Benefits**"). Following is a summary of each of these benefits.

85.     PTO. After the completion of six months of service, Employees who work 22.5 hours a week or more are entitled to vacation pay based on job classification and length of employment. Unused vacation days are carried over into the next calendar year up to a maximum of 10 days.

86.     Sick Leave. After the completion of thirty (30) days of service, employees who

4330690v.9

work 22.5 hours a week or more are entitled to one (1) day of sick pay for each month of service

up to a maximum of 12 days per year. Unused sick days are carried over into the next calendar

year up to a maximum of thirty (30) days.

87.     Holiday Pay. Employees are eligible to receive holiday pay after 30 days of

service. The Debtors recognize ten (10) holidays during the course of the year.

88.     Personal Days. After the completion of ninety (90) days of service, employees

who work 22.5 hours a week or more earn one (1) personal day per quarter for a total of four (4)

personal days per year. All personal days must be taken in the quarter in which they are earned.

89.     Employees cannot receive cash payments for accrued Benefit Policies so long as

they are employed by the Debtors.  As of the Petition Date, certain Employees have accrued

PTO, Sick Leave and/or Personal Days, and the Debtors seek authority to allow such Employees

to utilize these benefits postpetition in the ordinary course of business.

90.     Benefits for Union member Employees are provided through the Union and

include: (a) various health and welfare benefits, such as medical, dental life, disability, and

accidental death and dismemberment insurance options; (b) educational benefits; (c) child care

benefits; and (d) pension fund contributions.  Pursuant to its CBA, Good Sam is obligated to pay

approximately $92,091.00 monthly to the Union for these benefits (the "**Good Sam Union**

**Benefit Payments**"), and Kenwood Manor is obligated to pay approximately $16,908.00

monthly to the Union for these benefits  (the "**Kenwood Manor Union Benefit Payments**", and

together with the Good Sam Union Benefit Payments, the "**Union Benefit Payment**s").  All of

the benefits afforded to Union members shall be referred to as the "**Union Member Benefits**".

As of the Petition Date, Good Sam is in arrears with respect to its Union Benefit Payments in the

approximate amount of $504,000.00 and Kenwood Manor is in arrears with respect to its Union

4330690v.9

Benefit Payments in the approximate amount of $92,000.00. Nonetheless, the health and welfare benefits, educational benefits and child care benefits remain in full force and effect. The Debtors seek authority to maintain the Union Member Benefits in full force and effect during the Chapter 11 Cases through the payment of the Union Benefit Payments in the ordinary course of business, pending further order of this Court.

91.     Benefits for non-Union Employees are provided directly by the Debtors and include: (a) various medical and health care benefits, such as medical, dental, disability, and accidental death and dismemberment insurance options; (b) and pension fund contributions. These benefits afforded to non-Union Employees shall be referred to as the "**Non-Union Employee Benefits**". In certain instances, the Debtors deduct amounts from non-Union Employees' salary and wages to pay a portion of the Non-Union Employee Benefits (the "**Non-Union Employee Benefit Contributions**"). For example, non-Union Employee contributions to the health plans offered by the Debtors are collected through payroll deductions from participating Employees' wages. The Debtors also pay a portion of the cost of certain non-Union Employee Benefits. For example, Employees and eligible dependents are offered comprehensive medical coverage through two plans, for which the Debtors pay approximately $17,000 per month.

92.     The Debtors also maintain a retirement savings plan for eligible Employees pursuant to section 403(b) of the Internal Revenue Code (the "**403(b) Plan**"). Approximately seventeen Good Samaritan Employees and one Kenwood Manor Employees currently participate in the 403(b) Plan.

93.     The Debtors maintain a pension plan that is administered by Massmutual Retirement Services (the "Pension Plan"). Employees who work a minimum of 1,000 hours per

4330690v.9

year are eligible for the Pension Plan the first quarter after one year of service, and are fully

vested in the Pension Plan after five (5) years of service. The Debtors are not currently funding

the Pension Plan.

94.     I believe it is necessary to the continued operations of the Debtors to retain their

Workforce and to that end, this Court should grant the relief requested by the Workforce Motion.

**F.**     *Motion of Debtors for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (II) Approving the Debtors' Proposed Adequate Assurance of Payment for Postpetition Services, and (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment (the "***Utilities Motion***")*

95.      In conjunction with their day-to-day operations, the Debtors receive traditional

utility services from those utility providers listed on <u>Exhibit C</u> to the Utilities Motion (the

"**Utility Providers**", and each a "**Utility Provider**").

96.     Over the past twelve (12) months, the Debtors have paid an aggregate average of

approximately $23,400 monthly on account of utility services.

97.     As "adequate assurance," the Debtors propose to provide to each Utility Provider,

a deposit equal to the cost of two weeks of utility service, calculated on the basis of the historical

average of the Debtors' actual usage over the past twelve (12) months.  They also propose a

process for resolving requests for additional adequate assurance, as set forth in the Utilities

Motion.

98.     Uninterrupted utility services are essential to the safety and welfare of the

Debtors' residents, as well as to their business operations generally.  I believe that the relief

requested in the Utilities Motion is necessary to protect and preserve the welfare of the Debtors'

residents, and to avoid immediate and irreparable harm to the Debtors' estates, their creditors,

and all other parties in interest.

**G.**     *Motion of Debtors for Entry of an Order (I) Authorizing Continuation of Various*

*Insurance Policies and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection, if any, therewith, (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto, and (III) Preventing Insurance Companies from Giving any Notice of Termination or Otherwise Modifying any Insurance Policy Without First Obtaining Relief from the Automatic Stay* (the "**Insurance Motion**")

99.     The nature of the Debtors' Facilities makes it essential to maintain their insurance programs on an ongoing and uninterrupted basis. The nonpayment of any premiums, deductibles, or related fees under any of the Debtors' insurance programs could result in the insurance companies terminating existing policies, declining to renew insurance policies or refusing to enter into new insurance agreements in the future.

100.     In the ordinary course of their businesses, the Debtors maintain approximately 11 insurance policies with various insurance providers (each an "**Insurer**" and collectively, the "**Insurers**") that provide coverage for, among other things, the Debtors' general liability, automobile liability, professional liability, cyber liability, and property liability (each, an "**Insurance Policy**" and collectively, the "**Insurance Policies**"), as summarized in Exhibit B annexed to the Insurance Motion.

101.     The Debtors pay a total of approximately $162,500 in premiums and insurance costs, including broker fees, on an annual basis under the terms of their existing Insurance Policies as well as other obligations, including the Broker Fees and other related fees and costs (collectively, the "**Insurance Obligations**"). In addition, in the ordinary course of business, retroactive adjustments occasionally are made with respect to the Insurance Policies. Certain of the Debtors' Insurance Policies require annual premiums to be paid in full at the beginning of the applicable policy period (the "**Prepaid Policies**"), while other Insurance Policies of the Debtors are paid in installments (the "**Installment Policies**"). In the ordinary course of business, the Debtors renew coverage annually under their insurance policies.

102.    The Debtors use Cool Insuring Agency Inc. (the "**Broker**") to assist them with the procurement and negotiation of their insurance. The Broker assists the Debtors in obtaining comprehensive insurance coverage for their operations, analyzing the market for available coverage and negotiating policy terms, provisions, and premiums. The Broker also provides ongoing support through the policy periods. The Broker's fees and commissions (the "**Broker Fees**") are paid from the premium amounts paid by the Debtors. As of the Petition Date, the Debtors do not believe that they owe any past due Broker Fees or any other prepetition obligations for the current insurance policy periods other than those that may be contained in the next premium payments that will come due in the ordinary course of the Debtors' business.

103.    Based upon the Debtors' critical need for insurance coverage in the operation of their businesses, I believe the Court should grant the relief requested in the Insurance Motion.

**H.**    *Motion of Debtors for Entry of Interim and Final Orders Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts and Continuance of Deposit Practices* (the "**Cash Management Motion**")

104.    In the ordinary course of business, Good Samaritan maintains four bank accounts and Kenwood maintains three bank accounts (collectively, the "**Debtors' Bank Accounts**"), and Good Samaritan and Kenwood each operates a cash management system that is independent from the other (the "**Cash Management System**"). The Cash Management System is integral to the operation and administration of the Debtors' Facilities and allows each Debtor to monitor and control the Debtors' cash receipts and disbursements, identify the cash requirements of the Debtors, and transfer cash as needed to respond to the cash requirements of the Debtors.

105.    Good Samaritan maintains its bank accounts at Sterling National Bank, Amalgamated Bank, and Trustco Bank, as follows:

(a) Sterling National Bank – Good Samaritan maintains a payroll account

(7701) and an operating account (6929) at Sterling National Bank. The payroll account is used exclusively to pay employees. No taxes are paid through the payroll account. The operating account is used to deposit payments for services (Medicare, managed care, other third-party commercial insurance, and private pay) and issue checks to vendors.

(b) Amalgamated Bank – Good Samaritan maintains an operating account (3527) at Amalgamated Bank. This operating account is used to issue checks to vendors. Medicaid and Medicare reimbursements are also deposited into this operating account.

(c) Trustco Bank - Good Samaritan maintains a resident funds account and a chapel fund account at Trustco Bank. Residents living at Good Samaritan deposit funds into the resident funds account and such funds are then earmarked for such resident's needs, such as hair services. As the Debtors act merely as conduits, custodians and/or intermediaries for these transactions, and have no other right or interest in or to these funds. Such funds thus do not constitute property of the estate pursuant to 11 U.S.C. § 541(d).

106.    Kenwood Manor maintains its bank accounts at Sterling National Bank and Key Bank, as follows:

(a) Sterling National Bank - Kenwood Manor maintains a payroll account (8501) and operating account (6937) at Sterling National Bank. The payroll account is used exclusively to pay employees. No taxes are paid through the payroll account. The operating account is used to deposit payments for services and issue checks to vendors.

4330690v.9

(b) Key Bank – Kenwood Manor maintains a resident funds account (0791) at

Key Bank. Residents living at Kenwood Manor deposit funds into the resident

funds account and such funds are earmarked for such resident's needs, such as

hair services. As the Debtors act merely as conduits, custodians and/or

intermediaries for these transactions, and the Debtors have no rights or interest

in or to these funds, they do not constitute property of the estate pursuant to 11

U.S.C. § 541(d).

107.     As the foregoing overview reflects, the Cash Management System is specifically

designed for administering the Debtors' businesses and cannot be altered without significant

disruption to the Debtors' business operations and material distraction to the Debtors'

management.

108.     Replacing the current Cash Management System would be costly and disruptive

of the orderly collection of revenues by the Debtor, resulting in a significant adverse effect on

the Debtor's operations and sale efforts.  Accordingly, I believe the Court should authorize the

relief sought by the Cash Management Motion.

**I.**     *Motion for Entry of an Order Authorizing the Retention and Employment of OMNI Agent Solutions as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* (the "**Noticing Agent Motion**")

109.     Pursuant to the Noticing Agent Motion, the Debtors seek entry of an order

appointing Omni Management Group, Inc. ("**Omni**") to act as their claims and noticing agent in

order to assume full responsibility for the distribution of notices and the management of claims

in these Chapter 11 Cases.

110.     The Debtors anticipate there will be numerous creditors and parties-in-interest to

be noticed in these cases, including patients or residents and employees.  As previously stated,

4330690v.9

HIPAA imposes stringent confidentiality obligations upon information regarding the Debtors' patients and residents.  In order to comply with HIPAA requirements as well as the noticing that will be required by the bankruptcy process, appointing  Omni as the claims and noticing agent will relief the the Debtors and the Clerk's Office of the administrative burden of noticing what may be an overwhelming number of parties-in-interest, many of whom are subject to particular confidentiality requirements, and processing a potentially huge number of claims.

Pursuant to 28 U.C.C. Section 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: December 12, 2019

Respectfully submitted,

*/s/ Laraine Fellegara*

4330690v.9