STRADLEY RONON STEVENS & YOUNG, LLP
Deborah A. Reperowitz
100 Park Avenue, Suite 2000
New York, NY 10017

and

Daniel M. Pereira
Mischa S. Wheat
2005 Market Street, Suite 2600
Philadelphia, PA 19103

*Proposed Attorneys for the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Case No. 19-12215 (REL)** |
| | **Chapter 11(Main Case)** |
| **GOOD SAMARITAN LUTHERAN** | **Case No. 19-12216 (REL)** |
| **HEALTH CARE CENTER, INC. d/b/a** | |
| **BETHLEHEM COMMONS CARE** | **Jointly Administered** |
| **CENTER, et al.,[1]** | |
| **Debtors.** | |

**MOTION FOR ENTRY OF AN ORDER (A) APPROVING THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (B) ALLOWING THE
APPOINTMENT BY THE NEW YORK STATE DEPARTMENT OF HEALTH OF THE
PURCHASERS TO SERVE AS RECEIVERS, AND (C) GRANTING RELATED RELIEF**

The Good Samaritan Lutheran Health Care Center, Inc. ("**Good Samaritan**") and

Kenwood Manor, Inc. ("**Kenwood**" and together with Good Samaritan, the "**Debtors**"), by and

through their proposed undersigned counsel, file this motion seeking the entry of an order

---

[1]The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are: Good Samaritan Lutheran Health Care Center, Inc. d/b/a Bethlehem Commons Care Center (0663) and
Kenwood Manor, Inc. (8178).

substantially in the form attached hereto as <u>Exhibit A</u> (the "**Sale Order**") (A) approving the sale of all of the Debtors' real property (the "**Debtors' Real Property**") and substantially all of their personal property (the "**Debtors' Personal Property**"; and together with the Debtors' Real Property, the "**Sale Assets**"), free and clear of all liens, claims, encumbrances, and other interests except as expressly assumed in the Purchase Agreements (as hereinafter defined) to Purchasers (as hereinafter defined); (B) allowing the appointment by the New York State Department of Health (the "**DOH**") of the Purchasers to serve as receivers pursuant to the Receivership Agreements (as hereinafter defined); and (C) granting related relief (the "**Sale Motion**").

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Sale Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b).

2.      Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are sections 105(a) and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 6004-1 and 6004-2 of the Local Bankruptcy Rules for the Northern District of New York (the "**Local Bankruptcy Rules**").

## FACTS[2]

### A.    Background

4.      On December 12, 2019 (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court commencing a case under Chapter 11 of the Bankruptcy Code (each a "**Chapter 11 Case**", and together, the **"Chapter 11 Cases"**).

5.      On December 20, 2019, the Court entered an Order authorizing the joint administration of the Bankruptcy Cases (Dkt. No. 49).

6.      The Debtors remain in possession of their assets, and continue to operate and manage their businesses as debtors-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

7.      No trustee, examiner or official committee of unsecured creditors has been appointed in the Chapter 11 Cases.

8.      As detailed in the First Day Declaration, Good Samaritan operates a 120-bed nonprofit skilled nursing facility (the "**Good Samaritan Facility**") certified by the DOH under N.Y. Pub. Health L. § 2810.  Kenwood operates a 66-bed DOH-certified adult home (the "**Kenwood Facility**", and together with the Good Samaritan Facility, the "**Facilities**").

9.      The Facilities are located on one campus in Delmar, New York, known as the Good Samaritan Village.  Good Samaritan owns the building at which the Good Samaritan Facility

---

[2]    A detailed description of the Debtors' businesses, capital structure, and the reasons for commencing the Chapter 11 Cases is set forth in the *Declaration of Laraine Fellegra in Support of First Day Relief*, filed with the Court (Dkt. No.3) (the "**First Day Declaration**").

operates and the approximately 6.5-acre parcel on which the building sits (the "**Good Samaritan Real Property**").  Kenwood owns the building at which the Kenwood Facility operates and the approximately 1.7-acre parcel on which the building sits (the "**Kenwood Real Property**", and together with the Good Samaritan Real Property, the "**Real Property**").

## B.    **DIP Financing**

10.    Pursuant to an Interim Order entered on December 20, 2019 (Dkt. No. 50), the Debtors obtained authority to use cash collateral and to obtain additional debtor-in-possession financing in the form of a delayed draw term loan from Amalgamated Bank (the "**DIP Lender**") in the principal amount of one million dollars ($1,000,000) (the "**DIP Facility**").  As set forth in the First Day Declaration, the Debtors also obtained a prepetition subordinated secured loan from their parent company, The Lutheran Care Network ("**TLCN**"), in the amount of five hundred thousand dollars ($500,000) which was largely used to fund retainers for the Debtors' bankruptcy professionals. The DIP Facility is conditioned upon, among other things, the Debtors having an executed agreement for the sale of substantially all of their assets. The DIP Facility also imposes milestones that the Debtors must meet which, if not met, would constitute a breach of the DIP Facility.  A critical milestone is that the Debtors must obtain the entry of an order approving the sale of their assets by January 24, 2020[3]. Given the Debtors' current financial condition, financing arrangements and capital structure, the Debtors were unable to obtain financing from sources other than the DIP Lender on better terms than those reflected in the DIP Facility.

---

[3]    The Debtors and the DIP Lender currently are in negotiations to extend this date for a brief period.

4

C.    **Efforts to Sell the Sale Assets**

11.    The Debtors have been exploring a sale of the Sale Assets for several years and have been experiencing unsustainable losses for more than a year. While there have been numerous interested purchasers, and the Debtors have engaged in intensive, arms-length negotiations regarding term sheets and sale documents, the Debtors have not been able to sell the Sale Assets. Specifically, over the past several years, the Debtors have obtained two executed asset purchase agreements (including those that are the subject of this Sale Motion), have negotiated an asset purchase agreement with another potential purchaser that ultimately was not signed, and have obtained multiple executed letters of intent, that did not progress to sale documentation. Unfortunately, as time passed, the purchase price for the Debtors' assets has diminished.

12.    A primary reason cited by each of the potential purchasers for not moving forward with their purchase of the Sale Assets is that the benefits afforded to workers under the Debtors' Collective Bargaining Agreements (the "**CBAs**") with 1199SEIU United Healthcare Workers East (the "**Union**") are excessive and materially inconsistent with the benefits afforded to workers at similar care facilities in the Debtors' geographic region[4]. As a prerequisite to their purchase of the Sale Assets, several of these interested parties attempted to negotiate with the Union to modify the employer obligations under the CBAs, but they were unsuccessful. Similarly, the Debtors have had several meetings with the Union and attempted, unsuccessfully, to negotiate relief under the CBAs. Accordingly, despite their interest in owning the Sale Assets, several potential purchasers

---

[4]    The Debtors understand that the terms of their agreements with the Union are materially inconsistent with the terms of the Purchasers' agreements with the same Union relating to one or more facilities already owned by affiliates of the Purchasers in the same geographic area as the Debtors' Facilities.

refused to move forward with their purchase due to what they expressed to be the Debtors' overly

burdensome CBAs[5].

13.    Finally, in May 2019, the Debtors retained Blueprint Healthcare Real Estate

Advisors, LLC ("**Blueprint**") on an exclusive basis to market the Sale Assets for a three-month

period. Blueprint has a national platform, and according to its website, was named the 2018 market

leader in the seniors housing and care space. Chris Hyldahl, the Executive Managing Director and

Co-Founder of Blueprint, personally worked with the Debtors. According to Blueprint's website,

Mr. Hyldahl has closed more than $3 billion of senior housing transactions.

14.    Within a week of its engagement, Blueprint identified a buyer for the Sale Assets,

and the parties engaged in extensive negotiations and shared numerous drafts of sale documents

throughout Blueprint's engagement. Sometime in mid-August 2019, negotiations between the

potential purchaser and the Debtors turned to the CBAs and broke down.

15.    Blueprint was not able to deliver any other potential purchaser of the Sale Assets

by the time its contract expired at the end of August 2019. At the close of Blueprint's engagement,

the one interested purchaser identified by Blueprint had not executed a term sheet or a contract to

---

[5]    The Debtors understand that there are "Upstate" union contracts in the State of New York
and "Downstate" union contracts within the State of New York. The Downstate contracts
tend to exist in the metropolitan New York City area and provide greater benefits to workers
at a greater cost to employers. Employers in the metropolitan New York City area are able to
afford these benefits because the Medicare reimbursement rates per bed on a daily basis are
substantially higher in the metropolitan New York City area than the reimbursement rates in
update New York. The Debtors believe that their CBAs are akin to "Downstate" contracts,
while their Medicaid reimbursement rates are lower "Upstate" rates.

purchase the Sale Assets, and the Debtors had incurred significant legal fees negotiating with the potential purchaser on numerous draft sale documents.

16.    Once Blueprint's contract expired, the Debtors began calling upon previously interested purchasers to determine whether any of them remained interested in purchasing the Sale Assets. Centers Health Care ("**Centers**") stated that it remained interested in purchasing the Sale Assets but would not assume the Debtors' obligations under the CBAs.

**D.    The Sale**

17.    Following approximately three months of negotiations, the Debtors and Centers have agreed upon terms pursuant to which affiliates of Centers (collectively, the "**Purchasers**") will purchase the Sale Assets.  The agreement between Centers and each Debtor, is set forth in three separate documents (the "**Sale Agreements**"), as follows: (a) the Asset Purchase Agreements, one for each Debtor, pursuant to which an affiliate of Centers will purchase each of the Debtors' Facilities[6] (the "**Facilities Purchaser**"); (b) the Purchase and Sale Agreements, one for each Debtor, pursuant to which an affiliate of Centers will purchase each of the Debtors' Real Property[7]; and (c) the Receivership Agreements, one for each Debtor, pursuant to which the DOH, in accordance with N.Y. Pub. Health L. § 2810, will appoint the Facilities Purchasers to serve as the receivers for the respective Debtor's Facilities after entry of the Sale Order and until such time

---

[6]    Delmar SNF Operations Associates, LLC is the purchaser of the Good Samaritan Facility and Delmar AH Operations Associates, LLC is the purchaser of the Kenwood Facility. The registered address of both entities is c/o Isidor D. Friedenberg, Esq., 2 Cara Drive, Suffern, New York 10901.

[7]    Delmar SNF Realty Associates, LLC is the purchaser of the Good Samaritan Real Property and Delmar AH Realty Associates, LLC is the purchaser of the Kenwood Real Property. The registered address of both entities is c/o Isidor D. Friedenberg, Esq., 2 Cara Drive, Suffern, New York 10901.

as the sale closes (the "**Interim Period**"). True and correct copies of the Good Samaritan Asset Purchase Agreement, Purchase and Sale Agreement, and Receivership Agreement are attached hereto as <u>Exhibit B</u>; true and correct copies of Kenwood's Asset Purchase Agreement, Purchase and Sale Agreement, and Receivership Agreement are attached hereto as <u>Exhibit C</u>.

18.     Pursuant to the Sale Agreements, the Purchasers will pay the aggregate price of $7.5 million (the "**Purchase Price**") to acquire the Sale Assets. The essential contingencies to the closing of the sale are: (a) entry of an Order by the Bankruptcy Court, in form and substance satisfactory to the Purchasers, approving the sale and the Sale Agreements (the "**Sale Order**"); (b) the rejection by the Debtors of the CBAs prior to the entry of the Sale Order; and (c) the approvals from the DOH and the Attorney General of the State of New York (the "**AG**"), discussed below, which are required for the transfer of ownership of the Debtors' Facilities to the Purchasers.

19.     While the Purchasers are ready, willing and able and would like to, immediately take title to the Sale Assets, and the Debtors need to transfer the Sale Assets promptly before they run out of money, the asset transfer approval processes to be undertaken by the DOH and the AG could take from several months to a couple of years to complete. In this case, we expect the approval process will be expedited since the owners of Centers own/operate through their subsidiaries more than thirty senior housing and nursing care facilities within the State of New York. However, the Debtors do not have a commitment from the DOH or the AG to a timeframe within which they will rule upon the request for authority to transfer title to the Debtors' Facilities, and it is anticipated that the Debtors will run out of funding shortly after the Sale Order is entered. Accordingly, the Purchasers have agreed to fund the Debtors' operations during the Interim Period, but only through their appointment by the DOH to serve as a receiver.

E.    **Receivership**

20.    The DIP Facility is not sufficient to fund the Debtors' operations through the Interim Period, assuming the Interim Period continues for more than a month or so. Accordingly, the Purchasers have agreed to fund the Debtors' operations during the Interim Period, but only through the Facilities Purchasers' appointment by the DOH, under N.Y. Pub. Health L. § 2810, to serve as a receiver for the Facilities. Such appointment will allow the Facilities Purchasers to operate the Facilities for their own account, including: (a) paying the Debtors' operating expenses with Purchasers' funds to the extent such expenses exceed the revenue generated by the Facilities, and enjoying any profits achieved through the operation of their respective Facilities during the receivership; and (b) conducting the day-to-day operations of the Facilities, including interactions with the Debtors' employees, suppliers, and regulatory authorities. While the Bankruptcy Code prohibits the Bankruptcy Court's appointment of a receiver under Chapter 11 that essentially replaces a debtor-in-possession or an operating or liquidating trustee, the receivership in this case is a healthcare receivership which will not afford the receiver all of the rights of a debtor-in-possession or a trustee. Moreover, the DOH's appointment of the Facilities Purchasers as receivers under New York Public Health Law is essential, given (a) the dire financial condition of the Debtors, (b) the regulations imposed by the DOH on the management and operation of regulated facilities such as the Debtors' (c) the length of time the DOH and the AG could take to approve the transfer of title to the Facilities, and (d) the Facilities Purchasers' requirement that they be appointed as receivers as a precondition to funding the Debtors' operations during the Interim Period. Significantly, allowing the appointment of the Facilities Purchasers to serve as receivers, as proposed, is in the best interests of the Debtors and their creditors, as it allows for the financing of the Debtors' operations through the Interim Period at no cost to the Debtors or their estates.

21.     Given the limited amount of financing the DIP Lender is willing to extend to the
Debtors and the Debtors' unsuccessful efforts to obtain alternative funding, it is unlikely that the
Debtors will be able to continue operations during the Interim Period unless the Purchasers fund
the Debtors' operations.  The Purchasers are not willing to fund the Debtors' potentially significant
operational costs during the Interim Period unless they are able to operate the Facilities and the
Purchasers believe the only way to ensure that they can operate the Facilities without violating
New York Public Health Laws is through their appointment as receivers by the DOH under N.Y.
Pub. Health L. § 2810.

**RELIEF REQUESTED**

22.     By this Sale Motion, the Debtors seek authority to sell the Sale Assets to the
Purchasers through a private sale. After a substantial effort to sell the Sale Assets and extensive
negotiations with the Purchasers, each of the Debtors and the respective Purchasers have entered
into the Sale Agreements. The Debtors believe that the terms of the Sale Agreements represent the
highest and best offer for the Sale Assets, and that a public sale will only cause additional strain
on the Debtors' severely limited resources, unnecessary delay, and ultimately less value realized
for the Debtors' estates and creditors.

23.     In satisfaction of Local Bankruptcy Rule 6004-1(c), the Debtors provide the
following additional information:

a.     In addition to the DIP Facility, the DIP Lender, Amalgamated Bank, holds
a prepetition claim against the Debtors for which they are jointly and severally liable in the
approximate amount of $4.2 million which is secured by a lien on substantially all of the Debtors'
real and personal property. As of the anticipated closing of the Sale, the Debtors anticipate that

10

they will have drawn the full $1 million available under the DIP Facility. Accordingly at the time

of the closing of the Sale Assets, it is anticipated that the Debtors will owe Amalgamated Bank the

approximate principal amount of $5.2 Million, plus additional interest, fees and costs, which claim

is entitled to priority as a result of the bank's prepetition first priority liens and the DIP Facility

superpriority lien

      b.     In addition to a large unsecured claim against the Debtors based upon

advances made and services rendered under a management agreement, TLCN has a prepetition

claim against the Debtors in the principal amount of $500,000, plus interest, which is secured by

a mortgage against the Real Property. TLCN's mortgage that is subordinate to Amalgamated

Bank's liens.

      c.     The secured amounts owed by the Debtors to the DIP Lender and TLCN

constitute all of the Debtors' secured claims. It is anticipated that the sale of the Sale Assets will

generate sufficient funds to pay in full the secured claims against the Debtors and claims entitled

to priority under section 507 of the Bankruptcy Code. After payment of these claims, it is further

anticipated that there will be funds available to pay a portion of unsecured claims against the

Debtors.

      d.     There are no finder's fees, commissions or fees, other than ordinary and

customary closing costs (except transfer taxes which are not payable pursuant to New York state

law and 11 U.S.C. § 1146) and professional fees incurred by the Debtors' professionals retained

pursuant to Order of this Court, to be paid from the sale proceeds in connection with the proposed

sale of the Sale Assets.

      e.     The Debtors are current with respect to the payment of real estate taxes.

f.      The Debtors have not yet filed a proposed plan of reorganization or disclosure statement, but anticipate filing and obtaining confirmation of a chapter 11 plan prior to the closing of the Sale.

24.      The Debtors seek entry of the Sale Order, substantially in the form of <u>Exhibit A</u>: (a) authorizing the Debtors to enter into the Sale Agreements with the Purchasers; (b) authorizing the sale of the Sale Assets, free and clear of all liens, claims, encumbrances, and other interests with such liens, claims, encumbrances and other interests to attach to the proceeds of the sale in the same priority and order that they exist immediately prior to the closing of the sale; (c) allowing, but not ordering or requiring, the DOH to appoint the Facilities Purchasers to serve as the receivers of the Facilities under New York Public Health laws during the Interim Period; and (d) granting such other relief as the Court deems just and proper. The Debtors submit that the sale of the Sale Assets pursuant to the terms and conditions of the Sale Agreements will (a) preserve and protect the residents' quality of care, (b) maximize value for the Debtors' estates and their creditors and, (c) preserve jobs.

**BASIS FOR RELIEF**

**A.      The Sale Represents an Exercise of the Debtors' Sound Business Judgment and Should Be Approved Pursuant to 11 U.S.C. §§ 105(a) and 363(b).**

25.      Pursuant to section 105(a) of the Bankruptcy Code, "the court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title" 11 U.S.C. § 105(a). Section 363(b) of the Bankruptcy Code and Rule 6004 of the Bankruptcy Rules govern the sale of assets outside the ordinary course of business. Section 363(b)(1) provides, in relevant part, that a debtor-in-possession may, after notice and hearing, "use, sell or lease, other than in the ordinary course of business, property of the estate." *See* 11 U.S.C. § 363 (b)(l) and (f).

26.     The terms of section 363 sales are typically within the sound discretion of the debtors and it is well-settled that a court may approve such a sale upon determining that a good business justification exists for proceeding. *See In re MF Global, Inc.*, 535 B.R. 596, 605 (Bankr. S.D.N.Y. 2015) ("Courts should not generally interfere with business decisions absent a showing of 'bad faith, self-interest, or gross negligence.'") (quoting *In re Borders Grp., Inc.*, 453 B.R. 477, 483 (Bankr. S.D.N.Y. 2011)); *In re GSC, Inc.*, 453 B.R. 132, 173-74 (Bankr. S.D.N.Y. 2011) ("Courts give deference to the debtor as long as there is a 'reasonable basis for its business decision.'") (quoting *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 676 (Bankr. S.D.N.Y. 1989) (sale approved as exercise of the debtors' independent good faith and non-coerced business judgment).

27.     In addition, the Bankruptcy Code permits a debtor to sell property outside the ordinary course of business through a private sale, and affords bankruptcy courts "broad authority" to approve such sales.  *See MF Global*, 535 B.R. at 606 (approving private sale of debtors' assets to sole interested purchaser).  Further, a chapter 11 debtor may sell all or substantially all of its assets pursuant to section 363(b) prior to proposing a chapter 11 plan. *See GSC, Inc.*, 453 B.R. at 155 ("A debtor may sell substantially all of its assts as a going concern and later submit a plan of liquidation providing for the distribution of the proceeds of the sale."). Such a strategy is particularly appropriate "where there is a need to preserve the going concern value" of the debtor's assets. *Id.* (quoting *In re Chrysler*, 405 B.R. 84, 96 (Bankr. S.D.N.Y. 2009), *aff'd*, 576 F.3d 108 (2d Cir. 2009)). A court may approve such a sale where the debtor articulates a good business justification for proceeding with the sale before filing a plan of reorganization. *Id.* (citing *In re Boston Generating, LLC*, 440 B.R. 302, 329 (Bankr. S.D.N.Y. 2010) ("[T]he Court concludes that

there exists an articulated business justification and a good business reason to grant the Sale

Motion now and not wait for confirmation of a plan of reorganization.")).

28.    The Second Circuit has indicated that the following non-exclusive factors should

be considered during the sale approval process: (i) the proportionate value of the assets to the estate

as a whole; (ii) the amount of elapsed time since the filing; (iii) the likelihood that a plan of

reorganization will be proposed and confirmed in the near future; (iv) the effect of the proposed

disposition on future plans of reorganization; (v) the proceeds to be obtained from the disposition

vis-a-vis any appraisals of the property; (vi) which of the alternatives of use, sale or lease the

proposal envisions; and (vii) whether the asset is increasing or decreasing in value. *Boston*

*Generating, LLC*, 440 B.R. at 321-22 (relying on factors established by the Second Circuit in

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir.

1983)).

29.    Due to the extensive marketing of the Debtors' assets, and the turmoil in the

healthcare industry, it is highly unlikely that an auction and bidding process would yield a higher

and better offer for the Debtors' assets. Accordingly, the proposed private sale will (a) preserve

and protect the residents' quality of care, (b) maximize the value of the Debtors' estates for the

benefit of their creditors by, among other things, avoiding additional cost and delay, and (c)

preserve jobs.

30.    The Debtors' decisions to enter into the Sale Agreements, including the

Receivership Agreements, were based upon their inability to reduce their union expenses, as well

as their inability to obtain sufficient funding for their operations. Prior to the Petition Date, the

Debtors tried for several years to sell the Sale Assets and simultaneously, to obtain additional or

14

alternative financing for their operations, both to no avail.  Absent the prompt entry of the Sale

Order in accordance with the timeline established by the DIP Facility, the Debtors likely will run

out of money and be forced either (a) to cease operations, or (b) to surrender their assets to the

State of New York. If the Debtors' assets are surrendered to the State of New York, the State likely

will attempt to sell the assets or otherwise conduct an orderly wind-down of the Debtors'

operations. Either option would cause (a) serious, unnecessary disruption to the Debtors' residents

and a potential reduction in the quality of their care, (b) a significant devaluation of the Sale Assets,

which almost certainly will extinguish any value for unsecured creditors, and (c) loss of

employment to the Debtors' employees, including their non-Union employees. A prompt sale of

the Sale Assets is necessary to preserve quality of care of the Debtors' residents, to prevent the

accrual of unnecessary and burdensome administrative expenses, and to stop the hemorrhaging of

cash from the Debtors' operations.

31.     The Debtors have limited post-petition financing. The sale of the Sale Assets

requires the approval of the DOH and the AG, making the expedited entry of the Sale Order an

absolute necessity if the Debtors are to be able to remain operational until the sale can be closed.

Because the Debtors will be unable to self-fund during the Interim Period, and in order to maximize

value for the benefit of their creditors, the Debtors have obtained the agreement of the Purchasers

to fund, interest-free and without cost to the Debtors, the Debtors' operations during the pendency

of the DOH and AG approval applications. In exchange for the Purchasers' agreement to fund the

Debtors' operations and certain capital expenses during the Interim Period without taking any

credit against the Purchase Price, the Purchasers require that they be appointed by the DOH under

the New York Public Health Law, to serve as receivers for the Facilities. Under this arrangement,

the Purchasers will cover, with their own funds, any monthly cash shortfalls incurred in the

15

Debtors' operations and pay certain capital expenditures that come due. Absent appointment of the Facilities Purchasers as receivers, as proposed, the Debtors likely will exhaust their cash resources in spring, 2020, and it is a near-certainty that the DOH and the AG will not have approved the transfer of the Sale Assets to the Purchasers by that time.

32.    The sale to the Purchasers as proposed will maintain quality of care of the Debtors' residents, allow many (if not most) of the Debtors' employees to retain their jobs, and preserve value for the Debtors' creditors.

33.    The Debtors further submit that the Purchase Price represents fair value for the Sale Assets and provides the only feasible alternative to the likely closure of the Debtors' facilities. Extensive marketing of the Sale Assets has been conducted over several years, and while some of the previous offers (which did not lead to executed purchase agreements) may have been higher years ago, the offering prices have decreased, consistent with the state of the industry generally, and there is no indication that the price for the Sale Assets will not continue to decrease in the near-term if the proposed sale is not approved. As such, the Debtors submit that the proposed sale of the Sale Assets offers the greatest benefit to the Debtors' residents, its creditors and its employees, and its acceptance is within the informed and sound business judgment of the Debtors.

34.    As contemplated, the sale of the Sale Assets will result in the sale of virtually all of the Debtors' assets outside of a Chapter 11 plan, although the Debtors intend to propose and file a plan of reorganization as soon as practicable following the entry of the Sale Order.

**B.**    **Regulatory Approval**

35.    Pursuant to section 363(d) and 541(f) of the Bankruptcy Code, any sale of a non-profit debtor's property must comply with applicable non-bankruptcy law. *See* 11 U.S.C. §

363(d)(1). Section 363(d) provides that "[t]he trustee may use, sell or lease property under subsection (b) or (c) of this section only – (1) in accordance with applicable nonbankruptcy law that governs the transfer of property by a corporation that is not a moneyed business or commercial corporation . . . ." Section 541(f) further provides that the transfer of a non-profit entity's assets to a for-profit entity must comply with applicable non-bankruptcy law.

36.    Approval of the transfer of the Sale Assets requires approval from, among others, the DOH. *See* N.Y. Pub. Health Law § 2801-1 *et seq.* In accordance with section 2801-a of the New York Public Health Law, an applicant proposing to establish and operate a nursing home must make written application for authorization to the Commissioner of the DOH (the "**Commissioner**"). Before the Commissioner can act on the application it must be approved by the Public Health Council, the relevant health systems agency, and the State Hospital Review and Planning Council.

37.    In addition, transfer of the Debtors' assets will require approval of either the Supreme Court of New York or the AG. *See* N.Y. Not-for-Profit Corporation Law (the "**N-PCL**") §§ 510, 511 and 511-a. Section 510 of the N-PCL requires a New York not-for-profit corporation to obtain the approval of either the Supreme Court of New York or the AG prior to transferring substantially all of its assets. Section 511 governs the procedures for obtaining court approval while Section 511-A governs the procedures for obtaining approval from the AG. Both sections require the transferor to provide a description of the non-profit corporation's business, the assets to be sold, and to demonstrate, *inter alia*, that the transaction is "fair and reasonable."

38.    In light of the above-summarized state regulatory framework, the Sale Agreements provide that the Purchasers shall, at their own cost and expense, promptly after entry of the Sale

17

Order by the Court, submit to all regulatory authorities all applications for healthcare regulatory consents, licenses and/or approvals required for the transfer of the Sale Assets and the continued operation of the Debtors' Facilities. The Debtors shall cooperate, to the extent necessary, in the preparation and prosecution of all such applications The Debtors and the Purchasers reasonably expect that all necessary regulatory approvals will be granted since affiliates of Centers operate many facilities similar to the Debtors' throughout the State of New York. To the extent any regulatory body or governmental agency fails to approve the sale to the Purchasers, the Debtors reserve all rights to challenge such determination.

39.    Based on the terms of the Sale Agreements and the Debtors' and Purchasers' agreement thereunder to cooperate and comply with all state and federal regulatory requirements, the Debtors submit that the sale to the Purchasers complies with applicable non-bankruptcy law in accordance with section 363(d) of the Bankruptcy Code.

## C.    Entry into the Receivership Agreements Should be Approved

40.    New York bankruptcy courts have permitted healthcare debtors to enter into receivership agreements with the purchaser of their assets, where the debtors have demonstrated that entry into such agreement is within the sound business judgment of the debtor. *See, e.g.*, *In re Long Beach Medical Center*, Case No. 14-70593-ast (Bankr. E.D.N.Y. May 22, 2014) [Dkt. No. 185] (order authorizing, *inter alia*, debtor nursing home to enter into receivership agreement with purchaser and permitting debtor to request, pursuant to N.Y. Publ. Health L. § 2810, that the DOH appoint the purchaser as receiver of the nursing home); *In re Saint Vincents Catholic Medical Centers of New York*, Case No. 10-11963 (CGM) (Bankr. S.D.N.Y. Oct. 12, 2010) [Dkt. No. 1911] (order authorizing, *inter alia*, the debtors, owners of nursing homes, to enter into

receivership agreement with purchaser allowing purchaser to operate the debtors' businesses pending state regulatory approval and closing of the sale) (the "**St. Vincents Order**").

41.    In *St. Vincents*, the debtors sought approval of the sale of the debtors' New York nursing and rehabilitative care facility. *See St. Vincents Catholic Medical Centers of New York*, Case No. 10-11963 (CGM) (Oct. 12, 2010) [Dkt. No. 1694] (motion requesting, *inter alia*, approval of sale and entry into receivership agreement with purchaser). The asset purchase agreement was conditioned on the debtors' ability to enter into a receivership agreement pursuant to which the purchaser would operate the facility pending the closing of the sale. *Id.* at ¶ 18. The debtors explained that, because of the need to obtain state regulatory approval of the transaction, there could be a period of time between the court's approving the sale and the closing date. *Id.* at ¶ 29. Accordingly, the debtors submitted that it was necessary to enter into the agreement to preserve the nursing facility's services to its residents and to alleviate the debtors' ongoing expense of operating the facility. *Id.* at ¶ 96. The court authorized the debtors to enter into the receivership agreement, finding that it was a sound exercise of the debtors' business judgment because, among other things, the purchaser would not have consummated the sale otherwise. *See* St. Vincents Order, at p. 10, ¶ S.

42.    Similarly, in the case before the Court, the sale must be approved by the DOH and the AG pursuant to the State's regulatory framework. The Debtors do not have sufficient funds to maintain operations during the Interim Period and the Purchasers have offered to fund operations pending the obtaining of regulatory approval and the closing of the sale through their appointment as receivers under the New York State Public Health law. Accordingly, as a condition to entering into the Sale Agreement, the Purchasers have requested that the Debtors enter into the Receivership

19

Agreements pursuant to which it is contemplated that the DOH will appoint the Purchasers as receivers of the Facilities during the Interim Period. Because the Receivership Agreements are a critical part of the overall sale transaction and are necessary to continue the Debtors' businesses as going-concerns, this Court should approve the Debtors' entry into the Receivership Agreements as a sound exercise of the Debtors' business judgment.[8]

43.    In light of the Debtors' precarious financial condition, the sale to the Purchasers is critical to ensure the continuation of the Debtors' businesses as going concerns. As a result, because the Purchasers have conditioned the sale transaction on their appointment by the DOH as receivers of the Debtors' Facilities during the Interim Period, the Court should approve the Debtors' entry into the Receivership Agreements as a sound exercise of the Debtors' business judgment.

## D.    The Property Should be Sold Free and Clear of Liens

44.    Under section 363(f) of the Bankruptcy Code, a debtor may sell property free and clear of liens, claims and encumbrances under certain circumstances. *In re Smart World Tech., LLC*, 423 F.3d 166, 169 n. 3 (2d Cir. 2005) ("Section 363 permits sales of assets free and clear of claims and interests. It thus allows purchasers . . . to acquire assets without any accompanying liabilities.") (internal citation omitted)). Specifically, a debtor may sell assets free and clear provided that: (a) applicable nonbankruptcy law permits the sale of the property free and clear of

---

[8]    Section 105(b) of the Bankruptcy Code does not bar this Court from allowing the Debtors to enter into the Receivership Agreements. Section 105(b) provides that "a *court* may not appoint a receiver in a case *under this title*." (emphasis added). First, the Debtors are not requesting "a court" to appoint a receiver. Instead, the Debtors are requesting that the Bankruptcy Court allow the DOH to appoint the Purchasers to serve as receivers. Second, the Debtors are not asking for the appointment of a receiver under the Bankruptcy Code, but rather under § 2810 of the N.Y. Public Health Law.

such interests; (b) the entity holding the lien, claim or encumbrance consents to the sale; (c) the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest. 11 U.S.C. § 363(f). In order to sell assets free and clear, a debtor need only satisfy one of the above conditions. *See In re Dundee Equity Corp.*, No. 89-B-10233, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met.").

45.    The DIP Lender holds a lien or security interest against virtually all of the Sale Assets to secure its prepetition loan to the Debtors, as well as the DIP Loan. In addition, TLCN holds a mortgage, subordinate to the DIP Lender's liens, on the Real Property to secure TLCN's $500,000 prepetition loan to the Debtors. To the best of the Debtors' knowledge, no other parties have liens against or security interests in the Sale Assets. However, to the extent that any additional valid liens or security interests exist, such liens or security interests shall attach to the proceeds of the sale to the same extent and in the same order of priority as they exist immediately prior to the closing of the sale, and without prejudice to the Debtors' rights to object to the extent, validity or priority of such liens or security interests.

46.    In accordance with the provisions of the Sale Agreements and section 363(f), the Debtors request approval to transfer the Sale Assets to the Purchasers free and clear of all liens, claims and encumbrances. Amalgamated Bank and TLCN have been fully apprised of the negotiations with the Purchasers and have had the opportunity to review and comment upon drafts of the Sale Agreements and this Sale Motion. Nonetheless, they are being provided with notice of

this Sale Motion and the proposed sale and will have an opportunity to object to the relief requested

by this Sale Motion. Any purported holder of a lien or security interest that does not object to the

sale shall be deemed to have consented. *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-

286 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an

interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the

interest holder, and lack of objection (provided of course there is notice) counts as consent."); *see*

*also In re Enron Corp.*, No. 01-16034 (AJG), 2003 WL 21755006, at *2 (Bankr. S.D.N.Y. 2003)

(order deeming all parties who did not object to proposed sale to have consented under section

363(f)(2)); *Hargrave v. Township of Pemberton* (*In re Tabone, Inc.*), 175 B.R. 855, 858 (Bankr.

D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies

section 363(f)(2)).

47.    In this case, at least three separate grounds exist for permitting the Debtors to

transfer the Sale Assets free and clear of liens and encumbrances. First, both Amalgamated Bank

and TLCN have been fully appraised of the sale terms and have had the opportunity to review the

Sale Agreements and provide comment, and have consented to the sale free and clear of their liens

and security interests provided that their secured claims are paid in full. *See* 11 U.S.C. § 363(f)(2).

Second, the price at which the Sale Assets will be sold ($7.5 million) is greater than the aggregate

value of all liens on the sale Assets (approximately $5.7 million). *See* 11 U.S.C. § 363(f)(3). Third,

because both TLCN's and Amalgamated Bank's liens on the Sale Assets are security for money

obligations of the Debtors, outside of bankruptcy the Debtors could compel them to accept money

in satisfaction of their interests in the Sale Assets. *See* 11 U.S.C. § 363(f)(5).

48.     Accordingly, to the extent any party holding a lien against or security interest in the Sale Assets fails to object to the relief requested in this Sale Motion, the Sale Assets may be sold free and clear of all liens, claims and encumbrances pursuant to section 363(f)(2) of the Bankruptcy Code.

**E.      The Purchasers Are Entitled to the Protections of Section 363(m)**

49.     Section 363(m) affords protection to a good faith purchaser of a debtor's interest in property, regardless of whether the sale is later reversed or modified on appeal, provided no stay of the Sale Order is in effect at the time the assets are sold. Section 363(m) provides, in pertinent part:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m). *See also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (Bankr. S.D.N.Y. 1994) ("Section 363(m) of the Bankruptcy Code, which provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal."); *In re Stein & Day, Inc.*, 113 B.R. 157 (Bankr. S.D.N.Y. 1990) ("[P]ursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal.").

50.     The Second Circuit has held that a party must show something akin to fraud or collusion between a purchaser and the debtor-in-possession or trustee in order to demonstrate a lack of good faith. *In re Colony Hill Associates*, 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a purchaser's good faith status at a judicial

sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.").

51.    Here, the Purchasers are good faith purchasers as required by section 363(m) of the Bankruptcy Code. As previously indicated, the Sale Agreements are the product of extensive arms-length negotiations over a period of months, conducted in good faith, between the Debtors, Centers, and each parties' respective advisors. Accordingly, the Debtors request that the Court determine that the Purchasers are acting in good faith and are entitled to the protections of a good faith purchaser under section 363(m).

**F.    The Sale Is Exempt from Transfer and Similar Taxes**

52.    The sale of the Debtors' assets is exempt from state law sales taxes.

53.    Section 1146 of the Bankruptcy Code affords debtors a tax exemption for the transfer of property made under a chapter 11 plan, and the exemption extends to the sale of a debtor's property that occurs prior to confirmation of its chapter 11 plan.  *See In re New 118th, Inc.*, 398 B.R. 791, 798-99 (Bankr. S.D.N.Y. 2009) (holding that section 1146 exemption extended to sale of debtor's real estate which occurred prior to plan confirmation). In the case before the Court, it is anticipated that, due to the State regulatory approval process, the sale to the Purchasers will not close until after a plan of reorganization is confirmed in these cases.

54.    Additionally, pursuant to New York state law, the Debtors' sale of the Sale Assets is exempt from any state transfer taxes because it is being consummated under the Bankruptcy Code.  *See* N.Y. Tax Law § 1405(b)(8) ("The [real estate transfer] tax shall not apply to . . . [c]onveyances given pursuant to the federal bankruptcy act."). Accordingly, the Debtors

respectfully request that the Court find that the Debtors' estates are exempt from New York state real estate transfer taxes.

## NO PRIOR REQUEST

55.    No previous request for the relief sought herein has been made to this or any other court.

## NOTICE

56.    The Debtors shall cause a notice of the Sale Motion (the "Notice") in the form attached hereto as Exhibit D and  to be served via overnight mail, or electronic transmission followed by regular first class mail, on: (a) the Office of the United States Trustee for the Northern District of New York; (b) the Office of the Attorney General of the State of New York; (c) the New York State Department of Health; (d) the Debtors' twenty largest unsecured creditors on a consolidated basis; (e) counsel to Amalgamated Bank; (f) counsel to TLCN; (g) the Internal Revenue Service; (h) the Department of Medicaid, Department of Health, and Division of Health Services Regulation in the State of New York; (i) the U.S. Department of Health and Human Services; (j) all known creditors, and (k) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**").

57.    Objections, if any, to the sale or the Sale Order must be filed with this Court, so as to be received no later than 4:00 p.m. (prevailing Eastern Time) seven days prior to the sale hearing (the "**Objection Deadline**") by: (a) the Office of the United States Trustee for the Northern District of New York, 11A Clinton Avenue, Room 620, Albany, New York 12207, Attn: Lisa Penpraze and Amy J. Ginsberg; (b) counsel for Debtors, Stradley Ronon Stevens and Young, LLP, 100 Park Avenue, Suite 2000, New York, NY 10017, Attn: Deborah A. Reperowitz, and Daniel M. Pereira;

(c) counsel for the Purchasers, Isidor D. Friedenberg, Esq., 2 Cara Drive, Suffern, New York 10901; (d) counsel for Amalgamated Bank, Porzio, Bromberg & Newman, P.C., 100 Southgate Parkway, Morristown, New Jersey 07962, Attn: John S. Mairo and Kelly Deeanne Curtin; (e) counsel for TLCN, O'Connell & Aronowitz, 54 State Street, Albany, New York 12207, Attn: Daniel J. Tuczinski; and (f) The Lutheran Care Network, Incorporated, 700 White Plains Road, Suite 377, Scarsdale, New York 10583.

58.     Pursuant to Bankruptcy Rules 2002(c) and 6004, and Local Bankruptcy Rule 6004, the Debtors are required to give 21 days' notice of any proposed sale of property not in the ordinary course of business. Bankruptcy Rule 2002(c) further provides that such notice must include the time and place of the sale hearing, and the time fixed for objections to the sale, and Local Bankruptcy Rule 6004-2(b) sets forth additional information that must be included in the Notice. The Notice sets forth all the information required by the applicable Bankruptcy Rules and Local Rules to allow creditors and parties-in-interest to object thereto, including: the time, date, and location of the sale hearing.  In addition to being served upon creditors and parties-in-interest, the Notice will be posted on the website of the Debtors' claims and noticing agent, Omni Management Group, at https://cases.omniagentsolutions.com.

59.     The Debtors submit that the Notice constitutes good and adequate notice of the sale. Because the Debtors are providing notice of this Sale Motion and the sale to all known creditors and parties-in-interest, the Debtors submit that the notice requirements of Bankruptcy Rules 2002(2) and 6004 and Local Bankruptcy Rule 6004-2 are satisfied.

**WHEREFORE**, the Debtors respectfully request the entry of the Sale Order substantially in the form annexed hereto as Exhibit A, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: January 22, 2020                    **Stradley Ronon Stevens & Young, LLP**

By: */s/ Deborah A. Reperowitz*
Deborah A. Reperowitz
100 Park Avenue, Suite 2000
New York, NY 10017

and

Daniel M. Pereira
Mischa S. Wheat
2005 Market Street, Suite 2600
Philadelphia, PA 19103

*Proposed Counsel for Debtors and
Debtors-in-Possession*