**Exhibit B**

**Good Samaritan Sale Agreements**

*Execution Copy*

**ASSET PURCHASE AGREEMENT**

by and between

**GOOD SAMARITAN LUTHERAN HEALTH CARE CENTER, INC.**

and

**DELMAR SNF OPERATIONS ASSOCIATES, LLC**

Dated as of December 10, 2019

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>"), is made and entered into as of December 10, 2019, by and between Good Samaritan Lutheran Health Care Center, Inc., a New York not-for-profit corporation ("<u>Seller</u>"), and Delmar SNF Operations Associates, LLC, a New York limited liability company ("<u>Purchaser</u>").

## RECITALS

WHEREAS, Seller, along with certain of its Affiliates (collectively, the "<u>Debtors</u>"), will be filing for bankruptcy protection to become debtors-in-possession under Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "<u>Bankruptcy Code</u>"), and will be filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "<u>Bankruptcy Case</u>", with such date of filing of the Bankruptcy Case being the "<u>Petition Date</u>"), in the United States Bankruptcy Court for the Northern District of New York (the "<u>Bankruptcy Court</u>");

WHEREAS, the parties hereto are entering into this Agreement subject to the approval of the Bankruptcy Court and entry of the Sale Order (as defined below);

WHEREAS, Seller is engaged in the business of owning and operating a licensed 120 bed skilled nursing and residential health care facility under the name Bethlehem Commons Residential Care Center (the "<u>Business</u>" or the "<u>Facility</u>") at the premises known as 125 Rockefeller Road, Bethlehem, Albany County, New York (the "<u>Premises</u>"), which Premises are owned and operated by Seller; and

WHEREAS, subject to the approval of the Bankruptcy Court and in accordance with the terms of the Sale Order, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller pursuant to, *inter alia*, Sections 105, 363, and 365 of the Bankruptcy Code all of the Purchased Assets and Assumed Liabilities (each, as defined below), all as more specifically provided herein; and

WHEREAS, the Closing (defined below) is contingent upon the closing of the transactions contemplated by the Real Estate Contract (as defined below);

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1     <u>Certain Definitions</u>.

Unless the context otherwise requires or as otherwise defined herein, capitalized terms used in this Agreement shall have the meanings set forth in this <u>Section 1.1</u>:

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common

2

control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Antitrust Laws" means the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, the Donnelly Act, as amended, and the Hart-Scott-Rodino Antitrust Improvements Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, Orders, decrees, administrative or judicial doctrines or other Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Law to close.

"Closing Effective Date" means the earlier of (a) the Closing Date, or (b) the Receivership Date, if the Receivership Agreement becomes effective as contemplated by this Agreement.

"CMS" means the Centers for Medicare & Medicaid Services.

"Code" means the Internal Revenue Code of 1986, as amended.

"CON Application" means a Certificate of Need application with respect to the Business to be submitted by Purchaser to DOH.

"CON Approval" means the approval by DOH of a CON Application without contingencies or conditions that have not been satisfied, other than contingencies or conditions that may be satisfied in accordance with their terms after the Closing.

"Contemplated Transactions" means the transactions contemplated by this Agreement, namely, the Closing under this Agreement and the closing under the Real Estate Contract.

"Contract" means any written contract, indenture, note, bond, lease, license or other agreement, other than a real property lease, a personal property lease or an Intellectual Property License.

"Copyrights" means all copyrights and registrations and applications therefor and works of authorship, and mask work rights.

"Cost Reports" means all cost and other reports filed pursuant to the requirements of Healthcare Programs for payment or reimbursement of amounts due from such programs for services provided.

"Creditors' Committee" means the official committee of unsecured creditors of Seller appointed in connection with the Bankruptcy Case.

4326651v.5

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials exclusively related to the Business or the Purchased Assets, in each case whether or not in electronic form, other than Patient Records.

"DOH" means the Department of Health of the State of New York.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Contracts" means every Contract that is not an Assigned Contract or not otherwise specifically identified in Sections 2.1(a) through 2.1(k) hereto as a Purchased Asset.

"Furniture and Equipment" means all furniture, fixtures, furnishings, machinery, appliances and other equipment (including medical equipment) and leasehold improvements owned by Seller and used by Seller in the conduct of the Business, including all such desks, chairs, tables, Hardware, copiers, telephone lines, telecopy machines and other telecommunication equipment (and, to the extent assignable by Seller, the telephone numbers associated therewith used in the Ordinary Course of Business), cubicles and miscellaneous office furnishings.

"GAAP" means generally accepted accounting principles in the United States as of the date hereof.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hardware" means any and all computer and computer-related hardware, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Healthcare Program Liabilities" means all Liabilities under any Medical Reimbursement Program Law, including but not limited to any Liabilities arising at any time in connection with any rebasing, trend factor adjustments or Medicaid case mix adjustments relating to the Medicare and Medicaid provider numbers of Seller and related participation agreements.

"Healthcare Regulatory Consents" means in respect of Seller or Purchaser, as the case may be, (a) such consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Body as shall be required to be obtained and (b) such notifications to any Governmental Body as shall be required to be given by such party, in each case in order for such party to consummate the Contemplated Transactions in compliance with all applicable Laws relating to health care or healthcare services of any kind.  Without limiting the foregoing, Healthcare Regulatory Consents shall include (i) any such consents, approvals, authorizations, waivers, Orders, licenses or Permits, or notices to, the New York State Public Health Council,

4

CMS, and DOH and (ii) Purchaser obtaining a Certificate of Need from DOH with respect to its prospective operation of the Business following the Closing.

"Intellectual Property Licenses" means (a) any grant by Seller to a third Person of any right to use any of the Purchased Intellectual Property owned by Seller and (b) any grant to Seller of a right to use in connection with the Business any Intellectual Property Rights owned by any other Person, to the extent, and only to the extent, such right is transferable by Seller.

"Intellectual Property Rights" means all intellectual property rights available in respect of Copyrights, Marks, Software, trade secrets and Patents, whether registered or unregistered, and whether owned or licensed including, but not limited to, web sites and domain names.

"Intercompany Accounts Receivable" means any accounts receivable due to Seller from its Affiliates as of the Closing Date.

"Inventory" means all medical supplies, drugs, medications, food, janitorial, housekeeping and office supplies and other consumables located in or used in connection with the operation of the Business.

"IRS" means the Internal Revenue Service.

"Knowledge" means (i) with respect to Purchaser, the actual knowledge of those officers or Representatives of Purchaser identified in Section 1.1(a) of the Purchaser Disclosure Schedule and (ii) with respect to Seller, the actual knowledge of those officers of Seller or senior managers of the Business as of or prior to the Closing identified in Section 1.1(a) of the Seller Disclosure Schedule.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation enacted or issued by a Governmental Body.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, claims or alternative dispute resolution proceedings (public or private), or any proceedings by or before a Governmental Body.

"Liability or Liabilities" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all fines, penalties, interest, costs and expenses relating thereto.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement and transfer restriction under any agreement, except for any of the foregoing created by the acts or omissions of Purchaser or of the Receiver under the Receivership Agreement.

"Marks" means all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general

intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof.

"Material Adverse Effect" means (a) a material adverse effect on the ability of Seller to consummate the Contemplated Transactions or to perform its obligations under this Agreement other than effects arising from or relating to conditions created or permitted to exist by Seller (which conditions shall not include any condition that is beyond Seller's reasonable control) or (b) a material adverse effect on the Business (taken as a whole), including its assets, properties, results of operations or condition (financial or otherwise) as conducted on the date hereof, other than (in the case of clause (b) only) an effect resulting from any one or more of the following: (i) the effect of any change in the United States or foreign economies or securities or financial markets in general that does not materially disproportionately affect Seller; (ii) the effect of any change that generally affects the industry in which Seller operates (including a general adverse change in medical reimbursement rates); (iii) the effect of any changes in national or international political conditions, including any engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack occurring on or after the date of this Agreement that does not materially disproportionately affect Seller; (iv) the effect of any action taken by Purchaser or its Affiliates with respect to the Contemplated Transactions or with respect to Seller, including Seller's employees; (v) any matter of which Purchaser has Knowledge on the date hereof or, solely for purposes of determining whether the condition to the Closing set forth in Section 10.1(a) hereto has been satisfied, on the Closing Date, including those matters set forth in Section 1.1(b) of the Seller Disclosure Schedule; (vi) the effect of any change in applicable Laws or accounting rules; (vii) any effect resulting from the public announcement of this Agreement, compliance with terms of this Agreement or the consummation of the Contemplated Transactions; (viii) the effect of any action taken by Purchaser or its Affiliates under or in connection with the Receivership Agreement; (ix) the effect of any change occurring on or after the Closing Effective Date, or (x) any effect resulting from the filing or pendency of the Bankruptcy Case or Legal Proceedings relating thereto and reasonably anticipated effects thereof.

"Medicaid" means any state program for medical assistance administered under Title XIX of the Social Security Act.

"Medical Reimbursement Program" means Medicare, Medicaid, any other federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)), and any state sponsored reimbursement program.

"Medical Reimbursement Program Laws" means the Laws governing the Medical Reimbursement Programs, including but not limited to: 42 U.S.C. §§ 1320a-7, 1320a-7a, 1320a-7b and 1395nn; the False Claims Act (31 U.S.C. § 3729 et seq.); the False Statements Act (18 U.S.C. § 1001); the Program Fraud Civil Penalties Act (31 U.S.C. § 3801 et seq.); the anti-fraud and abuse provisions of the Health Insurance Portability and Accountability Act of 1996 (18 U.S.C. § 1347, 18 U.S.C. § 669, 18 U.S.C. § 1035, 18 U.S.C. § 1518; and the corresponding fraud and abuse, false claims and anti self-referral Laws of any other Governmental Body.

"Medicare" means the health insurance program administered under Title XVIII of the Social Security Act.

4326651v.5

"Order" means any order, injunction, judgment, decree, ruling, consent, approval, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business through the date hereof consistent with past practice, subject, however, to those actions necessary and incident, or otherwise relating, to the Bankruptcy Case.

"Organizational Documents" means (a) the articles or certificate of incorporation, the bylaws and any shareholders agreement of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and certificate of formation or organization of any limited liability company, (e) any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person, and (f) any amendment to any of the foregoing.

"Patents" means all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon.

"Patient Records" shall mean any documents containing information concerning medical, health care or behavioral health services provided to, or the medical, health care or behavioral health of any individual, or that are otherwise subject to regulation under applicable Law, including the Health Insurance Portability and Accountability Act of 1996, the Health Information Technology for Economic and Clinical Health Act, Title XIII of the American Recovery and Reinvestment Act of 2009, and all regulations promulgated pursuant thereto.

"Permits" means any approvals, authorizations, consents, licenses, permits, provider numbers, certificates of need, certificates of exemption, franchises, accreditations, registrations or certificates of a Governmental Body.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, association, estate, Governmental Body or other entity.

"Plan" means each material "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other material employee plan or agreement maintained by the Seller.

"Pre-Closing Accounts Receivable" means accounts receivable arising out of the rendition of services in the Ordinary Course of Business for dates of service occurring at any time prior to the Closing Effective Date.

"Purchased Intellectual Property" means all Intellectual Property Rights owned by Seller.

"Real Estate Contract" means the Purchase and Sale Agreement, dated as of the date hereof, among Seller and Delmar SNF Realty Associates, LLC (the "Real Estate Buyer"), pursuant to which the Real Estate Buyer shall purchase the Premises prior to, or contemporaneously with, the purchase of the Purchased Assets by Purchaser hereunder.

4326651v.5

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, or leaching of Hazardous Material into the indoor or outdoor environment, or into or out of any property.

"Representatives" means, with respect to any Person, any of its Affiliates and the directors, trustees, officers, members, employees, consultants, agents, advisors and other representatives of such Person or its Affiliates.

"Sale Motion" means the motion or motions of Seller seeking approval and entry of the Sale Order.

"Sale Order" means an order of the Bankruptcy Court approving the transactions contemplated by, and the terms contained in, this Agreement, the Real Estate Contract and the Receivership Agreement, which order shall be made on notice to the Existing Lender with an opportunity to object and to be heard, and shall include such other Bankruptcy Court orders which modify any of terms contained in this Agreement, the Real Estate Contract or the Receivership Agreement, and which order(s) shall in all events be in such form and substance as are acceptable to Purchaser. To the extent that Purchaser does not approve the Sale Order, it shall have the right to terminate this Agreement and receive the prompt refund of the Deposit.

"Software" means, except to the extent generally available for purchase from a third Person, any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (d) all documentation including user manuals and other training documentation related to any of the foregoing, in each case, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business. That portion of the Software that is owned by Seller is referred to herein as the "Proprietary Software," and that portion of the Software that is owned by any Person other than Seller is referred to herein as the "Third-Party Software."

"Tax Authority" means any federal, state or local government, or agency, instrumentality or employee thereof, charged with the administration of any Law relating to Taxes.

"Taxes" means (a) all federal, state, local or foreign taxes, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, unrelated business income, and estimated taxes, whether disputed or not, and (b) all interest, penalties and additions to tax or additional amounts imposed by any Taxing Authority in connection with any item described in clause (a).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs,

4326651v.5

subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or held for use in the Business, other than any in the form of Software.

"Universal Settlement" means the negotiated global agreement executed between Residential Health Care Facilities, respective Associations, and the State of New York, by and through New York State Department of Health, the Office of the Medicaid Inspector General and the New York State Division of the Budget in 2015. As part of this settlement, New York State agreed to make payments totaling $850 million over a five-year period in exchange for universal agreement among nursing homes to surrender their rights to pursue most pending Medicaid rate lawsuits and appeals, as well as certain future rights including to challenge Medicaid reimbursement and related decisions.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended.

Section 1.2    Terms Defined Elsewhere in this Agreement.    For purposes of this Agreement, each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Additional Purchased Assets | 3.5 |
| Agreement | Recitals |
| Allocation | 11.3 |
| Assigned Contracts | 2.1(d) |
| Assignment | 2.5(a) |
| Assumed Liabilities | 2.3 |
| Auction | 7.1(a) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Business | Recitals |
| Business Confidential Information | 8.8(b) |
| Closing | 4.1 |
| Closing Date | 4.1 |
| CON Termination Date | 4.4(c)(iv) |
| Cure Amounts | 2.5(b) |
| Escrow Agent | 3.2 |
| Escrow Agreement | 3.2 |
| Escrowed Funds | 3.2 |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Excluded Personal Property Leases | 2.2(e) |

9

| Term | Section |
|---|---|
| Financial Statements | 5.9 |
| Healthcare Applications | 8.6(a) |
| Healthcare Programs | 5.17(b) |
| Losses | 8.16 |
| Material Contracts | 5.14(a) |
| Medical Records Custody Agreement | 2.9 |
| Nonassignable Assets | 2.6(b) |
| Personal Property Leases | 5.12 |
| Petition Date | Recitals |
| Premises | Recitals |
| Proprietary Software | 1.1 |
| Provider Agreements | 2.1(h) |
| PTO | 9.2(a) |
| Purchase Price | 3.1 |
| Purchased Assets | 2.1 |
| Purchased Intellectual Property Licenses | 2.1(c) |
| Purchased Personal Property Leases | 2.1(b)(ii) |
| Purchaser | Recitals |
| Purchaser Disclosure Schedule | Article VI |
| Purchaser Documents | 6.2 |
| Receiver | 8.17 |
| Receivership Agreement | 8.17 |
| Receivership Date | 8.17 |
| Resident Assets | 8.15 |
| Seller Confidential Information | 8.8(a) |
| Seller Disclosure Schedule | Article V |
| Seller Documents | 5.2 |
| Seller | Recitals |
| Third-Party Software | 1.1 |
| Transfer Taxes | 11.1 |
| Transferred Employees | 9.1(a) |

Section 1.3    <u>Other Definitional and Interpretive Matters</u>.

(a)    Unless otherwise expressly provided herein, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    <u>Calculation of Time Periods</u>.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

10

(ii) <u>Dollars</u>. Any reference in this Agreement to currency shall be to, and all payments hereunder shall be paid in, U.S. dollars.

(iii) <u>Exhibits/Schedules</u>. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent it is reasonably apparent that it is pertinent to the subject matter of such other Schedule. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv) <u>Gender and Number</u>. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number shall have the corresponding meanings in the plural and vice versa.

(v) <u>Headings</u>. The provision of a Table of Contents, the division of this Agreement into articles, sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All article, section, schedule and exhibit references used in this Agreement are to articles, sections, schedules and exhibits to this Agreement unless otherwise specified.

(vi) <u>Herein</u>. The words "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear unless the context otherwise requires.

(vii) <u>Including</u>. The word "including" or any variation thereof means "including, without limitation", whether or not so stated, and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(viii) <u>Made Available to Purchaser</u>. The phrase "made available to Purchaser" shall mean made available to Purchaser through posting in Seller's electronic data room (if any), via email, facsimile or other electronic transfer to Purchaser or through other written means to Purchaser for all purposes of this Agreement and at such facsimile numbers and addresses provided by Purchaser.

(ix) <u>Make Available to Seller</u>. The phrase "make available to Seller" shall mean make available to Seller or its agents through email, facsimile or other electronic transfer or through other written means for all purposes of this Agreement.

(x) <u>Part of Speech</u>. If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).

11

(xi)    Date. The phrase "the date of this Agreement," "date hereof" and terms of similar import, unless the context otherwise requires, shall be deemed to refer to the date set forth in the preamble of this Agreement.

(xii)    Accounting Terms. All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP.

(b)    Each party hereto has been advised by experienced counsel, and the parties hereto have participated jointly, in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted in its entirety by the parties hereto, and no rule of construction shall operate and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

Section 2.1    Purchase and Sale of Assets.    On the terms and subject to the conditions set forth in this Agreement and pursuant to the Sale Order, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall, subject to Section 2.5 hereto, sell, transfer, assign, convey and deliver to Purchaser, all of Seller's right, title and interest in, to and under the Purchased Assets, free and clear of any and all Liens or any other interest. "Purchased Assets" means all of the following assets, rights and properties of Seller pertaining to or used in connection with the Business as existing on the Closing Effective Date, other than the Excluded Assets:

(a)    all Pre-Closing Accounts Receivable;

(b)    the proceeds of all pending rate appeals, and any rights to refunds and settlements, including, but not limited to, all proceeds from the Universal Settlement and retroactive adjustments, in each case arising from or relating to dates of service for any period or events occurring prior to the Closing Effective Date, whether or not arising from or relating to any overpayment, duplicate payment, refunds, discounts or adjustments due to healthcare cost reimbursement program or insurance coverage or otherwise, or the settlement of any pending Legal Proceeding in connection with any of the same;

(c)    (i) the Furniture and Equipment; (ii) the tools, spare parts, supplies (including all of Seller's Inventory) and all other tangible personal property owned by Seller, used by Seller in the conduct of the Business and set forth on Section 2.1(c) of the Seller Disclosure Schedule; and (iii) the Personal Property Leases identified in Section 5.12 of the Seller Disclosure Schedule which Purchaser may at any time prior to Closing elect to have, along with any additional Personal Property Leases exclusively pertaining to or used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.3 hereto (collectively, the "Purchased Personal Property Leases");

(d)    (i) the Purchased Intellectual Property set forth on Section 2.1(d) of the Seller Disclosure Schedule; and (ii) the rights of Seller as licensor under the Intellectual Property Licenses identified in Section 2.1(d) of the Seller Disclosure Schedule (or which Purchaser may

at any time prior to Closing elect to have) and all rights of Seller as licensee under its Intellectual Property Licenses, along with any additional Intellectual Property Licenses pertaining to or used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with <u>Section 8.3</u> hereto (collectively, the "<u>Purchased Intellectual Property Licenses</u>");

(e)    (i) all Contracts as may be selected by Purchaser in its sole discretion at any time prior to Closing from those set forth in <u>Section 2.1(e)</u> of the Seller Disclosure Schedule and all rights arising out of such Contracts; and (ii) any additional Contracts as may be selected by Purchaser in its sole discretion at any time prior to Closing pertaining to or used in connection with the Business that are entered into after the date hereof but prior to the Closing Effective Date in accordance with <u>Section 8.3</u> hereto (collectively, the "<u>Assigned Contracts</u>");

(f)    subject to the provisions of <u>Section 2.9</u> and Article VII hereto, all Documents that are used in, held for use in or intended to be used in, or that arise out of, the Business, including Documents relating to the services provided by the Business and employee personnel files (such personnel files to exclude any information that is required to be maintained confidential by Seller pursuant to applicable laws, rules or regulations) for Seller's employees which Purchaser may elect to hire (including, to the extent available, pre-employment, criminal background, drug screen, and immigration records) and books, files, invoices, flow sheets and other technical and non-technical data and information relating to the operations and services provided by the Business which are owned by Seller and which are used in the operation of the Business and the Premises, but excluding any Documents and Patient Records described in <u>Section 2.2(f)</u> or <u>Section 2.2(h)</u> hereto;

(g)    all Permits used by Seller in the Business and set forth in <u>Section 2.1(g)</u> of the Seller Disclosure Schedule (to the extent transferable);

(h)    the Medicare and Medicaid provider numbers for the Business and related provider agreements used in the Business, as identified in <u>Section 2.1(h)</u> of the Seller Disclosure Schedule, along with third party payor agreements to the extent they are transferable (collectively, the "<u>Provider Agreements</u>");

(i)    all goodwill and other intangible assets (other than Intellectual Property Rights) owned by Seller and used in connection with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property;

(j)    all security deposits and prepayments of Business residents, if any, held by Seller for services to be provided on and after the Closing Effective Date;

(k)    all menus, policies and procedures manuals;

(l)    any rights to refunds, settlements and retroactive adjustments arising at any time with respect to dates of service before, on or after the Closing Effective Date in connection with any Medical Reimbursement Program including but not limited to any refunds, settlements and retroactive adjustments associated with the Healthcare Program Liabilities and any private sector healthcare cost reimbursement or insurance coverage;

13

4326651v.5

(m)    all accounts receivable generated by the Business before, on or after the Closing Effective Date and all cash maintained on or after the Closing Effective Date by Purchaser or such other entity as may be designated by Purchaser in its capacity as Receiver under the Receivership Agreement, subject, however, to the terms of the Receivership Agreement;

(n)    all telephone numbers and telefax numbers used by the Business; and

(o)    all other assets used in connection with the Business.

Section 2.2    Excluded Assets.    Except as set forth in the Receivership Agreement and undertaken by the Receiver, nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser or its Affiliates, and Seller shall retain all right, title and interest to, in and under the Excluded Assets.  "Excluded Assets" shall mean the following assets, properties, interests and rights of Seller:

(a)    all cash, cash equivalents, bank deposits or similar cash items of Seller existing as of 11:59 PM on the day before the Closing Effective Date, and all securities owned by Seller on the Closing Effective Date;

(b)    Excluded Contracts;

(c)    CBAs and Union Agreements;

(d)    any other Contract to which Seller is a party or under which it has rights that is not used in the Business, unless included in Section 2.1(d) of the Seller Disclosure Schedule among the Assigned Contracts;

(e)    the Personal Property Leases identified in Section 2.2(e) of the Seller Disclosure Schedule (the "Excluded Personal Property Leases");

(f)    the Intercompany Accounts Receivable;

(g)    any (i) personnel files for employees of Seller who are not hired by Purchaser; (ii) other books and records that Seller is required by Law to exclusively retain; (iii) Documents which Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party (other than any patient confidentiality obligation referred to in the foregoing clause (ii) or in the Medical Records Custody Agreement); (iv) books and records and other Documents related to malpractice prevention programs, incident reporting or quality assurance to the extent confidential under applicable Law; (v) Documents relating to proposals to acquire the Business by Persons other than Purchaser or its Affiliates; (vi) any Documents primarily related to or that are required to realize the benefits of any Excluded Assets; (vii) Documents related to Intercompany Accounts Receivable; (viii) corporate records and Tax Returns of Seller and (ix) Documents necessary to prepare Tax Returns and Cost Reports except for Cost Reports filed or to be filed by the Receiver pursuant to the Receivership Agreement if such agreement becomes effective;

(h)    any Patient Records, except as provided in the Medical Records Custody Agreement;

(i)      any claim, right or interest of Seller in or to any refund, rebate, abatement or other recovery for Taxes related to the operation of the Business for any periods prior to the Closing Effective Date, together with any interest due thereon or penalty rebate arising therefrom;

(j)      all insurance policies or rights to proceeds thereof relating to the Business or the Purchased Assets to the extent arising from any occurrence prior to the Closing Effective Date;

(k)      security deposits for rent, electricity, telephone or other utilities and prepaid charges and expenses of Seller to the extent related to the Business or the Purchased Assets, but in all events subject to adjustment at Closing under this Agreement to the extent such deposits are utilized by Purchaser from and after the Closing Effective Date;

(l)      any rights, claims or causes of action of Seller against third parties relating to assets, properties, business or operations of Seller, including any actions under Chapter 5 of the Bankruptcy Code, except for those arising out of the operation of the Facility by the Receiver under the Receivership Agreement;

(m)      rights of Seller under this Agreement, the Seller Documents, the Contemplated Transactions, the Real Estate Agreement, the Receivership Agreement and the Sale Order;

(n)      Intentionally Omitted;

(o)      Intentionally Omitted;

(p)      any personal, tangible and intangible property of Seller identified in Section 2.2(p) of the Seller Disclosure Schedule;

(q)      Intentionally Omitted;

(r)      any right to receive or expectancy of Seller in any charitable gift, grant, bequest or legacy (including any income or remainder interest in or under any trust or estate), regardless of when received and whether or not designated to be applied or used in respect of the Business; and

(s)      the Premises and all other Property (as defined in the Real Estate Contract) that is subject to the Real Estate Contract.

Section 2.3    Assumption of Liabilities.    On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing Effective Date, and shall timely pay, perform and discharge in accordance with their respective terms, only the following Liabilities (collectively, the "Assumed Liabilities"):

(a)      in each case to the extent and only to the extent specifically provided in Article IX hereto, those Liabilities arising out of, relating to or with respect to the employment by Seller of any employees of Seller on or after the Closing Effective Date;

15

(b)    all Liabilities to the extent arising from and after the Closing Effective Date with respect to the Assigned Contracts;

(c)    the Cure Amounts as required by <u>Section 2.5</u> hereto;

(d)    Liabilities to the extent arising from and after the Receivership Date under the Receivership Agreement and to the extent that Purchaser or its designee is the Receiver under such Receivership Agreement; and

(e)    any Liability arising from or relating to any period or events or omissions occurring before or after the Closing Effective Date from or relating to any overpayment, duplicate payment, refunds, discounts or adjustments due to healthcare cost reimbursement programs or insurance coverage, for dates of service before, on or after the Closing Effective Date, including all Healthcare Program Liabilities.

Section 2.4    <u>Excluded Liabilities</u>.    Except for the Assumed Liabilities and any Liabilities of Purchaser in its capacity as Receiver under the Receivership Agreement, Purchaser shall not assume or become liable for the payment or performance of any Liability of Seller or the Business of any nature whatsoever, whether accrued or unaccrued, known or unknown, fixed or contingent ("<u>Excluded Liabilities</u>"), including, but not limited to, the following:

(a)    Other than the enumerated Assumed Liabilities set forth above, any Liability of Seller arising from or relating to the operation of the Business at any time prior to the Closing Effective Date (including, but not limited to, accounts payable) or arising from or relating to the Contemplated Transactions;

(b)    any Liability associated with any Excluded Assets;

(c)    Intentionally Omitted;

(d)    any Liability arising from or relating to claims of medical malpractice and/or other professional Liability of Seller, or any of its employees, agents or independent contractors, arising out or relating to any period or events or omissions occurring prior to the Closing Effective Date;

(e)    any Liability arising out of or in connection with any claim or Legal Proceedings (whether instituted prior to or after the Closing) to the extent arising from or relating to any period or acts or omissions which occurred prior to the Closing Effective Date; and

(f)    any Liability arising from or relating to the CBAs, Union Agreements, any Plans or Seller's employees (whether current, former or retired), as the Purchaser does not assume or adopt any terms and/or conditions of the current, expired, or extant CBAs between Seller and 1199SEIU United Healthcare Workers East ("Union") and/or any liability to the Union, employees, contractual funds, or withdrawal liability assessed under ERISA against Seller and/or Purchaser or by the 1199SEIU Pension Fund or any other pension.

Section 2.5    <u>Assignment and Cure Amounts</u>.

(a)    Subject to the terms and conditions of this Agreement and the entry of the Sale Order, at the Closing and pursuant to Section 365 of the Bankruptcy Code, Seller shall assume and assign to Purchaser, and Purchaser shall assume from Seller, the Assigned Contracts, pursuant to an assignment (the "Assignment") in a form to be mutually agreed to by the parties, if necessary. No contract, lease, or other agreement shall be assumed absent concurrent assignment to Purchaser. Purchaser shall be responsible for satisfying the requirements of "adequate assurance of future performance" as required by Section 365 of the Bankruptcy Code and shall cooperate fully with Seller in seeking such approval from the Bankruptcy Court, including without limitation, Purchaser providing the necessary evidence required as part of the Sale Motion to approve this Agreement and the transactions contemplated herein.

(b)    The cure amounts, if any, as determined by the Bankruptcy Court, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses, if any, that have resulted from any defaults on the part of Seller under the Assigned Contracts (collectively, the "Cure Amounts"), shall be paid by Purchaser (or Purchaser shall have delivered into escrow on terms reasonably acceptable to Seller and Purchaser amounts sufficient to pay any claim therefor that remains disputed as of the Closing, as such amount shall have been determined by the Bankruptcy Court) at or before the Closing (except as otherwise agreed to by the other party to the Assigned Contracts or as directed by the terms of the Sale Order), and Seller shall have no Liability for any such Cure Amount. Purchaser shall indemnify Seller for any such Cure Amount obligations. Purchaser shall not have the right to terminate this Agreement as a result of the inability of Seller to assign to Purchaser (on terms and conditions no less favorable than those in existence as of the date hereof) at the Closing any Assigned Contracts, or Purchaser's decision not to assume any Assigned Contracts as to which Purchaser has not paid the related Cure Amount in accordance with this section. To the Knowledge of Seller, an estimate as of the date hereof of the Cure Amounts described in this section is set forth on Section 2.5(b) of the Seller Disclosure Schedule. Notwithstanding anything to the contrary, Purchaser shall have no obligation or liability for any Cure Amount related to any Excluded Liability or any Excluded Asset.

(c)    Intentionally Omitted.

Section 2.6    Further Conveyances and Assumptions.

(a)    From time to time following the Closing, each party shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents at the Closing and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the Liabilities and obligations intended to be assumed by Purchaser under this Agreement and the Seller Documents at the Closing, and to otherwise make effective the transactions contemplated hereby and thereby; provided however that nothing herein shall obligate or otherwise require either party to pay any claims or liabilities except as set forth in this Agreement.  In the event that Purchaser or its Affiliates receives any Excluded Assets (or any payments or proceeds related thereto) following the Closing, Purchaser shall promptly deliver such Excluded Assets (or any payments or proceeds related thereto) to Seller.  In the event that Seller

17

receives any Purchased Assets (or any payments or proceeds related thereto) following the Closing, Seller shall promptly deliver such Purchased Assets (or any payments or proceeds related thereto) to Purchaser. This provision shall survive Closing.

(b)    Except for the assignment of the Provider Agreements, to the extent that the assignment of any Purchased Asset shall require the consent of any other Person and such consent shall still be required notwithstanding the Sale Order and Sections 363 and 365 of the Bankruptcy Code (each, a "Nonassignable Asset"), (i) nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign such Nonassignable Asset unless and until such consent shall have been obtained, and (ii) Purchaser shall be obligated to close whether or not the Nonassignable Asset can be transferred, and Seller agrees to reasonably cooperate with Purchaser to seek to obtain any required consent; provided however that Seller shall not be required to pay any claims or incur any other obligations in order to obtain such consent.  Notwithstanding anything to the contrary contained herein, Purchaser shall have the right to terminate this Agreement as a result of the inability of Seller to assign to Purchaser (on terms and conditions no less favorable than those in existence as of the date hereof) at the Closing any material Assigned Contract.

Section 2.7    Bulk Sales Laws.  The parties hereto hereby waive compliance by Seller with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

Section 2.8    Accounts Receivable.  If the Closing occurs, (a) all Pre-Closing Accounts Receivable of the Business shall be included in the Purchased Assets and transferred to Purchaser at Closing and (b) all accounts receivable relating to the operation of the Business based on services rendered on and after the Closing Effective Date shall also be the property of Purchaser. Until such time as the Closing occurs, title to all accounts receivable of Seller (including all Pre-Closing Accounts Receivable and any accounts receivable relating to the operation of the Business between the Closing Effective Date and the Closing Date) shall remain as Seller's (subject to Liens in favor of Amalgamated Bank and subject to the terms of the Receivership Agreement), and Receiver shall have the right to use such accounts receivable in the Business under the Receivership Agreement.  For the avoidance of doubt, (i) during such time as Purchaser serves as Receiver under the Receivership Agreement and (ii) from and after the Closing Date, Seller shall not be entitled to bill for or receive any Pre-Closing Accounts Receivable, and Purchaser shall be entitled to bill for and receive all amounts collected in respect of services rendered by the Business before, on and/or after the Closing Effective Date.

Section 2.9    Agreement Regarding Confidentiality of Patient Information.    At the Closing, Seller and Purchaser will enter into a Medical Records Custody Agreement (the "Medical Records Custody Agreement") in the form attached hereto as Exhibit A.  Seller shall have no obligation hereunder to provide Purchaser with custody of Patient Records except as otherwise set forth in the Medical Records Custody Agreement.

18

## ARTICLE III

## CONSIDERATION

Section 3.1    Consideration.    The consideration for the Purchased Assets shall be (a) **NINE HUNDRED THOUSAND** Dollars ($900,000.00), subject to adjustment in accordance with Section 3.3 hereof (the "Purchase Price"); (b) the assumption by Purchaser of the Assumed Liabilities; and (c) the aggregate Cure Amounts payable or reserved by Purchaser under Section 2.5.

Section 3.2    Purchase Price Deposit.    Within One (1) business day after Seller's notice to Purchaser of the approval and entry of the Sale Order by the Bankruptcy Court, Purchaser shall immediately deposit with National Granite Title Insurance Agency, Inc. in its capacity as escrow agent (the "Escrow Agent"), pursuant to the terms of that certain Escrow Agreement, dated as of the date hereof, by and among Purchaser, Seller and the Escrow Agent (the "Escrow Agreement"), by wire transfer of immediately available funds, an amount equal to NINETY THOUSAND DOLLARS ($90,000 the "Escrowed Funds") to be released by the Escrow Agent and delivered to either Purchaser or Seller, in accordance with the provisions of the Escrow Agreement. Pursuant to the Escrow Agreement, the Escrowed Funds shall be deposited into an interest-bearing account and (together with all accrued investment income thereon) distributed as follows:

(a)    upon the Closing, the Escrowed Funds shall be delivered to Seller as partial consideration for the Purchased Assets, and all accrued investment income thereon shall be delivered to Seller at the Closing as additional consideration and not part of the Purchase Price;

(b)    if this Agreement is terminated by Seller pursuant to Section 4.4(b)(ii) or Section 4.4(b)(iii) or Section 4.4(c)(v) hereto, the Escrowed Funds, together with all accrued investment income thereon, shall be delivered to Seller as its liquidated damages and Seller's sole remedy and Purchaser's sole liability; or

(c)    if this Agreement is terminated pursuant to Section 4.4 hereto for any reason other than pursuant to Section 4.4(b)(ii), Section 4.4(b)(iii), or Section 4.4(c)(v) hereto, or if this Agreement is terminated for any other reason for which Purchaser is permitted to terminate this Agreement, the Escrowed Funds, together with all accrued investment income thereon, shall in each case be returned to Purchaser and shall be Purchaser's sole remedy and Seller's sole liability except as set provided in Section 12.2.

Section 3.3    Payment of Purchase Price.    On the Closing Date, Purchaser shall pay the Purchase Price, subject to adjustment in accordance with this Agreement and subject to any credit due under the Receivership Agreement, less an amount equal to the  Escrowed Funds being released to Seller on the Closing Date pursuant to Section 3.2 hereto. At Closing, Purchaser shall deposit cash in escrow equal to such amount (if any) as is required by Section 2.5 hereto.

Section 3.4    Resident Transition.    Subject to resident choice, Purchaser shall formally admit all residents of the Business as of midnight on the Closing Date and Seller shall simultaneously discharge them.

4326651v.5

# ARTICLE IV

# CLOSING AND TERMINATION

Section 4.1    Closing Date.   Subject to the satisfaction of the conditions set forth in Article X hereto (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereto (the "Closing") shall take place at the offices of Purchaser's counsel, or in escrow through the Escrow Agent, at 11:00 a.m. (New York time) on a date agreed upon by Seller and Purchaser that is within ten (10) Business Days following the satisfaction or waiver of the conditions set forth in Article X hereto (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by Seller and Purchaser. Notwithstanding the foregoing, either party may request up to two (2) extensions of the Closing of five (5) Business Days each upon the demonstration of legitimate cause for such extension or extensions, which requests will not be unreasonably delayed, conditioned or withheld by the other party. Notwithstanding anything in this Agreement to the contrary, in no event shall the Purchaser be required to close before ten (10) Business Days from the date of a letter from DOH stating that all contingencies have been met. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date." With respect to the Closing, unless otherwise agreed by Seller and Purchaser in writing, regardless of the time at which the Closing is completed, the Closing shall be deemed effective and all right, title and interest of Seller in the assets to be acquired by Purchaser hereunder at the Closing, and any Assumed Liability and all risk of loss with respect to the Business, shall be considered to have passed to Purchaser as of 12:00 a.m. (New York time) on the Closing Date. Notwithstanding anything to the contrary contained in this Agreement, the Parties acknowledge and agree that the Contemplated Transactions must close contemporaneously with the transactions contemplated by the Real Estate Contract.

Section 4.2    Deliveries by Seller.   At the Closing, Seller shall deliver to Purchaser:

(a)    a duly executed bill of sale in a form reasonably acceptable to Purchaser and Seller to evidence the conveyance and transfer of the Purchased Assets free and clear of any and all Liens;

(b)    the Assignment, if necessary, in a form reasonably acceptable to the Parties and prepared by Purchaser, duly executed by Seller;

(c)    the officer's certificates required to be delivered pursuant to Sections 10.1(a) and 10.1(b) hereto;

(d)    the Medical Records Custody Agreement between Purchaser and Seller, substantially in the form attached hereto as Exhibit A, duly executed by Seller;

(e)    copies of all consents and notices required by Section 10.2(c) hereto for which Seller is responsible;

(f)    duly executed documents prepared by Purchaser as necessary to assign Seller's Medicaid and Medicare provider numbers and the Provider Agreements to Purchaser;

4326651v.5

(g)    all other instruments of conveyance and transfer executed by Seller, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser free and clear of all Liens; and

(h)    such other Documents, instruments and certificates necessary or desirable to consummate the Contemplated Transactions as Purchaser may reasonably request no later than two (2) days before the Closing Date.

Section 4.3    Deliveries by Purchaser.    At the Closing, Purchaser shall deliver to Seller:

(a)    the Purchase Price, in immediately available funds, in accordance with Section 3.3 hereto;

(b)    a counterpart, duly executed by Purchaser, of the bill of sale described in Section 4.2(a);

(c)    a counterpart, duly executed by Purchaser, of the Assignment described in Section 4.2(b), if necessary;

(d)    a counterpart, duly executed by Purchaser, of the Medical Records Custody Agreement;

(e)    the officer's certificates required to be delivered pursuant to Sections 10.2(a) and 10.2(b) hereto;

(f)    copies of all consents and notices required by Section 10.1(d) hereto for which Purchaser is responsible;

(g)    a copy of any notification that Purchaser is required under the Escrow Agreement to deliver to the Escrow Agent in order for the Escrow Agent to release the Escrowed Funds to Seller at the Closing;

(h)    evidence reasonably acceptable to Seller of Purchaser's deposit in escrow of such amounts (if any) required by Section 2.5 hereto; and

(i)    such other Documents, instruments and certificates necessary or desirable to consummate the Contemplated Transactions as Seller may reasonably request no later than two (2) days before the Closing Date.

Section 4.4    Termination of Agreement.

(a)    Termination by Purchaser. Purchaser may terminate this Agreement prior to the Closing upon the occurrence of any of the following:

(i)    if any of the conditions to the obligations of Purchaser to close that are set forth in Sections 10.1 and 10.3 hereto shall have become incapable of fulfillment other than as a result of a material breach by Purchaser or its Affiliates of any covenant or

21

agreement contained in this Agreement, and such condition is not waived in writing by Purchaser; provided that the right to terminate this Agreement pursuant to this Section 4.4(a)(i) shall not apply with respect to the approvals of Governmental Bodies addressed in Sections 4.4(c)(iii) and (c)(iv) hereto, which are addressed and provided for in such Sections;

(ii)    if there shall be a material breach by Seller of any representation or warranty, or any covenant or agreement contained in this Agreement, which breach relates to a matter that is, or would result in, a Material Adverse Effect and cannot be cured or has not been cured within twenty (20) Business Days after the giving of written notice by Purchaser to Seller of such breach;

(iii)    if the Sale Order is not entered by March 31, 2020;

(iv)    if the Receivership Agreement is terminated prior to the Closing Date due to a breach or default of Seller;

(v)    if the CBAs or any Union Agreements will be binding upon Purchaser or the Business on or after the Closing Effective Date; or

(vi)    upon any other event which, under the terms hereof, explicitly provides Purchaser the right to terminate this Agreement.

(b)    Termination by Seller.    Seller may terminate this Agreement prior to the Closing upon the occurrence of any of the following:

(i)    if any of the conditions to the obligations of Seller to close that are set forth in Sections 10.2 and 10.3 hereto shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller; provided that the right to terminate this Agreement pursuant to this Section 4.4(b)(i) shall not apply with respect to the approvals of Governmental Bodies addressed in Sections 4.4(c)(iii) and (c)(iv) hereto, which are addressed and provided for in such Sections;

(ii)    if there shall be a material breach by Purchaser or its Affiliate of the Sale Order or of any representation or warranty, covenant or agreement contained in this Agreement, the Real Estate Agreement, or the Receivership Agreement, which breach would have a Material Adverse Effect on the ability of Purchaser to consummate the Contemplated Transactions or to perform its obligations under this Agreement and cannot be cured or has not been cured within twenty (20) Business Days after the giving of written notice by Seller to Purchaser of such breach;

(iii)    if the Real Estate Agreement or the Receivership Agreement is terminated pursuant to its terms prior to the Closing Date due to a breach of Purchaser or such other entity designated by the Purchaser thereunder, if different than Purchaser hereunder, for a breach that cannot be cured or has not been cured within twenty (20) Business Days after the giving of written notice by Seller to Purchaser or such other entity designated by the Purchaser thereunder, of such breach; or

22

(iv)    upon any other event which, under the terms hereof, explicitly provides Seller the right to terminate this Agreement.

(c)    <u>Termination by Purchaser or Seller</u>.    Either Purchaser or Seller may terminate this Agreement prior to the Closing upon the occurrence of any of the following unless the party seeking to terminate is in material breach of this Agreement prior to the occurrence of the following:

(i)    by mutual written consent of Seller and Purchaser;

(ii)    intentionally omitted;

(iii)    upon twenty (20) Business Days' written notice to the other party after twelve (12) months from the entry of the Sale Order by the Bankruptcy Court, if either Purchaser or Seller reasonably determines, after consultation with the DOH and the other party, that it is more likely than not that DOH will not provide the CON Approval by the CON Termination Date for reasons that are specific to Purchaser and the contents of its CON Application and not for reasons that are related to either DOH's normal operating procedures in considering the CON Application or DOH's opinion on the financial feasibility of the Contemplated Transactions, it being understood by the parties that DOH's opinion on the financial feasibility of the Contemplated Transactions is a separate and distinct analysis from the DOH's analysis referred to in <u>Section 4.4(c)(v)</u> below of whether Purchaser has sufficient financial resources to fulfill its obligations related to Closing hereunder. Notwithstanding the foregoing, neither Purchaser nor Seller may terminate this Agreement under this <u>Section 4.4(c)(iii)</u> if within such twenty (20) Business Day period DOH provides the CON Approval or either party receives from DOH reasonably satisfactory assurances that Purchaser will receive the CON Approval by the CON Termination Date;

(iv)    upon twenty (20) Business Days' written notice to the other party if the Closing shall not have occurred by the close of business on the date that is twenty-four (24) months from the entry of the Sale Order (the "<u>CON Termination Date</u>"); <u>provided</u> that such termination pursuant to this <u>Section 4.4(c)(iv)</u> shall not be effective if within such twenty (20) Business Day period all outstanding required regulatory approvals shall have been obtained and all other Closing conditions shall have been satisfied; <u>provided</u>, <u>further</u>, that if the Closing shall not have occurred on or before the CON Termination Date due to an uncured (if curable) material breach of any representations, warranties, covenants, or agreements contained in this Agreement, then the breaching party or its Affiliates may not terminate this Agreement pursuant to this <u>Section 4.4(c)(iv)</u>;

(v)    in the event that Purchaser's CON Application is finally rejected by the DOH due to: (1) a character and competency issue after Purchaser has exercised its rights to substitute members, officers, directors, or employees of Purchaser in the CON Application in accordance with <u>Section 8.6(a)</u> hereof, or (2) an inability of Purchaser to demonstrate sufficient financial resources necessary to Close under this Agreement; or

(vi)    in the event that the Real Estate Contract or the Receivership Agreement is terminated in accordance with its respective terms prior to the closing of the transactions contemplated thereunder other than due to a breach by the terminating party or its Affiliate.

(d)    <u>Cross-Defaults</u>.  Subject to the opportunity to cure defaults or breaches set forth in this Agreement: (i) a default in any material respect by Seller under the Sale Order, the Real Estate Contract or the Receivership Agreement prior to closing thereunder shall be deemed a default by Seller under this Agreement, and a default in any material respect by Seller under this Agreement shall be deemed a default by Seller under the Sale Order, the Real Estate Contract and the Receivership Agreement; (ii) a default in any material respect by the Real Estate Buyer under the Sale Order or the Real Estate Contract prior to the closing thereunder shall be deemed a default by Purchaser under this Agreement and a default in any material respect by Purchaser under this Agreement shall be deemed a default by Real Estate Buyer or the Receiver, as applicable, under the Sale Order, the Real Estate Contract and the Receivership Agreement. In addition, (x) if the Real Estate Buyer is entitled to cancel or terminate the Real Estate Contract or receive the return of the deposit paid under such agreement in accordance with its terms, then the Purchaser under this Agreement shall have the right (i) to terminate this Agreement and the Receivership Agreement simultaneously therewith upon notice to Seller and (ii) to pursue its rights and remedies as provided in this Agreement, the Receivership Agreement and the Sale Order including but not limited to the right to receive the prompt return of the Escrowed Funds plus accrued interest thereon, or (y) if Seller is entitled to terminate the Real Estate Contract or entitled to receive the deposit paid under the Real Estate Contract, then Seller shall be entitled to terminate this Agreement simultaneously therewith upon notice to Purchaser and shall have the right to receive the Escrowed Funds plus accrued interest thereon pursuant to the terms of this Agreement.  In all events, if any of this Agreement, the Real Estate Contract or the Receivership Agreement shall terminate, the other agreements shall also simultaneously terminate.

Section 4.5    <u>Procedure for Termination</u>.   In the event of termination of this Agreement by Purchaser or Seller, or both, pursuant to <u>Section 4.4</u> hereto, written notice thereof shall forthwith be given to the other party, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in <u>Section 4.4</u> hereto) the Contemplated Transactions shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by <u>Section 4.6</u> hereto, without further action by the parties.

Section 4.6    <u>Effect of Termination</u>.

(a)    In the event that this Agreement is validly or automatically terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without Liability to any party; <u>provided</u> that the obligations of the parties set forth in the Confidentiality Agreement, Escrow Agreement, <u>Sections 3.2</u>, <u>4.6</u>, <u>7.2</u> and <u>8.8</u> hereto and <u>Article XII</u> hereto, and to the extent necessary to effectuate the foregoing enumerated provisions, <u>Article I</u> hereto, and the obligations with respect to the payment of the Escrowed Funds shall survive any such termination and shall be enforceable in accordance with their terms. In addition, if this Agreement is terminated as provided herein, Purchaser shall upon request redeliver to Seller as soon as practicable any or all Documents, work papers and other material relating to the Business, whether obtained before or

24

after the execution hereof, together with written certification by an authorized officer of Purchaser who has supervised its compliance with this sentence that confirms such compliance.

(b)     If this Agreement is terminated in accordance with Sections 4.4 and 4.5 hereto, Purchaser shall not, directly or indirectly, and shall cause its Affiliates not to, for a period of one (1) year from the date of this Agreement, solicit, recruit, employ or contract with any employee of Seller or any member of Seller's professional staff.

(c)     Except with respect to indemnification under Section 8.15 (Indemnification) for amounts actually paid to third parties, no party shall be liable to the other for any indirect, special, consequential, or speculative damages, including, without limitation, loss of opportunity, or profits.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as otherwise disclosed to Purchaser in a schedule delivered to Purchaser by Seller prior to the execution of this Agreement (the "Seller Disclosure Schedule"), and except for the effects of the commencement of the Bankruptcy Case, Seller hereby represents and warrants to Purchaser as follows:

Section 5.1     Organization and Good Standing.  Seller is a not-for-profit corporation duly organized, validly existing and in good standing under the laws of the State of New York, and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Section 5.2     Authorization of Agreement.  Subject to entry of the Sale Order, (a) Seller has all requisite power, authority and legal capacity to execute and deliver, and has taken all corporate action, including approval of its members (as applicable), necessary for it to validly execute and deliver, this Agreement and each other agreement, document, or instrument or certificate contemplated by this Agreement to be executed and delivered by Seller in connection with entering into this Agreement, and (b) subject to the satisfaction of the conditions referred to in Section 5.3 hereto, Seller has all requisite power, authority and legal capacity to execute and deliver, and has taken all corporate action necessary for it to validly execute and deliver, each agreement, document, or instrument or certificate contemplated by this Agreement to be executed by Seller in connection with the consummation of the Contemplated Transactions (together with the Documents, other than this Agreement, referred to in clause (a) of this sentence, the "Seller Documents") and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. This Agreement and each of the Seller Documents to be executed and delivered by Seller in connection with Seller entering into this Agreement have been, and each other Seller Document will be at or prior to the Closing, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Sale Order ) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting

4326651v.5

creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a Legal Proceeding at law or in equity). None of the execution and delivery by Seller of this Agreement and the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Seller with any of the provisions hereof or thereof will conflict with, or result in any violation of the Organizational Documents of Seller.

Section 5.3    Consents of Third Parties; Contractual Consents.

(a)    Except as set forth in Section 5.3 of the Seller Disclosure Schedule, Seller is not required to obtain any consent, waiver, approval, Order, Permit or authorization of, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or the Seller Documents by Seller, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Seller of any other action contemplated hereby or thereby, except for (a) the entry of the Sale Order, (b) Healthcare Regulatory Consents, (c) the consent of the Office of the New York State Attorney General to the transactions contemplated under this Agreement and the Real Estate Contract, and (d) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications of which the failure to have obtained or made the same would not have a Material Adverse Effect.

(b)    Except as set forth in Section 5.3(b) of the Seller Disclosure Schedule, to Seller's Knowledge, none of the execution and delivery by Seller of this Agreement or any of the Seller Documents, the consummation of the Contemplated Transactions by Seller, or compliance by Seller with any of the provisions hereof or thereof will conflict with, or result in any violation of or a material default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which Seller is a party or by which any of the Purchased Assets are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a Material Adverse Effect.

Section 5.4    Litigation.    There are no claims or Legal Proceedings pending or, to the Knowledge of Seller, threatened against Seller, or to which Seller is otherwise a party, before any Governmental Body, which, if adversely determined, would reasonably be expected to have a Material Adverse Effect. Seller is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a Material Adverse Effect.

Section 5.5    Licenses and Governmental Permits.    Seller is currently established and licensed by the DOH, pursuant to the Public Health Law of the State of New York, to operate the Business as a 120 bed skilled nursing facility. To Seller's Knowledge, Seller possesses all Permits required for the operation of the Business as currently operated, except for any Permits the failure of which to have would not result in a Material Adverse Effect. The Business participates as a provider in the Medicare and Medicaid programs pursuant to Medicare and Medicaid provider agreements.

Section 5.6    Intentionally Omitted.

4326651v.5

Section 5.7    Health Surveys.    Section 5.7 of the Seller Disclosure Schedule contains the most recent DOH survey or inspection report of the Business and accepted Plan of Correction, if any. Except as may be set forth in said report, and except as set forth in Section 5.7 of the Seller Disclosure Schedule, to Seller's Knowledge, there are no material violations, orders or deficiencies issued or recommended by any Governmental Body, and, to Seller's Knowledge, there are no material inspections, license reviews, investigations or proceedings of any sort pending by or before any such Governmental Body that relate to the Business and that, if adversely determined, would result in a Material Adverse Effect.

Section 5.8    Notices.    Except as set forth in Section 5.8 of the Seller Disclosure Schedule, the Business has not been served with any notice which: (a) requires the performance of any material work on or alterations to the Premises, or in the streets bounding thereon; or (b) orders the installation, repair or alteration of any improvements on the Premises or the streets bounding thereon, in each case including, but not limited to, notices received under the Americans with Disabilities Act of 1990, as amended.

Section 5.9    Financial Statements.    Seller has furnished Purchaser with (i) audited financial statements for Seller for the year ended December 31, 2018 (the "Year End Financial Statements"), and (ii) Seller's unaudited balance sheet for the Business as of August 31, 2019 (the "Interim Balance Sheet" and together with the Year End Financial Statements, the "Financial Statements").    Seller shall provide Purchaser with such additional financial information as Purchaser reasonably requests between the date hereof and the Closing Effective Date. Without limiting the foregoing, from and after the date hereof until the date that the Receivership Agreement becomes effective, Seller shall deliver to Purchaser such periodic unaudited financial reports regarding balance sheet items and/or operating data with respect to the Purchased Assets and/or the Business as are regularly prepared by or for Seller promptly after the same are prepared and/or delivered to Seller and/or its Representatives, along with any and all Cost Reports that are required to be filed for any periods prior to Closing. This provision shall survive Closing.

Section 5.10    Title to Purchased Assets.    Except as set forth in Section 5.10 of the Seller Disclosure Schedule, Seller owns each of the Purchased Assets. Upon Closing, Purchaser will be vested with good title to such Purchased Assets, free and clear of all Liens, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code. To Seller's Knowledge, no Person has any right or option to acquire the Purchased Assets or any material part thereof.

Section 5.11    Intentionally Omitted.

Section 5.12    Tangible Personal Property.    Section 5.12 of the Seller Disclosure Schedule sets forth all leases of personal property, including Equipment, exclusively used by Seller in the operation of the Business that involve annual payments in excess of $5,000.00. ("Personal Property Leases").

Section 5.13    Intellectual Property.    Seller has licenses to use all material Third-Party Software used in the operation of the Business as now operated.

4326651v.5

Section 5.14    Material Contracts.

(a)    Section 5.14(a) of the Seller Disclosure Schedule sets forth a list of all of the following Contracts to which Seller is a party or by which it is bound and that are exclusively related to the Business or by which the Purchased Assets may be currently bound or affected (collectively, the "Material Contracts"):

(i)    Contracts with any labor union or association representing any employees of Seller (the "Union Agreements") and each labor or collective bargaining agreement applicable to employees of Seller (the "CBAs"), none of which shall be assumed by Purchaser; and

(ii)    Contracts which involve the annual expenditure of more than $5,000.00 in the aggregate or require performance by any party more than one year from the date hereof that, in either case, are not terminable without penalty on less than thirty (30) days' notice.

(b)    Except (i) as set forth on Schedule 5.14(b), (ii) as otherwise provided in the Bankruptcy Code, (iii) for events of default arising as a result of the commencement of the Bankruptcy Case, or (iv) for general principles of equity that may limit the specific performance of particular provisions, each Material Contract is a legal, valid and binding obligation of Seller and is enforceable by Seller against the other party or parties to such Material Contract in accordance with its terms.

Section 5.15    Employees; Employee Benefits.

(a)    Section 5.15(a) of the Seller Disclosure Schedule sets forth a true and complete list of all Plans.  Each Plan has been administered and is in compliance with the terms of such Plan and in accordance with all other applicable Laws except (i) as otherwise provided in the Bankruptcy Code or (ii) where the failure of compliance would not have a Material Adverse Effect. Purchaser shall not assume any Plans or any Liabilities associated therewith, unless otherwise expressly set forth herein.

(b)    Except as set forth in Section 5.15(b) of the Seller Disclosure Schedule, no "reportable event" (as such term is used in Section 4043 of ERISA), "prohibited transaction" (as such term is used in Section 406 of ERISA or Section 4975 of the Code) or "accumulated funding deficiency" (as such term is used in Section 412 or 4971 of the Code) has heretofore occurred with respect to any Plan which would have a Material Adverse Effect.

Section 5.16    Employment and Labor.  Section 5.16 of the Seller Disclosure Schedule (i) sets forth a true and complete list of all employees of Seller as of the date set forth therein (ii) shall be updated and delivered by Seller to Purchaser not later than thirty (30) days prior to the Closing only if the Receivership Agreement shall not have become effective prior to such date and (iii) to the Knowledge of the Seller, accurately sets forth in all material respects the following information for each employee of Seller as of the date hereof: (1) the position; (2) date of hire; (3) current annual salary or hourly wage; (4) accrued vacation, holidays and/or sick leave as a result of the individual's employment with Seller; and (5) the collective bargaining representative of the union, if any, of which the individual is a member. From the date hereof through the Closing Date, so

28

long as the Receivership Agreement does not become effective, Seller shall deliver to Purchaser, upon Purchaser's request, weekly updates to <u>Section 5.16(a)</u> of the Seller Disclosure Schedule to reflect any individual that is hired by, or transferred to, the Business as an employee consistent with the provisions in <u>Section 8.3</u> hereto.

Section 5.17    <u>Compliance with Laws; Permits</u>.

(a)    Seller is duly authorized by DOH to operate the Business.

(b)    Seller is eligible to receive payment under Titles XVIII and XIX of the Social Security Act and is a "provider" under existing provider agreements with the Medicare and Medicaid programs (collectively, the "<u>Healthcare Programs</u>") through the applicable intermediaries.

(c)    Except as set forth in <u>Section 5.17(c)</u> of the Seller Disclosure Schedule, to the Knowledge of Seller, Seller is in compliance with all Laws and Permits applicable to the Purchased Assets or the Business, except where the failure to be in compliance would not have a Material Adverse Effect.

Section 5.18    <u>Financial Advisors</u>.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the Contemplated Transactions. Any fees, commissions or like payment due to any such Person shall be paid by Seller and no Person is or shall be entitled to any fee or commission or like payment from Purchaser.

Section 5.19    <u>No Other Representations or Warranties; Schedules</u>.    Except for the representations and warranties contained in this Agreement (as modified by the Seller Disclosure Schedules) and the Seller Documents, neither Seller nor any other Person makes any other representation or warranty whether express or implied, written or oral, with respect to Seller, the Business, the Purchased Assets, the Assumed Liabilities or the Contemplated Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, its Affiliates or any of their respective officers, directors, members, employees, agents, consultants or other Representatives. Except for the representations and warranties contained in this Agreement (as modified by the Seller Disclosure Schedules) and the Seller Documents, Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser or its Representatives by any director, officer, member, employee, agent, consultant or other Representative of Seller or any of its Affiliates). Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Business. Seller makes no implied representation or warranty as to the condition, merchantability, usage, suitability or fitness for any particular purpose with respect to the Purchased Assets except for the representations and warranties contained in this Agreement (as modified by the Seller Disclosure Schedules) and the Seller Documents. The disclosure of any matter or item in any Section of the Seller Disclosure

Schedule shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as otherwise disclosed to Seller in a schedule delivered to Seller by Purchaser prior to the execution of this Agreement (the "Purchaser Disclosure Schedule"), Purchaser hereby represents and warrants to Seller, as follows:

Section 6.1    Organization and Good Standing.    Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of New York and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Section 6.2    Authorization of Agreement.    Purchaser has all requisite power, authority and legal capacity to execute and deliver this Agreement, the Receivership Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement and the Receivership Agreement to be executed by Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (collectively with the Receivership Agreement, the "Purchaser Documents"), and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly and validly authorized by all necessary corporate action on behalf of Purchaser. This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly and validly executed and delivered by Purchaser, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a Legal Proceeding at law or in equity). None of the execution and delivery by Purchaser of this Agreement and the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of the Organizational Documents of Purchaser.

Section 6.3    Conflicts; Consents of Third Parties.

(a)    To Purchaser's Knowledge, except as set forth in Section 6.3(a) of the Purchaser Disclosure Schedule, Purchaser is not required to obtain any consent, approval, authorization, waiver, Order or Permit of or from, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or the Purchaser Documents by Purchaser, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action

30

contemplated hereby or thereby, except for (i) the Healthcare Regulatory Consents, and (ii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications (A) that have already been obtained or made or (B) of which the failure to have obtained or made would not have a Material Adverse Effect or would not reasonably be expected to prevent or materially delay the ability of Purchaser to perform or consummate the Contemplated Transactions.

(b)     To Purchaser's Knowledge, except as set forth in Section 6.3(b) of the Purchaser Disclosure Schedule, none of the execution and delivery by Purchaser of this Agreement or any of the Purchaser Documents, the consummation of the Contemplated Transactions by Purchaser, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or a default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which Purchaser or any of its Affiliates is a party or by which any of the properties or assets of Purchaser or any of its Affiliates are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect on the ability of Purchaser to consummate the Contemplated Transactions.

Section 6.4    Litigation.    There are no claims or Legal Proceedings pending or, to the Knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions. Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions.

Section 6.5    Financial Advisors.    Except as set forth in Section 6.5 of the Purchaser Disclosure Schedule, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the Contemplated Transactions and no such Person is entitled to any fee or commission or like payment from Seller in respect thereof.

Section 6.6    Healthcare Regulatory Compliance Status.    To Purchaser's Knowledge, neither Purchaser nor any of its members, directors, officers or employees has (i) been indicted or convicted of a felony, (ii) been suspended or excluded from the Healthcare Programs or (iii) failed to pass a character and competency or financial feasibility review by DOH or comparable Governmental Body of another State. To Purchaser's Knowledge, there is no reason why Purchaser should fail to successfully obtain CON Approval for reasons relating to the character, competence and/or financial capacity of Purchaser and  its members, managers, officers, or employees.

Section 6.7    Acknowledgement Regarding Condition of the Business.    Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, whether express or implied or written or oral, beyond those expressly given by Seller to Purchaser in this Agreement (as modified by the Purchaser Disclosure Schedule) and the Purchaser Documents, and Purchaser acknowledges and agrees that, except for the representations and warranties contained herein and therein, the

31

Purchased Assets and the Business are being transferred to Purchaser on a "WHERE IS" and "AS IS" physical condition basis. Purchaser further represents that neither Seller nor any of its Affiliates nor any other Person has made any representation or warranty, express or implied, written or oral, as to the accuracy or completeness of any information regarding Seller, the Business or the Contemplated Transactions not expressly set forth in this Agreement or the Seller Documents, and neither Seller, any of their Affiliates or any other Person will have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser or its Representatives or the use by Purchaser or any of its Affiliates of, any such information, including any confidential memoranda distributed on behalf of Seller relating to the Business or other publications or data room information provided to Purchaser or its Representatives, or any other document or information in any form provided to Purchaser or its Representatives in connection with the sale of the Business and the Contemplated Transactions. Purchaser acknowledges that it, along with its Representatives, has conducted to its satisfaction, its own independent investigation of the Business and the Purchased Assets and, in making the determination to proceed with the Contemplated Transactions, Purchaser has relied on the results of its own independent investigation.

Section 6.8    Financing.  On the date hereof Purchaser has, and on the Closing Date Purchaser will have, sufficient funds on hand to consummate the Contemplated Transactions. On the Closing Effective Date, Receiver will have sufficient funds to fulfill its obligations under the Receivership Agreement. Purchaser acknowledges that, at the hearing seeking approval of the Sale Order, Purchaser must demonstrate sufficient financial wherewithal to consummate the Contemplated Transactions.

Section 6.9    No Other Representations or Warranties; Schedules.   Except for the representations and warranties contained in this Article VI (as modified by the Purchaser Disclosure Schedules) and the Purchaser Documents, neither Purchaser nor any other Person makes any other representation or warranty, whether express or implied, written or oral, with respect to Purchaser or the Contemplated Transactions, and Purchaser disclaims any other representations or warranties, whether made by Purchaser, any Affiliate of Purchaser or any of their respective officers, directors, members, managers, employees, agents, consultants or other Representatives.  Except for the representations and warranties contained in this Article VI (as modified by the Purchaser Disclosure Schedules) and the Purchaser Documents, Purchaser disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Seller or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Seller by any director, officer, member, manager, employee, agent, consultant, or other Representative of Purchaser or any of its Affiliates). The disclosure of any matter or item in any Section of the Purchaser Disclosure Schedule shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material.

4326651v.5

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

Section 7.1    <u>Competing Transactions</u>.

(a)    Except for the Escrow Agreement for the Escrowed Funds which is binding pursuant to its terms, this Agreement, the Receivership Agreement, the Seller Documents and the Purchaser Documents are subject to approval by the Bankruptcy Court. To the extent that any of the terms of this Agreement, the Receivership Agreement or the Real Estate Contract are modified in connection with or as a result of the Bankruptcy, then any such modification shall in all events be subject to the approval of Purchaser and, to the extent that any such change is in connection with the Real Estate Contract, the Real Estate Buyer. To the extent that Purchaser or Real Estate Buyer, as applicable, does not approve any such modification, then Purchaser shall have the right, but not the obligation, to terminate and cancel this Agreement and receive the immediate refund of the Escrowed Funds, and upon such termination the Real Estate Contract shall automatically terminate, and the Real Estate Buyer shall receive the immediate refund of the deposit paid under the Real Estate Contract.

(b)    Until Bankruptcy Court approval of this Agreement, Seller is permitted to cause its Representatives to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any person (in addition to Purchaser and its Representatives) in connection with any sale or other disposition of all or any part of the Purchased Assets. In addition, until Bankruptcy Court approval of this Agreement, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable Law, including, without limitation, supplying information relating to the Purchased Assets to prospective purchasers.

Section 7.2    <u>Bankruptcy Court Filings</u>.    As promptly as practicable following the execution of this Agreement, Seller shall, at its sole cost and expense, file with and seek the approval of the Bankruptcy Court of the Sale Motion. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other Documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order shall be appealed, each party shall use its respective commercially reasonable efforts to defend against such appeal.

4326651v.5

## ARTICLE VIII

## COVENANTS

Section 8.1    Conveyance.    Subject to entry of the Sale Order and the terms of the Receivership Agreement (if the Receivership Agreement becomes effective), at Closing, Seller shall convey the Purchased Assets to Purchaser, free and clear of all violations, liens and encumbrances that were existing immediately prior to the Closing Effective Date.  As per the Sale Order, all Liens attached to the Purchased Assets shall attach to the net proceeds of the sale received by Seller after deduction of third party costs required for consummation of the Closing (but without deduction of any amount that Seller, as a debtor-in-possession, is prohibited from paying) (the "Net Proceeds") to the same priority and extent as they encumbered the Purchased Assets prior to Closing, including Liens in favor of the Existing Lender.  To the extent Seller is required to satisfy any of the Liens from the Net Proceeds (it being understood that amounts owing to the Existing Lender shall be paid from such Net Proceeds), Seller shall make such payments in accordance with the Sale Order or by further order of the Bankruptcy Court.

Section 8.2    Access to Information.    Seller agrees that, prior to the Closing Effective Date, Purchaser shall be entitled, through its Representatives and at its own expense, to make such investigation of the assets, properties and operations of the Business and such examination of the books and records of Seller pertaining to the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and, and at its own expense, to make extracts and copies of such books and records. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances, any request for such examination shall be made to one of the Persons identified in Section 8.2 of the Seller Disclosure Schedule, and Purchaser's access to such information shall be subject to any restrictions on disclosure by Seller to Purchaser or use of the information contained therein by Purchaser applicable pursuant to any agreement to which Seller is a party or is bound prior to the date hereof or under applicable Law.   Seller shall cause its Representatives to promptly cooperate with Purchaser and its Representatives in connection with such investigation and examination, and Purchaser and its Representatives shall cooperate with Seller and its Representatives and shall use its commercially reasonable efforts to minimize any disruption to Seller's business and operations, including the Business. Notwithstanding anything herein to the contrary, Seller shall not be required to permit any such investigation or examination if, and to the extent that, Seller, upon advice of counsel, determines that such investigation or examination by Purchaser would or is reasonably likely to result in a loss of any attorney-client or attorney work product privilege available to Seller. Notwithstanding any provision of this Agreement to the contrary, Seller shall timely cooperate and provide Purchaser with such information as Purchaser reasonably requires to prepare and file its CON Application and to respond to DOH requests or inquiries and for other legitimate purposes related to the Contemplated Transactions including, without limitation, in connection with Purchaser seeking financing for the within transactions.

Section 8.3    Conduct of the Business Pending the Closing.    During the period from the date hereof through and including the Closing Effective Date, except (i) as required by applicable Law (including without limitation as a result of the commencement of the Bankruptcy Case), or (ii) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), Seller shall use its commercially reasonable efforts to operate the

4326651v.5

Business in the Ordinary Course of Business. Without limiting the generality of the foregoing, from the date of this Agreement through and including the Closing Effective Date, Seller shall, except (i) as required by applicable Law (including without limitation as a result of the commencement of the Bankruptcy Case) or (ii) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), solely as it relates to the Business:

        (a)      operate the Business (i) only in the ordinary course, (ii) in a businesslike manner and in substantially the same manner as it has heretofore been conducted, and (iii) in compliance in all material respects with all applicable Laws;

        (b)      within five (5) Business Days of receipt or filing, as the case may be, provide Purchaser with copies of all DOH survey reports and material notices from Governmental Bodies that are received by Seller, along with copies of all Seller's responsive correspondence;

        (c)      timely file plans of correction, if necessary, and provide Purchaser with copies of all of the same within five (5) Business Days of filing;

        (d)      not (i) acquire or dispose of any fixed assets of the Business with a value of $5,000.00 or more, or (ii) make any capital expenditures for the Business in excess of $5,000.00 per item;

        (e)      maintain and keep the Purchased Assets in the same condition and working order as exists on the date hereof (including making necessary repairs and replacements), ordinary wear and tear, depreciation and casualty excepted;

        (f)      (i) maintain and preserve intact the business organization relating to the Business, (ii) retain adequate staffing of the Business and (iii) maintain the Business's relationship with physicians, employees, residents, residents' families, suppliers, customers, and others having business relationships with the Business with a view to preserving such relationships for Purchaser on the Closing Effective Date;

        (g)      consult with Purchaser and obtain Purchaser's approval in each instance before renewing or entering into any Contracts with an annual aggregate payment in excess of $5,000, which Contracts are not terminable by Purchaser, without cost, penalty or liability, it being understood that Purchaser shall not be obligated to assume any Contract entered into or extended after the date hereof and before the Closing Effective Date which is not terminable without cost or penalty to Purchaser unless Purchaser has specifically hereafter consented in writing to assume such Contract;

        (h)      afford Purchaser, and its agents, reasonable access to the Business during normal business hours upon prior reasonable request;

        (i)      (i) file all Costs Reports required to be filed for any periods prior to the Closing Effective Date and provide Purchaser, within five (5) Business Days of filing, with copies of any Cost Reports that are required to be filed for any periods prior to the Closing Effective Date and (ii) cooperate with the Purchaser in connection with its duties under the Receivership Agreement, including providing the Purchaser with all documents and information in Seller's

4326651v.5

possession or under its control that are reasonably required by Purchaser in connection with its duties under the Receivership Agreement and in connection with the filing of Cost Reports for periods commencing on and after the Closing Effective Date.  In the event Seller does not timely file such Cost Reports, the parties will negotiate either a credit to the Purchase Price and/or an extension to the Closing; *provided*, however, that the effect of Seller's failure to file any such Cost Reports shall, at Purchaser's election, constitute a Material Adverse Effect;

(j)    maintain all of its books and records in accordance with past practice;

(k)    keep in full force and effect all licenses currently in effect, unless such licenses are no longer necessary for the operation of the Business;

(l)    keep in full force and effect all insurance policies currently in effect, or replacements thereof, unless such insurance policies are no longer necessary for the operation of the Business;

(m)    promptly advise Purchaser in writing if Seller becomes aware of any threatened or actual claim, action, suit, or proceeding, arbitration or investigation against the Business, any of its employees or the Purchased Assets, which if adversely determined would result in a Material Adverse Effect; and

(n)    subject to the Sale Order, not enter into any agreement, other than this Agreement, for the sale of the Purchased Assets.

Section 8.4    Satisfaction of Conditions.    Each of Seller and Purchaser shall use reasonable commercial efforts to obtain the satisfaction of the conditions to its obligation to close the Contemplated Transactions as specified in Article X of this Agreement.

Section 8.5    Consents; Insurance.

(a)    Through the filing of the Sale Motion and except as may be satisfied through the entry of the Sale Order, Seller shall use its commercially reasonable efforts, and Purchaser shall cooperate with Seller, to obtain at the earliest practicable date following entry of the Sale Order all necessary consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Seller (including all consents listed in Section 5.3 of the Seller Disclosure Schedule), and to give at the earliest practicable date following entry of the Sale Order any notices required to be given by Seller, in order for Seller to consummate the Contemplated Transactions on the terms and in the manner provided hereby; provided that Seller shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than post-petition filing or post-petition application fees payable to any Governmental Body) or to initiate any Legal Proceedings to obtain any such item, except as otherwise provided in this Agreement. Purchaser shall use its commercially reasonable efforts, and Seller shall cooperate with Purchaser, to obtain at the earliest practicable date following entry of the Sale Order all consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Purchaser, and to give at the earliest practicable date following entry of the Sale Order any notices required to be given by Purchaser, in order for Purchaser to consummate the Contemplated Transactions on the terms and in the manner provided hereby and to operate the Business after the Closing; provided that Purchaser shall not be obligated to pay any consideration

4326651v.5

therefor to any third party from whom any such item is requested (other than filing or application fees payable to any Governmental Body) or to initiate any Legal Proceedings to obtain any such consent or approval, except as otherwise provided in this Agreement.

    Section 8.6    <u>Regulatory Approvals</u>.

    (a)    Purchaser shall, at its own cost and expense, (i) subject to Seller's timely cooperation to the extent reasonably required by Purchaser, within the later of thirty (30) days after the date hereof or two (2) Business Days after Purchaser's receipt of notice from Seller that the Sale Order was entered, formally submit a complete CON Application to DOH; and (ii) promptly after the entry of the Sale Order, submit to any other Governmental Body all other applications for any Healthcare Regulatory Consents required in order for Purchaser to consummate the Contemplated Transactions and to operate the Business in accordance with applicable Law (collectively with the CON Application, the "<u>Healthcare Applications</u>"), excepting however such applications which are required to be filed after the Closing, and further excepting such applications for Healthcare Regulatory Consents which are required to be filed by Seller in order to consummate the Contemplated Transactions, which shall be promptly submitted and diligently prosecuted by Seller, at its sole cost and expense, after the entry of the Sale Order by the Bankruptcy Court. Purchaser shall use its best efforts to prosecute its Healthcare Applications and shall, subject to the cooperation required of Seller, timely submit all information and Documents requested in connection therewith by DOH and any other Governmental Body. Without limiting the generality of the foregoing, Purchaser shall promptly take such actions as may be reasonably necessary to cure any character or competency objections that DOH may raise to the CON Application, including removing or substituting any members, officers, directors, or employees of Purchaser that fail to obtain character and competency approval from DOH. Each party shall provide the other with prompt written notice of such party's submission of a Healthcare Application. Within five (5) Business Days of its submission or receipt, a party shall deliver to the other party, or to the other party's counsel, a complete copy of all correspondence to or from DOH or any other applicable Governmental Body having jurisdiction concerning a Healthcare Application. Each party shall provide the other party, or the other party's counsel, with periodic reports of a party's efforts to obtain all Healthcare Regulatory Consents. In addition, Purchaser shall provide Seller with notice as promptly as practicable of its receipt of DOH's approval, contingent approval or a rejection of the CON Application, or of any pending or threatened claim or Legal Proceeding which seeks to challenge the Contemplated Transactions, along with a copy of any documentation related thereto. Purchaser shall not knowingly take any action prior to the Closing intended to disqualify Purchaser as an established and licensed operator of the Business. Purchaser shall timely respond to any "30-day letters" relating to Purchaser's CON Application and shall not seek any extension of the deadline within which Purchaser must respond to any such 30-day letter without the written approval of Seller in each instance, which written approval will not be unreasonably withheld by Seller.

    (b)    Intentionally Omitted.

    (c)    If necessary, each of Purchaser and Seller shall use its commercially reasonable efforts to (i) make or cause to be made all filings required of each of them in respect of the Contemplated Transactions under any applicable Law, including such filings as are required to obtain the consents, approvals, authorizations, waivers, Orders, licenses or Permits or to provide

<center>37</center>

the notices specified in Section 5.3 of the Seller Disclosure Schedule or Section 6.3(a) of the Purchaser Disclosure Schedule, as promptly as practicable, (ii) comply at the earliest practicable date with any request for additional information, Documents, or other materials received by each of them from any Governmental Body in respect of such filings or the Contemplated Transactions and (iii) cooperate with each other in connection with resolving any investigation or other inquiry of any Governmental Body under such Laws with respect to any such filing or any such transaction.

(d)     Each of Purchaser and Seller shall use its commercially reasonable efforts to furnish to each other through counsel all information required for any application or other filing to be made pursuant to any applicable Law in connection with the Contemplated Transactions. Each such party shall promptly inform the other parties through counsel of any material oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. Seller shall not independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation or other inquiry without giving the Purchaser prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate.

Section 8.7    Further Assurances.

(a)     Subject to the terms and conditions of this Agreement, each party shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the Contemplated Transactions and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Contemplated Transactions. Without limiting the generality of the foregoing, from time to time after the Closing, without additional consideration, each party hereto will (or, if appropriate, cause its Affiliates to) execute and deliver such further instruments and take such other action as may be necessary or reasonably requested by the other party to make effective the Contemplated Transactions and to provide the other party with the intended benefits of this Agreement. In addition, upon the reasonable request of Purchaser, Seller shall execute, acknowledge and deliver all such further assurances, deeds, assignments, powers of attorney and other instruments and paper as may be required to sell, transfer, convey, assign and deliver to Purchaser all right, title and interest in, to and under the Purchased Assets. If any party to this Agreement shall, following the Closing, have in its possession any asset or right which under this Agreement should have been delivered to the others at the Closing, such party shall promptly deliver such asset or right to the others.

(b)     Without limiting the generality of the foregoing, if Purchaser or any of its Affiliates shall at any time after the Closing receive any charitable gift, contribution or bequest that might be an Excluded Asset, or receives any notice that such a charitable gift, contribution or bequest may be received or available to Purchaser, Purchaser shall give prompt written notice thereof to Seller and make available to Seller upon reasonable request such information that Purchaser or any of its Affiliates has available to it regarding such gift, contribution or bequest and will cooperate with Seller in determining whether such gift, contribution or bequest should be characterized as an Excluded Asset, which shall be paid over to Seller in accordance with the terms of this Agreement.

(c)     The provisions of this Section 8.7 shall survive the Closing.

4326651v.5

Section 8.8    Confidentiality.

(a)    From and after the date hereof, Purchaser shall, and shall cause its Representatives to, maintain in confidence, not disclose to any third party without the prior written consent of Seller, and not use to the detriment of Seller, any Seller Confidential Information relating to or obtained from Seller or its Representatives except that from and after the Closing Effective Date Purchaser may make disclosures in connection with (i) operating the Businesses in the ordinary course and in accordance with the Receivership Agreement, (ii) any investigations by Governmental Bodies, (iii) compliance activities after the Closing related to periods occurring after the Closing Effective Date, (iv) any claims or Legal Proceedings, (v) enforcing any rights or other claims of Purchaser under this Agreement, (vi) performing any obligations of Purchaser under this Agreement, including billing and collecting Pre-Closing Accounts Receivable and other related activities, or (vii) as permitted by the Medical Records Custody Agreement. For purposes of this Section 8.8, "Seller Confidential Information" shall mean any information that is confidential or proprietary in nature that is related to the Purchased Assets, the Assumed Liabilities, the Business, the Excluded Assets or the Excluded Liabilities, including methods of operation, patient information, prices, fees, costs, Technology, Software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided that Seller Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) is or becomes generally available to the public other than as a result of a disclosure by Purchaser or any of its Representatives, (ii) becomes available to Purchaser on a non-confidential basis from a source other than Seller or its Representatives; provided that such source is not known by Purchaser to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller, (iii) is lawfully received by Purchaser from a third party having the right to disseminate such information without restriction on disclosure or (iv) can be shown by Purchaser through written Documents or evidence maintained by Purchaser to have been independently developed; and provided, further, that the restrictions contained in this Section 8.8 shall not apply after the Closing Date to the Business Confidential Information (defined below).  Purchaser may disclose any of the Seller Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who agree to keep it confidential. Purchaser shall instruct its Representatives having access to the Seller Confidential Information of such obligation of confidentiality. If Purchaser or anyone to whom it has transmitted Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Confidential Information, Purchaser shall provide Seller with prompt written notice prior to making any disclosure so that Seller may, at its sole cost and expense, seek a protective Order or other appropriate remedy. If such protective Order or other remedy is not obtained, Purchaser shall furnish only that portion of the Seller Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed, and Purchaser will exercise commercially reasonable efforts to obtain assurance to the extent possible that confidential treatment will be accorded to that portion of Seller Confidential Information that is being disclosed. In any event, Purchaser will not oppose action by Seller to obtain an appropriate protective Order or other reliable assurance that confidential treatment will be accorded Seller Confidential Information. The restrictions contained hereinabove shall not apply to any disclosures made in connection with obtaining the Regulatory Approvals contemplated under this Article VIII or in connection with any other legitimate purpose of Purchaser related to the Contemplated Transactions including any financing Purchaser may seek to obtain in connection with the within transactions.

4326651v.5

(b)    From and after the Closing Date, unless this Agreement is terminated prior to the Closing, Seller shall, and shall cause its Representatives to, maintain in confidence, not disclose to any third party without the prior written consent of Purchaser, and not use to the detriment of Purchaser, any Business Confidential Information, other than in connection with (i) operating other businesses (not related to the Business) in the ordinary course, (ii) any investigations by Governmental Bodies, (iii) compliance activities after the Closing related to periods occurring prior to the Closing Effective Date, (iv) any claims or Legal Proceedings, (v) enforcing any rights or other claims of Seller under this Agreement, (vi) performing any obligations of Seller under this Agreement, or (vii) as permitted by the Medical Records Custody Agreement. For purposes of this Section 8.8, "Business Confidential Information" shall mean any information that is confidential or proprietary in nature that pertains to the Business or to the Purchased Assets or the Assumed Liabilities, other than information primarily pertaining to the Excluded Assets or the Excluded Liabilities, including methods of operation, patient information, prices, fees, costs, Technology, Software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided that Business Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Seller or its Representatives in violation of this Agreement, (ii) becomes available to Seller after the Closing Effective Date on a non-confidential basis from a source other than Seller or its Representatives; provided that such source is not known by Seller to be bound by a confidentiality agreement with, or other obligation of secrecy to, Purchaser, or (iii) is lawfully received by Seller from a third party having the right to disseminate the Business Confidential Information without restriction on disclosure. Seller may disclose any of the Business Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who agree to keep it confidential. Seller shall instruct its Representatives having access to the Business Confidential Information of such obligation of confidentiality. If Seller or anyone to whom it has transmitted Business Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Business Confidential Information, Seller shall provide Purchaser with prompt notice prior to making any disclosure so that Purchaser may seek, at its sole cost and expense, a protective Order or other appropriate remedy. If such protective Order or other remedy is not obtained, Seller shall furnish only that portion of the Business Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed, and Seller will exercise commercially reasonable efforts to obtain assurance to the extent possible that confidential treatment will be accorded to that portion of Business Confidential Information that is being disclosed. In any event, Seller will not oppose action by Purchaser to obtain an appropriate protective Order or other reliable assurance that confidential treatment will be accorded Business Confidential Information.

Section 8.9    Preservation of Records.  Purchaser agrees that it shall preserve and keep the records held by it relating to the operation of the Business prior to the Closing Date for the maximum period of time after the Closing Date as required by Law, and shall, subject to the Medical Records Custody Agreement, make such records and personnel available to Seller at Seller's sole expense as may be reasonably required by Seller in connection with, among other things, any insurance claims, Legal Proceedings or tax audits or other governmental or healthcare payor investigations or audits of Seller or any of its Affiliates or in order to enable Seller to comply with its obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. In the event Purchaser wishes to destroy such records, Purchaser

4326651v.5

shall first give ninety (90) days prior written notice to Seller and, if it is then existing and functioning, to the Creditors' Committee, and Seller shall have the right at its option and expense, upon prior written notice given to Purchaser within such ninety (90) day period, to take possession of the records within one hundred and twenty (120) days after the date of such notice.

Section 8.10    <u>Publicity</u>.  Each of Seller and Purchaser agrees that it shall not issue any press release or public announcement concerning this Agreement or the Contemplated Transactions without obtaining the prior written approval of the other, which approval will not be unreasonably withheld, delayed or conditioned, unless, in the judgment of such issuing party upon advice of counsel, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement; <u>provided</u> that such party that intends to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other parties with respect to the text thereof. Notwithstanding the foregoing, Purchaser understands that Seller will be filing various pleadings, including the Sale Motion, in furtherance of obtaining Bankruptcy Court approval of this Agreement and the Contemplated Transactions, and Seller understands that Purchaser will be making various filings in connection with the CON Application and in connection with any financing that Purchaser may elect to obtain.

Section 8.11    Intentionally Omitted.

Section 8.12    <u>Supplementation and Amendment of Schedules</u>.

(a)    Purchaser may, at its option, include in the Purchaser Disclosure Schedule, and Seller may, at its option, include in the Seller Disclosure Schedule, as the case may be, any references to dollar amounts, but such references shall not be deemed (i) to be an acknowledgement or representation that such items are material, (ii) to establish any standard of materiality or (iii) to define further the meaning of such terms for purposes of this Agreement. Information disclosed in the Purchaser Disclosure Schedule or the Seller Disclosure Schedule, as the case may be, shall constitute a disclosure for all purposes of this Agreement notwithstanding any reference to a specific Section in such Disclosure Schedule, and all such information shall be deemed to qualify the entire Agreement and not just such Section.

(b)    Unless otherwise expressly set forth herein, no less than three (3) Business Days prior to the Closing Effective Date, Seller shall deliver to Purchaser an update to the Seller Disclosure Schedule to reflect changes thereto which occur between the date hereof and the date which is three (3) Business Days prior to the Closing Effective Date in the Ordinary Course of Business in accordance with <u>Section 8.3</u> hereto and shall, as promptly as practicable following the Closing Effective Date, deliver to Purchaser an update to the Seller Disclosure Schedule to reflect changes thereto between the date which is three (3) Business Days prior to the Closing Effective Date and the Closing Effective Date.

Section 8.13    <u>Cooperation</u>.  Seller and Purchaser agree to reasonably cooperate with each other, from the date hereof through and following the Closing Date, in good faith, in an effort to satisfy all further conditions, undertakings and agreements contained in this Agreement.

41

Section 8.14    Resident Assets.

(a)    At the Closing, a schedule shall be prepared by the Parties of all resident funds held by the Business delineated for each resident, and a check or checks drawn on the residents' accounts maintained by the Business for the full amount of such account(s) shall be deposited by Purchaser in a new residents' allowance account to be maintained by Purchaser (collectively, the "Residents Assets").

(b)    Seller and Purchaser shall promptly give all notices required by applicable Law in connection with the transfer of the Resident Assets.

Section 8.15    Indemnification.

(a)    (1) Seller shall, and hereby agrees to, indemnify, defend and hold Purchaser, its owners, managers, agents, employees and Purchaser's Affiliates, successors and assigns (collectively, the "Purchaser Indemnified Parties") harmless from and against any and all claims, obligations, expenses, costs, Liabilities and damages (including reasonable attorneys' fees) (collectively, "Losses") based on, arising out of or resulting from any and all (i) material breaches of any of Seller's warranties, representations, covenants or agreements contained in this Agreement or in any Seller Document, (ii) Excluded Liabilities, including those relating to Seller's CBAs, Union Agreements and Plans; (iii) failure by Seller to properly remit all Resident Assets to Purchaser; and (iv) Legal Proceedings incident to any of the foregoing or incurred in attempting to oppose the imposition thereof, or incurred in connection with enforcing this indemnity provision.  (2) Purchaser shall, and hereby agrees to, indemnify, defend and hold Seller, its directors, officers, managers, agents, employees and Seller's Affiliates, successors and assigns (collectively, the "Seller Indemnified Parties") harmless from and against any and all Losses based on, arising out of or resulting from any and all (i) material breaches of any of Purchaser's warranties, representations, covenants or agreements contained in this Agreement or in any Purchaser Document; (ii) all claims related to Resident Assets arising after the Closing Effective Date; and (iii) Legal Proceedings incident to any of the foregoing or incurred in attempting to oppose the imposition thereof, or incurred in connection with enforcing this indemnity provision. (3) In the event either party fails to satisfy its obligations under this Section 8.15, the other party shall have the right to setoff Losses incurred against sums otherwise due under this Agreement.

(b)    In the event any of the Indemnified Parties receives notice of a claim or a Legal Proceeding for which a party is entitled to indemnification pursuant to this Section 8.15, then such party shall promptly (i) notify the other party of the claim or the Legal Proceeding, (ii) provide the other party copies of any correspondence it receives with respect to such claims Legal Proceeding, and (iii) fully cooperate with the other party (at the other party's expense for any reasonable costs actually incurred by such party in providing such cooperation) in connection with the defense and/or settlement thereof.

(c)    Notwithstanding any provision of this Agreement to the contrary, if the Indemnified Party fails to promptly notify the other party or fails to provide copies of any correspondence it receives concerning a claim or Legal Proceeding as to which such Indemnified Party would be entitled to indemnification under this Section 8.15, then, provided that the other party is not already aware of such claim or Legal Proceeding and/or did not otherwise receive the

42

foregoing correspondence, such Indemnified Party shall be entitled to indemnification under this Section 8.15 except for only that portion of the indemnifiable Losses that are directly attributable to the Indemnified Party's failure to promptly notify the other party. Notwithstanding any provision of this Agreement to the contrary, if an Indemnified Party makes any payments in respect of any claim or Legal Proceeding for which such Indemnified Party is entitled to indemnification under this Section 8.15, the payment of which was not expressly authorized in writing by the other party, then such Indemnified Party shall nonetheless still be entitled to indemnification under this Section 8.15 for any such claim or Legal Proceeding.

(d)     The provisions of this Section 8.15 shall expire and be of no further force and effect upon the expiration of the applicable statute of limitations.

Section 8.16    Intentionally Omitted.

Section 8.17    Receivership Agreement.

(a)     Contemporaneously herewith, the Seller and the Purchaser (in such capacity, the "Receiver") are entering into a Receivership Agreement – Nursing Home (the "Receivership Agreement"), pursuant to which the Receiver will assume the management and responsibility for the Business through the Closing Date, to the extent permitted by applicable Law, on and in accordance with the terms and subject to the conditions of such Receivership Agreement. The Receivership Agreement is subject to the prior approval of DOH and the Bankruptcy Court and shall not become effective unless and until DOH and the Bankruptcy Court have approved the same, with such changes, if any, as are acceptable to Seller and Purchaser in their discretion. In the event the DOH and the Bankruptcy Court approve the Receivership Agreement in a form acceptable to the Seller and Purchaser, the Receivership Agreement shall become effective on the date specified therein (the "Receivership Date").

(b)     The parties shall submit the Receivership Agreement to DOH for approval promptly following the entry of the Sale Order. The Receivership Agreement will terminate upon the Closing or otherwise in accordance with its terms.

## ARTICLE IX

## EMPLOYEES AND EMPLOYEE BENEFITS

Section 9.1    Offers of Employment.

(a)     Purchaser intends, but is not obligated to, offer employment, commencing on the Closing Effective Date, to a majority of the employees of Seller, including those on vacation, leave of absence, disability or layoff, who are employed by the Seller on the day immediately preceding the Closing Effective Date upon such terms and conditions as Purchaser may elect. All such employees who accept Purchaser's offer of employment shall become employees of Purchaser as of the Closing Effective Date (hereinafter collectively referred to as the "Transferred Employees"). Purchaser does not assume or adopt nor shall it be obligated to assume or adopt any of Seller's CBAs.

4326651v.5

(b)    Subject to the provisions of the Receivership Agreement, if applicable, prior to, or in connection with, the Closing Effective Date, Purchaser shall take no action to cause Seller or the Business to terminate the employment of any employee, and neither Seller nor the Business shall be under any obligation to terminate any employee prior to or on the Closing Effective Date. As of the Closing Effective Date, Seller shall not have any liability or responsibility with respect to any employee benefit plan, program, policy or other arrangement maintained by or contributed to by Purchaser with respect to Transferred Employees. Except as set forth in <u>Section 9.2</u> below, Purchaser shall not be obligated after the Closing Effective Date for any obligation or liability of Seller to Employees which arises prior to the Closing Effective Date, including but not limited to any and all employee compensation and benefit obligations or any obligation that may arise from the CBAs or otherwise which, as noted in this Agreement, are not assumed or adopted by Purchaser. To the extent that Purchaser offers employment to employees of Seller, their rates of pay and other conditions of employment on and after the Closing Effective Date shall be determined by Purchaser.

Section 9.2    <u>Employment Terms; Employee Benefits</u>.

(a)    As of the Closing Effective Date, Purchaser shall assume all wage payment obligations for vacation, holiday time, and personal days which were accrued by Transferred Employees but not yet taken or paid as of the Closing Effective Date (collectively, the "<u>PTO</u>"), which to the best of Seller's Knowledge is listed on <u>Section 9.2(a)</u> of the Seller Disclosure Schedule.

(b)    To the extent Seller becomes subject to any Liabilities under the WARN Act or any comparable state or local Law by reason of any act or omission by Purchaser (or any successor thereto, including the Receiver under the Receivership Agreement), Purchaser shall be responsible therefor. Without limiting the foregoing, and notwithstanding anything to the contrary herein, Purchaser shall be responsible for, shall pay as and when due, and shall defend, indemnify and hold harmless Seller from and against, amounts due after the Closing Effective Date under the New York State Unemployment Insurance Law with respect to employees of Seller (including those on vacation, leave of absence, disability or layoff) who are employed by Seller on the day immediately preceding the Closing Effective Date, whether or not such employees become Transferred Employees.

(c)    Intentionally Omitted.

(d)    Nothing contained in this Agreement, expressed or implied, shall be construed to confer upon any of the employees or Transferred Employees (including any beneficiary or dependent thereof) any rights or remedies whatsoever, including, without limitation, any right to employment or continued employment for any specified period or of any nature or kind.

4326651v.5

# ARTICLE X

# CONDITIONS TO CLOSING

Section 10.1    Conditions Precedent to Obligations of Purchaser.    The obligation of Purchaser to consummate the Contemplated Transactions as provided by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of Seller set forth in this Agreement and the Seller Documents shall be true and correct in all material respects at and as of the Closing Effective Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date), and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated as of the Closing Date, to the foregoing effect;

(b)    Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement and the Seller Documents to be performed or complied with by it prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated as of the Closing Date, to the foregoing effect;

(c)    Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in clauses (a) through (g) of Section 4.2 hereto;

(d)    all notices, consents, approvals, licenses or Permits, or waivers thereof, of the Governmental Bodies set forth in Section 10.1(d) of the Seller Disclosure Schedule and in Section 10.2(c) of the Purchaser Disclosure Schedule shall have been made or obtained, and any applicable waiting period under any Antitrust Laws shall have expired or been terminated;

(e)    the closing of the transactions contemplated by the Real Estate Contract shall have closed or will close simultaneously with the Closing hereunder; and

(f)    the Sale Order as approved by Purchaser shall be in effect and shall not be modified.

Section 10.2    Conditions Precedent to Obligations of Seller.    The obligation of Seller to consummate the Contemplated Transactions as provided by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of Purchaser set forth in this Agreement and the Purchaser Documents shall be true and correct in all material respects at and as of the Closing, except to the extent such representations and warranties relate expressly to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date) and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, to the foregoing effect;

4326651v.5

(b)       Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement and the Purchaser Documents to be performed or complied with by Purchaser on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, to the foregoing effect;

(c)       all notices, consents, approvals, licenses or Permits, or waivers thereof, of the Governmental Bodies set forth in Section 10.2(c) of the Purchaser Disclosure Schedule and in Section 10.1(d) of the Seller Disclosure Schedule shall have been made or obtained, and any applicable waiting period under any of the Antitrust Laws shall have expired or been terminated;

(d)       the closing of the transactions contemplated by the Real Estate Contract shall have closed or will close simultaneously with the Closing hereunder; and

(e)       Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 4.3 hereto.

Section 10.3   Conditions Precedent to Obligations of Purchaser and Seller.   The respective obligations of the parties to consummate the Contemplated Transactions as provided by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser or Seller, respectively as the case may be, in whole or in part to the extent permitted by applicable Law):

(a)       there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Contemplated Transactions;

(b)       the Sale Order shall have been entered by the Bankruptcy Court and not be subject to any stay or the time for an appeal has expired;

(c)       in the event an appeal is taken from the entry of the Sale Order on the grounds that the Sale Order improperly authorized the sale of assets to Purchaser free and clear of all Liens, such appeal shall have been finally decided affirming the entry of the Sale Order and all time to further appeal shall have expired; and

(d)       the New York State Office of Attorney General shall have approved the within transactions as well as the transactions contemplated by the Real Estate Contract within the time frame set forth in the Real Estate Contract.

Section 10.4   Frustration of Closing Conditions.   No party may rely on the failure of any condition set forth in Section 10.1, 10.2 or 10.3 hereto, as the case may be, to excuse it from consummating the Closing hereunder if the failure of any such condition set forth in Section 10.1, 10.2 or 10.3 hereto was primarily caused by such party's failure to materially comply with any provision of this Agreement, the Real Estate Contract, the Receivership Agreement or any other Seller Document or Purchaser Document.

4326651v.5

# ARTICLE XI

# TAXES

Section 11.1    Transfer Taxes.    Seller shall be liable for and shall timely pay any transfer or similar fees or Taxes or governmental charges (including any interest and penalty thereon) customarily paid by a seller that are payable in connection with the Contemplated Transactions and from which Seller is not exempt ("Transfer Taxes"); and Purchaser shall be liable for the payment of any New York State, city, county or other sales, filing, recording or similar fees or Taxes or governmental charges (including any interest and penalty thereon) customarily paid by a purchaser and payable in connection with the Contemplated Transactions ("Sales Taxes"). Purchaser shall make due and timely payment of any Sales Tax to the applicable Tax Authority and shall provide Seller with a true and complete copy of each Tax Return relating to Sales Taxes as filed and evidence of the timely filing of such Tax Return and payment of such Sales Tax.  The parties shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds of Sales Taxes.

Section 11.2    Prorations.    All applicable real and personal property Taxes or similar ad valorem obligations levied with respect to the Purchased Assets, if any, for any taxable period that includes the Closing Effective Date and ends after the Closing Effective Date, whether imposed or assessed before or after the Closing Effective Date, and any payroll due Transferred Employees (including split week) fully burdened with all taxes and costs thereon, shall be prorated between Seller and Purchaser as of 12:01 a.m. (New York time) on the Closing Effective Date based on the number of days in such period through and including the day prior to the Closing Effective Date and the number of days in such period on and after the Closing Effective Date. If any Taxes subject to proration are paid by Purchaser, on the one hand, or Seller, on the other hand, the proportionate amount of such Taxes paid (or in the event of a refund of any portion of such Taxes previously paid is received, such refund) shall be paid promptly by (or to) the other after the payment of such Taxes (or promptly following the receipt of any such refund).

Section 11.3    Purchase Price Allocation.    The Purchase Price will be allocated for Tax purposes (the "Allocation") among the Purchased Assets as set forth in Section 11.3 of the Purchaser Disclosure Schedule. The Seller and the Purchaser shall report the Allocation as provided in Section 1060 of the Code, and shall prepare and file all Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with the Allocation. No party shall take any position (whether in audits, Tax Returns or otherwise) that is inconsistent with the Allocation unless required to do so by applicable Law.

Section 11.4    Cooperation on Tax Matters.    The parties shall furnish or cause to be furnished to each other, as promptly as practicable following the request therefor, and at the expense of the requesting party, such information and assistance relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other filings relating to Tax matters, for the preparation for and defense of any Tax audit, for the preparation of any Tax protest, or for the prosecution or defense of any suit or other proceeding relating to Tax matters.

4326651v.5

# ARTICLE XII

# MISCELLANEOUS

Section 12.1    Expenses.    Except as otherwise expressly provided in this Agreement, each party shall bear its own costs and expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.    The prevailing party in any dispute concerning this Agreement shall be entitled to recover its fees and costs, including reasonable attorneys' fees and court costs incurred in such dispute.

Section 12.2    Specific Performance.    Seller agrees that if any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached by Seller, irreparable damage to Purchaser would occur, no adequate remedy at law would exist and damages would be difficult to determine, and that Purchaser shall be entitled to specific performance of the terms hereof (without the posting of any bond), in addition to any other remedy at law or equity. The rights set forth in this Section 12.2 shall be in addition to any other rights which Purchaser may have at law or in equity pursuant to this Agreement.

Section 12.3    Governing Law; Jurisdiction; Consent to Service of Process.    This Agreement and any disputes arising in connection herewith shall be governed by and construed in accordance with the internal Laws of the State of New York without regard to the conflict of law principles thereof. Without limiting any party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (b) any and all Legal Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court.  Each of the parties hereto hereby (a) irrevocably submits with regard to any such Legal Proceeding to the exclusive personal jurisdiction of the Bankruptcy Court in the event any dispute arises out of this Agreement or any transaction contemplated hereby, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court or that such action is brought in an inconvenient forum and (c) agrees that it shall not bring any action relating to this Agreement or any transaction contemplated hereby in any court other than the state or federal courts referenced above. Each of the parties hereto further agrees to accept and acknowledge service of any and all process which may be served in any such Legal Proceeding in the Bankruptcy Court in the State of New York, and agrees that service of process upon such party by a method permitted by the applicable Laws of the State of New York to such party's address as set forth in Section 12.6 hereto, will be deemed in every respect effective service of process upon such party, in any Legal Proceeding.

Section 12.4    WAIVER OF JURY TRIAL.    EACH OF THE PARTIES HEREBY WAIVES TRIAL BY JURY IN ANY ACTION TO WHICH THEY ARE PARTIES INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO OR CONNECTED WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 12.5    <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement (including the schedules and exhibits hereto and the Real Estate Contract referenced herein), the Escrow Agreement, and the Receivership Agreement contain the entire understanding and agreement of the parties hereto and thereto with respect to the subject matter hereof and thereof and supersede all previous written or oral negotiations, commitments, understandings and writings with respect to such subject matter. This Agreement may be amended, modified, supplemented or changed, and any provision hereof can be waived, only by written instrument duly executed by all of the parties hereto and approved by the Bankruptcy Court.  Any party hereto may, by written notice to the other parties hereto, (a) extend the time for performance of any of the obligations of the other party under this Agreement, (b) waive any inaccuracies in the representations or warranties of the other party contained in this Agreement, (c) waive compliance with any of the conditions or covenants of the other party contained in this Agreement or (d) waive or modify performance of any of the obligations of the other party under this Agreement; subject in each case to all necessary approvals of the Bankruptcy Court. Except as provided in the immediately preceding sentence, no action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, condition, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach, whether of a similar or dissimilar nature. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

Section 12.6    <u>Notices</u>.  All notices and other communications under this Agreement shall be in writing and, unless otherwise provided in this Agreement, shall be deemed given (a) when delivered personally by hand, (b) when sent by facsimile (confirmed in writing by mail promptly thereafter dispatched), (c) three (3) days after being mailed by certified or registered mail, postage prepaid, return receipt requested or (d) one (1) Business Day following the day sent by a nationally recognized overnight courier service, in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

      (a)    If to Purchaser, to:

         Delmar SNF Operations Associates, LLC
         4770 White Plains Road, 3rd floor
         Bronx, New York 10470
         Attn:   Kenneth Rozenberg
                 Managing Member

         with a copy to (which shall not constitute notice):

         Isidor Friedenberg, Esq.
         2 Cara Drive
         Suffern, New York 10901

4326651v.5

Fax:    (845) 362-0168

(b)    If to Seller, to:

Good Samaritan Lutheran Health Care Center, Inc.
c/o The Lutheran Care Network
700 White Plains Road
Scarsdale, New York  10583
Attn:  Ms. Laraine Fellagara

with copies to each of (which shall not constitute notice):

Deborah A. Reperowitz, Esq.
Stradley Ronon Stevens & Young, LLP
100 Park Avenue, Suite 2000
New York, NY 10017
Email:    dreperowitz@stradley.com
Fax:    646.682.7180

Amalgamated Bank
275 Seventh Avenue
New York, New York 10001
Attention: Melony Hey

Amalgamated Bank
275 Seventh Avenue
New York, New York 10001
Attention: General Counsel

and

John Mairo, Esq.
Kelly Curtin, Esq.
Porzio Bromberg & Newman P.C.
100 Southgate Parkway
Morristown, NJ 07962-1997
Fax:    973.538.5146

Section 12.7    Invalid Provisions.   If any term or other provision of this Agreement is held to be invalid, illegal, or incapable of being enforced under any present or future Law, and if the rights or obligations under this Agreement of Seller on the one hand and Purchaser on the other hand will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement

50

a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

Section 12.8    Binding Effect; Assignment; Successors and Assigns.    This Agreement shall apply to, be binding in all respects upon and inure to the benefit of the parties and their respective successors, administrators and permitted assigns. A successor to Seller shall include Seller as a reorganized debtor. No assignment of this Agreement or of any rights or obligations hereunder may be made by any party (by operation of Law or otherwise) without the prior written consent of Purchaser and Seller and any required approval of the Bankruptcy Court, and any attempted assignment without the required consents shall be void. No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their respective successors, administrators and permitted assigns.

Section 12.9    No Personal Liability.    In entering into this Agreement, the parties understand, agree and acknowledge that no director, trustee, officer, manager, member, employee, shareholder, attorney, accountant, advisor or agent of any party hereto shall be personally liable or responsible to any other party or its Affiliates, directors, trustees, officers, managers, members, employees, shareholders, attorneys, accountants, advisors or agents for the performance of any obligation under this Agreement of any party to this Agreement or the truth, completeness or accuracy of any representation or warranty contained in, or statement made in, this Agreement or any document prepared pursuant hereto and that all obligations hereunder are those of the named parties only (but nothing contained herein shall limit the Liability of any Person for his or her fraudulent acts).

Section 12.10    Execution in Counterparts.    This Agreement may be executed in two (2) or more counterparts, each of which will be deemed an original, but all of which together will constitute one (1) and the same agreement. Any counterpart may be executed by facsimile signature, or by electronic mail in "portable document format" (".pdf"), and such facsimile or .pdf signature shall be deemed an original.

Section 12.11    Survival of Representations, Warranties and Covenants.    Except as otherwise specifically set forth in this Agreement, the representations, warranties and covenants of the parties contained in this Agreement shall survive the Closing.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

4326651v.5

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**GOOD SAMARITAN LUTHERAN HEALTH CARE CENTER, INC.**

By: _____

Name: Thomas Roerke

Title: Director

**DELMAR SNF OPERATIONS ASSOCIATES, LLC**

By: _____

Name: Kenneth Rozenberg

Title:  Managing Member

52

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**GOOD SAMARITAN LUTHERAN HEALTH CARE CENTER, INC.**

By: _____
    Name:
    Title:

**DELMAR SNF OPERATIONS ASSOCIATES, LLC**

By: _____
    Name: Kenneth Rozenberg
    Title:  Managing Member

4326651v.5

**EXHIBIT A**
**Form of Medical Records Custody Agreement**

**MEDICAL RECORDS CUSTODY AGREEMENT**

THIS MEDICAL RECORDS CUSTODY AGREEMENT (this "Agreement") is made and entered into as of _____, 2020, by and between Good Samaritan Lutheran Health Care Center, Inc., a New York not-for-profit corporation ("Seller"), and Delmar SNF Operations Associates, LLC, a New York limited liability company ("Purchaser").

WHEREAS, Seller and Purchaser entered into an Asset Purchase Agreement, dated as of December 10, 2019, pursuant to which Seller agreed to sell, and Purchaser agreed to purchase, substantially all of the assets of the 120 bed skilled nursing and residential health care facility operated by Seller under the name Bethlehem Commons Residential Care Center (the "Facility") pursuant to the terms and conditions set forth therein (the "Asset Purchase Agreement") effective upon the Closing (as defined in the Asset Purchase Agreement);

WHEREAS, Seller wishes to ensure the continuation of necessary health care services for patients of the Facility and to provide for the smooth transfer of the Patient Records (as defined below) to Purchaser so that the Patient Records may be accessed readily by health care providers that will provide continuing treatment to the patients; and

WHEREAS, Purchaser also has agreed to assume the custody and storage of the Patient Records pursuant to applicable law.

NOW, THEREFORE, in consideration of the mutual promises contained herein, as well as other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.   Transfer and Custody of Patient Records.

a.   Upon the Closing, Seller will transfer to Purchaser custody of its existing patient records, patient charts and patient films for patients receiving health care services from the Facility, including paper records and digital media records (the "Patient Records").  Seller hereby appoints Purchaser, and Purchaser agrees to serve during the term of this Agreement, as custodian for the maintenance, safekeeping, inspection and copying of the Patient Records.

b.   The parties agree that the Patient Records are being transferred for custodial purposes to Purchaser hereunder for purposes of the care and treatment of patients by Purchaser, its employees and staff, the billing activities of Purchaser related to such care and the operations of the Facility as operated by Purchaser.

c.   Purchaser shall store and maintain the Patient Records in accordance with applicable Federal, State and local laws, rules and regulations, including those laws, rules and regulations governing the confidentiality of patient protected health information, and Purchaser shall take reasonable measures to protect the Patient Records from theft, loss, unauthorized destruction and unauthorized access.  Purchaser shall at all times safeguard the safety of the Patient

- 53 -

Records and will promptly report to Seller any problems or security incidents with respect to the Patient Records.

        d.     All Patient Records transferred to Purchaser hereunder shall be retained by Purchaser for the time period required by applicable law or regulation. Notwithstanding the foregoing, in the event that Seller notifies Purchaser of an actual or potential claim, investigation or litigation regarding a particular patient, Purchaser shall retain the Patient Records for that individual until Seller notifies Purchaser that such Patient Records can be destroyed. Subject to the previous sentence, nothing herein shall prohibit Purchaser from transferring the Patient Records to off-site storage facilities and/or destroying the Patient Records following the end of the applicable minimum retention period specified in this Section 1(d).

        2.     <u>Patient Communication and Access</u>.

        a.     Purchaser shall provide timely access to, and photocopies of, the Patient Records to patients and their legal representatives to the extent required by laws, rules or regulations applicable to the parties, and to other individuals, entities, and governmental agencies that have the right to access and/or receive photocopies of Patient Records. Such access and copies shall be provided within the time periods required by applicable laws, rules and regulations. Purchaser may charge appropriate copying fees, consistent with its then-existing policies and procedures and the requirements of applicable laws, rules and regulations. The form of authorization/release for Patient Records which shall be utilized for such purpose shall be compliant with applicable federal and state law.

        b.     Purchaser shall promptly provide Seller with access to the Patient Records upon request during regular business hours, at no cost to Seller. Purchaser shall provide copies of Patient Records to Seller upon written request at the cost of five (5) cents per page. Seller shall not request access to or copies of any Patient Records, or portions thereof, which Seller is not entitled to receive from Purchaser in accordance with applicable state and federal law and regulations in effect as of the time of request.

        3.     <u>Legal and HIPAA Compliance</u>. Purchaser acknowledges that the Patient Records being transferred hereunder are confidential. In the event that a patient or other appropriate person under applicable laws, rules or regulations (including, without limitation, a committee for an incompetent, a conservator, or other person pursuant to court order) requests that a copy of a patient's Patient Records be provided to such person or to another health care provider, Purchaser shall promptly forward, or shall cause its designee to forward, a copy of the Patient Records; *provided,* that in all instances, Purchaser or its designee shall comply with all provisions of applicable law, rules and regulations with respect to the confidentiality of such Patient Records. With respect to the Patient Records transferred to Purchaser hereunder, Purchaser shall abide by all applicable laws, rules and regulations applicable to such records, including, without limitation, the Federal Health Insurance Portability and Accountability Act of 1990 and its related regulations.

4326651v.5

4.    <u>Term and Termination</u>.

a.    This Agreement shall taKe effect upon execution by the parties hereto and shall remain in effect for as long as Purchaser retains custody of the Patient Records transferred hereunder.

b.    This Agreement may be terminated at any time by the mutual written agreement of the parties.

5.    <u>Insurance</u>.  Purchaser represents and warrants that its activities hereunder are covered by insurance policies in the minimum amount of $1,000,000 per incident, $3,000,000 in the aggregate.  Purchaser shall provide a certificate of insurance evidencing such coverage upon execution of this Agreement.

6.    <u>Miscellaneous</u>.

a.    Neither party may assign this Agreement without the express prior written consent of the other party, and any attempt to assign this Agreement without such consent shall be void.

b.    Neither party shall be authorized to act as agent for the other or to incur any liability in the name of or on behalf of the other, unless specifically authorized in this Agreement or in a writing executed by the party that would be responsible for the obligation.

c.    This Agreement shall be governed by the laws of the State of New York, exclusive of conflict of law rules.  Each party to this Agreement hereby agrees and consents that any dispute with respect to this Agreement shall only be adjudicated by the Bankruptcy Court (as defined in the Asset Purchase Agreement).  By execution and delivery of this Agreement, each such party hereby: (i) accepts the jurisdiction of the Bankruptcy Court; (ii) agrees to be bound by any order of the Bankruptcy Court; (iii) waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the venue set forth above; and (iv) further waives any claim that the Bankruptcy Court is an inconvenient forum.

d.    Nothing express or implied in this Agreement is intended to confer, nor shall anything herein confer, upon any person other than a party hereto any rights, remedies, obligations or liabilities whatsoever.

e.    This Agreement is the entire agreement between the parties concerning the subject matter hereof and supersedes all prior agreements, whether written or oral, concerning such subject matter.  This Agreement shall not be changed or modified, except by a writing signed by both of the parties hereto or their respective successors.  Except as otherwise provided herein, all rights and remedies set forth in this Agreement shall be in addition to and not exclusive of any other rights or remedies now or hereafter existing at law or in equity.

f.    Any notice, request, instruction or document to be given hereunder by any party to another shall be in writing and delivered personally or mailed, first class registered or certified mail, postage prepaid, or by reputable overnight courier, to the address of such other party stated below:

- 55 -

(a)    If to Purchaser, to:

> Delmar SNF Operations Associates, LLC
> 4770 White Plains Road, 3rd floor
> Bronx, New York 10470
> Attn:   Kenneth Rozenberg
>            Managing Member

> with a copy to (which shall not constitute notice):

> Isidor Friedenberg, Esq.
> 2 Cara Drive
> Suffern, New York 10901
> Fax:    (845) 362-0168

(b)    If to Seller, to:

> Good Samaritan Lutheran Health Care Center, Inc.
> c/o The Lutheran Care Network
> 700 White Plains Road
> Scarsdale, New York  10583
> Attn:  Ms. Laraine Fellagara

> with a copy to (which shall not constitute notice):

> Deborah A. Reperowitz, Esq.
> Stradley Ronon Stevens & Young, LLP
> 100 Park Avenue, Suite 2000
> New York, NY 10017
> Email:       dreperowitz@stradley.com
> Fax: 646.682.7180

Each party hereto shall have the right to give notice to the other party changing its address as stated above and such address shall thereupon be deemed to be changed accordingly.

g.    If any provision of this Agreement or the application of any provision hereof to any person or circumstances is held to be legally invalid, inoperative or unenforceable, then the remainder of this Agreement shall not be affected unless the invalid provision substantially impairs the benefits of the remaining portions of this Agreement to the other party or parties.

h.    Any consent or waiver executed in writing by a party hereto shall be binding upon such party from and after the date of execution thereof unless a later or earlier date is specified therein.  No delay or failure to exercise any remedy or right occurring upon any default shall be construed as a waiver of such remedy or right, or an acquiescence in such default, nor shall it affect any subsequent default of the same or a different nature.

4326651v.5

i.       All headings and captions in this Agreement are for convenience only.  They shall not be deemed part of this Agreement and shall in no way define, limit, extend or describe the scope or intent of any provisions hereof.

j.       The parties hereto shall execute and deliver all documents, provide all information and take or forbear from all such action as may reasonably be necessary or appropriate to achieve the purposes set forth in this Agreement.

k.       This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective administrators, successors and assigns.

1.       This Agreement may be executed in counterparts and each such counterpart, when taken together, shall constitute a single and binding agreement.

IN WITNESS WHEREOF, this Medical Records Custody Agreement is signed as of the day and year first above written.

GOOD SAMARITAN LUTHERAN HEALTH CARE CENTER, INC.

By:       _____
          Name:
          Title:

DELMAR SNF OPERATIONS ASSOCIATES, LLC

By:       _____
          Name:
          Title:

4326651v.5

**ESCROW AGREEMENT**

**BY AND AMONG**

**GOOD SAMARITAN LUTHERAN HEALTH CARE CENTER, INC**.

**AND**

**DELMAR SNF OPERATIONS ASSOCIATES, LLC**

**AND**

**NATIONAL GRANITE TITLE INSURANCE AGENCY, INC., AS ESCROW AGENT**

December 10, 2019

4326651v.5

## ESCROW AGREEMENT

**ESCROW AGREEMENT** ("AGREEMENT") is made as of December 10, 2019 by and among **Good Samaritan Lutheran Health Care Center, Inc**., a New York not-for-profit corporation ("Seller"), **Delmar SNF Operations Associates, LLC**, a New York limited liability company ("Purchaser"), and **National Granite Title Insurance Agency, Inc.**,  with offices at 155 North Main Street, New City, New York 10956 (the "Escrow Agent").  All capitalized terms used but not defined herein shall have the meanings assigned to them in the Purchase Agreement (as defined below).

Recitals:  The following recitals are hereby incorporated into this Agreement:

A.      Purchaser and Seller have entered into an Asset Purchase Agreement, dated as of the date hereof (the "Purchase Agreement"), pursuant to which, among other things, Purchaser shall deposit NINETY THOUSAND Dollars ($90,000) (the "Deposit") into escrow with Escrow Agent within one (1) business day after the entry of the Sale Order.  The amount in the Escrow Account (defined below) from time to time, including the Deposit and all earnings thereon, is referred to herein as the "Escrow Fund."

NOW, THEREFORE, the parties hereto agree as follows:

1.      Deposit and Acknowledgment of Receipt.

1.1      Within one (1) business day after the delivery by Seller to Purchaser of a copy of the court entered Sale Order, Purchaser shall deliver to Escrow Agent, and Escrow Agent shall acknowledge receipt of, Purchaser's wire transfer in the amount of the Deposit.

1.2      Intentionally Omitted.

1.3      Escrow Agent hereby agrees to hold the Escrow Fund in an interest-bearing account for the benefit of Seller and Purchaser (the "Escrow Account") pending the disbursement of the Escrow Fund in accordance with the terms of this Agreement.

1.4      The Escrow Fund, until released by the Escrow Agent in accordance with this Agreement, shall not be subject to lien or attachment by any creditor of any party hereto and shall be used solely for the purposes set forth in this Agreement.  Amounts held in the Escrow Account shall not be available to, and shall not be used by, Escrow Agent to set off any obligations of either Purchaser or Seller owing to Escrow Agent in any capacity.

2.      Terms of Escrow.

2.1      Upon the Closing, Escrow Agent shall disburse the Escrow Fund to Seller or as otherwise directed by Seller, without further instruction from Purchaser.

2.2      Escrow Agent shall, subject to Section 2.1, disburse amounts from the Escrow Fund, upon delivery, by Seller and Purchaser to Escrow Agent, of joint written instructions executed by an authorized officer of both parties directing Escrow Agent to deliver to Seller or Purchaser, as the case may be, an amount equal to the amount to which such party is entitled

pursuant to those joint written instructions. Each of Seller and Purchaser agrees to execute and deliver such joint written instructions as are required to cause the Escrow Fund to be disbursed as contemplated by the Purchase Agreement. Upon receipt of the joint written instructions, Escrow Agent shall release by wire transfer to an account or accounts designated by Seller or Purchaser, as the case may be, the amount specified in the joint written instructions.

2.3     Notwithstanding anything to the contrary, in the event that the Sale Order is not entered by March 31, 2020 (including if the Sale Order is issued in form or substance that is not acceptable to Purchaser) and if Purchaser has previously paid the Deposit, then upon Purchaser's termination of the Purchase Agreement and written demand to the Escrow Agent, the Escrow Agent shall refund and pay over the Escrow Fund to Purchaser.

2.4     Notwithstanding anything to the contrary contained in this Agreement, in the event of a dispute concerning the Escrow Fund, the Escrow Agent shall not disburse any amounts from the Escrow Fund until its receipt of (a) joint written instructions from Seller and Purchaser as set forth hereinabove or (b) an order of the United States Bankruptcy Court for the Northern District of New York (the "Bankruptcy Court") directing the disbursement of the Escrow Fund.

2.5     Upon the completion of the disbursements as set forth above, Escrow Agent shall have no further duties hereunder.

3.     Obligations and Liabilities of Escrow Agent.

3.1     The duties and obligations of Escrow Agent shall be determined solely by the express provisions of this Agreement.

3.2     Escrow Agent shall not be responsible in any manner whatsoever for any failure or inability of Purchaser or Seller to perform or comply with any of the provisions of the respective agreements between them.

3.3     Escrow Agent shall not be bound by any modification, cancellation or rescission of this Escrow Agreement unless in writing, signed by Purchaser and Seller and expressly consented to in writing by Escrow Agent.

3.4     Escrow Agent's duties hereunder are as a depository only, ministerial in nature, and Escrow Agent shall incur no liability whatsoever hereunder for any error of judgment, or any action taken or omitted hereunder, except for damages directly resulting from Escrow Agent's gross negligence or willful misconduct as determined by a final and non-appealable judgment of the Bankruptcy Court.

3.5     Delivery of the Escrow Fund by Escrow Agent pursuant to the provisions of this Agreement shall constitute a complete discharge and satisfaction of all obligations of Escrow Agent hereunder.

3.6     Nothing contained herein shall be deemed to preclude Escrow Agent at any time and for any reason from (a) depositing the Escrow Fund into the Bankruptcy Court upon prior notice to the parties hereto and (b) abiding by the determination of the Bankruptcy Court with

4326651v.5

respect thereto.  In such event, such delivery shall constitute a complete discharge and release of Escrow Agent of its obligations hereunder.

3.7    Escrow Agent shall be entitled to rely conclusively upon any written notice, waiver, receipt, or other document which Escrow Agent believes in good faith to be genuine, including, without limitation, a written statement by Purchaser or Seller that they have complied with the terms of the Purchase Agreement with respect to a demand for payment.

3.8    In the event of any controversy or dispute under this Escrow Agreement or with respect to any question as to the construction hereof or any action to be taken or omitted by Escrow Agent, Escrow Agent shall be entitled to consult with counsel of its own choosing.

4.    <u>Expenses of Escrow Agent</u>.  Escrow Agent shall serve without compensation.

5.    <u>Indemnification of Escrow Agent</u>.  Purchaser and Seller agree, jointly and severally, to indemnify Escrow Agent and hold Escrow Agent harmless from any loss, liability and expenses which it incurs in connection with or arising out of its compliance with the terms of this Agreement, including the fees, costs and expenses of defending itself against any claims of liability hereunder, except for a loss, liability or expense arising solely from Escrow Agent's own gross negligence, willful misconduct or breach of fiduciary duty as determined by a final and non-appealable judgment of the Bankruptcy Court.

6.    <u>Successor Escrow Agent</u>.  In the event Escrow Agent is no longer able or willing to serve, Escrow Agent shall have the right, after consultation with Seller and Purchaser, to appoint a successor Escrow Agent who shall be bound by the terms and conditions set forth herein.

7.    <u>Notices.</u>

7.1    All notices and other communications under this Agreement shall be in writing and, unless otherwise provided in this Agreement, shall be deemed given (a) when delivered personally by hand, (b) when sent by facsimile (confirmed in writing by mail promptly thereafter dispatched), (c) three (3) days after being mailed by certified or registered mail, postage prepaid, return receipt requested or (d) one (1) Business Day following the day sent by a nationally recognized overnight courier service, in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Seller:

Good Samaritan Lutheran Health Care Center, Inc.
c/o The Lutheran Care Network
700 White Plains Road
Scarsdale, New York  10583
Attn:  Ms. Laraine Fellagara

4326651v.5

With copies to each of:

Deborah A. Reperowitz, Esq.
Stradley Ronon Stevens & Young, LLP
100 Park Avenue, Suite 2000
New York, NY 10017
Email: dreperowitz@stradley.com
Fax:    646.682.7180

Amalgamated Bank
275 Seventh Avenue
New York, New York 10001
Attention: Melony Hey

Amalgamated Bank
275 Seventh Avenue
New York, New York 10001
Attention: General Counsel

and

John Mairo, Esq.
Kelly Curtin, Esq.
Porzio Bromberg & Newman P.C.
100 Southgate Parkway
Morristown, NJ 07962-1997
Fax:    973.538.5146


If to Escrow Agent:

National Granite Title Insurance Agency, Inc.
155 North Main Street
New City, New York 10956
Attn: Joseph Deutsch, Esq.

If to Purchaser:

DELMAR SNF OPERATIONS ASSOCIATES, LLC
4770 White Plains Road, 3rd floor
Bronx, New York 10470

With a copy to:

Isidor D. Friedenberg, Esq.
2 Cara Drive
Suffern, New York 10901

8.      Binding Effect; Further Assurances.

8.1     This Agreement shall inure to the benefit of and shall be binding upon the respective heirs, personal representatives, successors, and assigns of the parties hereto.

8.2     Seller and Purchaser hereto covenant that they will execute all instruments and documents and will take all steps which may be necessary in order to implement the provisions of this Agreement.

9.      Governing Law; Forum.

9.1     This Agreement shall be construed under and governed by the laws of the State of New York, without regard to its principles of conflicts of laws.

9.2     Each party to this Agreement irrevocably consents and agrees that any dispute arising out of or in any way connected to this Agreement shall only be adjudicated by the Bankruptcy Court.  Each of the parties hereto hereby (a) irrevocably submits with regard to any such Legal Proceeding to the exclusive personal jurisdiction of the Bankruptcy Court in the event any dispute arises out of this Agreement or any transaction contemplated hereby, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from the Bankruptcy Court or that such action is brought in an inconvenient forum and (c) agrees that it shall not bring any action relating to this Agreement or any transaction contemplated hereby in any court other than the Bankruptcy Court. Each of the parties hereto further agrees to accept and acknowledge service of any and all process which may be served in any such Legal Proceeding in the Bankruptcy Court in the State of New York, and agrees that service of process upon such party by a method permitted by the applicable Laws of the State of New York to such party's address as set forth in Section 7.1 hereto, will be deemed in every respect effective service of process upon such party, in any Legal Proceeding.

10.     Counterparts.  This Agreement may be executed in one or more counterparts (whether facsimile or original), each of which when taken together shall be deemed one and the same original instrument.

11.     Prevailing Party. In the event of a dispute between the Purchaser and Seller in connection with the Escrow Fund, the prevailing party shall be entitled to recover from the non-prevailing party the reasonable legal fees and costs incurred by the prevailing party in connection with such dispute.

[Remainder of Page Intentionally Left Blank]

4326651v.5

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Escrow Agreement as of the day and year first above written.

GOOD SAMARITAN LUTHERAN HEALTH
CARE CENTER, INC.

By: _Thomas Roemke_____
Name: _Thomas Roemke_
Title: _Director_

DELMAR SNF OPERATIONS ASSOCIATES,
LLC

By: _____
Name:  Kenneth Rozenberg
Title:    Managing Member

NATIONAL GRANITE TITLE INSURANCE
AGENCY, INC.

By: _____
Name:
Title:

6

4326651v.5

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Escrow Agreement as of the day and year first above written.

GOOD SAMARITAN LUTHERAN HEALTH
CARE CENTER, INC.

By: _____
    Name:
    Title:

DELMAR SNF OPERATIONS ASSOCIATES,
LLC

By: _____
    Name:   Kenneth Rozenberg
    Title:   Managing Member

NATIONAL GRANITE TITLE INSURANCE
AGENCY, INC.

By: _____
    Name:   *Joseph Deutsch*
    Title:   *V. P. & Counsel*

*Good Sam   APA escrow*

6

4326651v.5

*Execution Copy*

# PURCHASE AND SALE AGREEMENT

By and Between

## GOOD SAMARITAN LUTHERAN HEALTH CARE CENTER, INC.

as Seller

and

## DELMAR SNF REALTY ASSOCIATES, LLC

as Purchaser

Dated as of: December 10, 2019

Property:

125 Rockefeller Road, Bethlehem, Albany County, New York

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** is entered into by and between **Good Samaritan Lutheran Health Care Center, Inc.**, a New York not-for-profit corporation ("**Seller**"), and **Delmar SNF Realty Associates, LLC**, a New York limited liability company ("**Purchaser**"), as of the 10th day of December, 2019.

### Recitals

**WHEREAS**, Seller, along with certain of its Affiliates, will be filing for bankruptcy protection to become debtor-in-possession under Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**"), and will be filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "**Bankruptcy Case**", with such date of filing of the Bankruptcy Case being the "**Petition Date**"), in the United States Bankruptcy Court for the Northern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, Seller is the owner of the Property (as hereinafter defined);

**WHEREAS,** the parties hereto are entering into this Agreement subject to the approval of the Bankruptcy Court and entry of the Sale Order (as defined below);

**WHEREAS**, subject to the approval of the Bankruptcy Court and` in accordance with the terms of the Sale Order, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume the Property from Seller pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code, all as more specifically provided herein;

**WHEREAS**, simultaneously with the execution and delivery of this Agreement, (i) Seller, as seller, and Delmar SNF Operations Associates, LLC, an Affiliate of Purchaser ("**Asset Purchaser**"), as buyer, are entering into that certain Asset Purchase Agreement (the "**Asset Agreement**") for the purchase and sale of certain assets used in connection with the operation of Bethlehem Commons Residential Care Center, a skilled nursing facility which is located at the Property (the "**Facility**") and (ii) Seller and Asset Purchaser or its designated Affiliate (as applicable, the "**Receiver**") are entering into that certain Receiver Agreement – Nursing Home (the "**Receivership Agreement**") pursuant to which Receiver will, subject to the approval of the Bankruptcy Court and the approval of the New York State Department of Health, be appointed interim operator of the Facility pending consummation of the transactions contemplated by this Agreement and the Asset Agreement; and

**WHEREAS**, the Closing (defined below) is contingent upon the closing of the transactions contemplated by the Asset Agreement;

**NOW, THEREFORE**, subject to the terms and conditions of this Agreement, for and in consideration of good and valuable consideration, including the mutual covenants and agreements set forth herein, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

4329285v.5

## ARTICLE 1
## DEFINITIONS

For purposes of this Agreement, all capitalized terms and certain other terms used herein shall have the respective meanings specified in <u>Schedule I</u> attached hereto and made a part hereof.

## ARTICLE 2
## GENERAL TERMS

**SECTION 2.1.**     **The Transaction**.

2.1.1.  Subject to the terms and conditions of this Agreement and the entry of the Sale Order, on the Closing Date (as defined herein), Seller agrees to sell, transfer, convey and assign to Purchaser, and Purchaser agrees to purchase and accept from Seller, free and clear of all liens, tenancies (except for residents of the skilled nursing facility), leases, options, rights of first refusal and claims, subject only to Permitted Exceptions and any interest to the extent acceptable to Purchaser, as provided in the Sale Order pursuant to Section 363(b) and Section 363(f) of the Bankruptcy Code, Seller's right, title and interest, in and to (i) that certain real property as more particularly described on <u>Schedule II</u> attached hereto and made a part hereof together with the buildings and improvements thereon located at and commonly known as 125 Rockefeller Road, Town of Bethlehem, County of Albany designated as Block 86.1, Lot 1 (collectively, the **"Real Estate"**), and (ii) the fixtures, exclusively owned by Seller located in or upon, affixed to and used in connection with, the Real Estate (collectively, the **"Fixtures"**). The Real Estate and the Fixtures are to be conveyed together with (x) all easements, rights of way, air or development rights, reservations, privileges, appurtenances, and other estates and rights of Seller, if any, pertaining to its interest in the Real Estate, and (y) all right, title and interest of Seller, if any, in and to all alleys adjoining its interest in the Real Estate and in and to the land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining its interest in the Real Estate to the center line thereof, and (z) subject to apportionment if required hereunder, all right, title and interest of Seller, if any, in and to any award made for any taking by condemnation or any damages to its interest in the Real Estate by reason of a change of grade of any street, road or avenue (such taking or damages, a **"Condemnation"**) or to be made in lieu thereof and in and to any unpaid award for any Condemnation (the Real Estate and the Fixtures, together with all of the foregoing, are hereinafter sometimes collectively referred to herein as the **"Property"**).

**SECTION 2.2.**     **Purchase Price**.

2.2.1. The **"Purchase Price"** for the Property and the various assignments incidental thereto referred to herein is FIVE MILLION ONE HUNDRED THOUSAND AND NO/100s DOLLARS **(US $5,100,000)**.   The Purchase Price shall be payable (i) by the payment of the Deposit in immediate funds into escrow pursuant to Section 2.2.2, and (ii) the balance in cash (by wire transfer) at the Closing as directed by Seller in writing at least two (2) business days

-2-

prior to the Closing.  Seller may direct, among other things, that Purchaser pay a portion of the Purchase Price at the Closing, in an amount or amounts specified by Seller, to persons or entities other than Seller for Seller's purposes, including to the Title Company and the Existing Lender (defined below).

2.2.2.  Concurrently with the execution and delivery hereof, Seller and Purchaser have agreed that, as security for the performance of Purchaser's obligations hereunder, upon the entry of the Sale Order, Purchaser shall deposit with Escrow Agent, by wire transfer to the account described in <u>Schedule III</u>, a cash earnest money deposit in the amount of FIVE HUNDRED TEN THOUSAND AND NO/100s DOLLARS (**US $510,000**), representing 10% of the Purchase Price (the **"Deposit"**).

2.2.3.  The Deposit shall be deposited by Purchaser and held by Escrow Agent, in trust, in an interest bearing account pursuant to and in accordance with the provisions of an Escrow Agreement dated as of the date hereof among Seller, Purchaser and Escrow Agent, a copy of which is attached hereto and made a part hereof as <u>Exhibit A</u> (the "**Escrow Agreement**").

## ARTICLE 3
## PERMITTED EXCEPTIONS; TITLE INSURANCE

**SECTION 3.1.**      **Sale Subject to**.  Subject to the terms and condition of this Agreement and the Sale Order, at the Closing, Seller shall convey, and Purchaser shall accept fee simple title to the Real Estate, insurable by the Title Company at regular premiums, without exceptions or reservations of any type or kind, except (a) ALTA standard printed exceptions other than those that can be removed by the Sale Order, or by any affidavit of Seller provided pursuant to Section 3.2.3 hereof, (b) the Permitted Exceptions, and (c) the obligations expressly assumed by Purchaser under this Agreement.  The parties hereby agree that **"Title Company"** shall mean National Granite Title Insurance Agency Inc. ("**NGTIA**") underwriting through any major insurance company or, if NGTIA shall no longer be in the title insurance business, another reputable title insurance company reasonably acceptable to Seller.

3.1.1. Pursuant to the Sale Order, all liens and claims and encumbrances attached to the Property (the "**Liens**") shall attach to the net proceeds of the sale received by Seller after deduction of title company fees, recording fees and other third party costs required for consummation of the Closing (but without deduction of any amount that Seller, as a debtor-in-possession, is prohibited from paying) (the "**Net Proceeds**") to the same priority and extent that the Liens encumbered the Property, including Liens in favor of the Existing Lender.  To the extent Seller is required to satisfy any of the Liens from the Net Proceeds (it being understood that amounts owing to the Existing Lender shall be paid from such Net Proceeds), Seller shall make such payments in accordance with the Sale Order or by further order of the Bankruptcy Court.

4329285v.5

**SECTION 3.2.**        **Title Evidence**.  Purchaser shall unless already done, at its sole cost, order a title commitment for the Property within ten (10) days after the date hereof and shall cause a title report to be delivered to Seller's counsel within thirty (30) days after the date hereof.

3.2.1.  If Purchaser's title commitment/report or any update thereto reflects any title exceptions that are not Permitted Exceptions and, therefore, which Purchaser is not required to accept (the **"Non-Permitted Exceptions"**), Seller shall use reasonable efforts, at or prior to Closing, to attempt to remove the following: (i) any and all of the Non-Permitted Exceptions that Seller willfully placed of record or consented to be placed of record following the date hereof, and (ii) any and all other Non-Permitted Exceptions that may be removed by the entry of the Sale Order.  Seller shall have the right to adjourn the Closing Date, from time to time, for up to ninety (90) days in the aggregate for the purpose of removing/eliminating such Non-Permitted Exceptions.

3.2.2.  In the event that there exists any Non-Permitted Exception which is not removed in accordance with Section 3.2.1, Purchaser may elect within five (5) Business Days after (x) Seller delivers to Purchaser a copy of the court-entered Sale Order or (y) Purchaser delivers to Seller's counsel any update to the title report showing any Non-Permitted Exception which is not removed in accordance with Section 3.2.1, to either (i) not consummate the transactions contemplated hereby, in which event this Agreement shall be terminated and of no further force and effect, the Deposit shall be returned to Purchaser, and neither of the parties hereto shall have any rights or obligations to the other hereunder (other than those that, pursuant to the express terms hereof, expressly survive termination hereof) or (ii) consummate the transactions contemplated hereby subject to such additional exceptions and proceed to Closing without an abatement of the Purchase Price.  Purchaser's failure to timely deliver a notice electing to not consummate the transactions contemplated hereby shall be deemed Purchaser's election not to consummate the transaction.

3.2.3.  If required by the Title Company, Seller agrees to execute, acknowledge and deliver a standard and customary owner's title affidavit at Closing in form and substance reasonably acceptable to the Title Company as modified for a debtor in chapter 11 and such other matters as the Title Company may reasonably require in order to issue a policy of title insurance to Purchaser in the manner required under this Agreement; provided however that Seller shall not be obligated to pay any amounts to or claims of third parties in order to do so (other than as required by the Sale Order or pursuant to Sections 3.1.1 (as and to the extent provided for therein) and 3.2.1 above).

**SECTION 3.3.**        **Permitted Exceptions**.  "Permitted Exceptions" means:

3.3.1.  liens for unpaid taxes, assessments, charges, rents and any other governmental charges, which are not yet due and payable and are apportioned in accordance with the provisions of Article 4 hereof;

4329285v.5

3.3.2. all rights and easements of record, for (i) access, (ii) parking and (iii) electricity, gas, telephone, water, cable television and any other utilities to maintain and operate lines, cables, poles and distribution boxes in, over and upon the Real Estate;

3.3.3. possible projections and/or encroachments of retaining walls, foundations, stoops, areas, steps, sills, trim, cornices, standpipes, fire escapes, coal chutes, casings, ledges, water tables, lintels, porticos, keystones, windows, hedges, copings, cellar doors, sidewalk elevators, fences, fire escapes and the like, or similar projections or objects upon, under or above any adjoining buildings and/or streets or avenues or those belonging to adjoining premises which encroach upon the Real Estate, or within any set back areas, and variations between the lines of record title and fences, retaining walls, hedges, and the like;

3.3.4. possible minor variations between the tax diagram or the tax map and the record description;

3.3.5. building, zoning, subdivision and other governmental laws, codes and regulations, and landmark, historic and wetlands designations to the extent not currently violated by the current use or improvements located upon the Real Estate;

3.3.6. any matter created or caused by Purchaser, the Receiver or their agents, employees, contractors or representatives; and

3.3.7. any matters which the Title Company may raise, provided that the Title Company shall agree to omit or insure without additional premium to Purchaser against collection of the same out of the Property; and

3.3.8. the matters described on Schedule VI to the extent applicable to the Property.

**SECTION 3.4.    Existing Mortgage.**  At the request of Purchaser, but at no cost or liability to Seller, Seller shall use reasonable efforts to endeavor to cause Amalgamated Bank (the "**Existing Lender**"), the holder of a mortgage currently encumbering the Property (the "**Existing Mortgage**"), to assign the Existing Mortgage and the promissory note(s) secured thereby to Purchaser's designee (without recourse, representation, or warranty) at Closing; provided, however, (a) Purchaser shall pay all fees, charges, costs and expenses of the Existing Lender in connection with such assignment of the Existing Mortgage and the promissory note(s) secured thereby, and the preparation of the documents effectuating such assignment and the recording thereof, and (b) the Existing Lender shall have agreed to such assignment and (c) such assignment is consummated at Closing.

**SECTION 3.5    Violations**.  Purchaser acknowledges and agrees that it shall take the Property "As Is Where Is" and subject only to the provisions of the Sale Order; provided, however that Purchaser shall not be obligated to take the Property if at the Closing Effective Date it is subject to (a) any open permits, alterations, violations of building, fire, sanitary, environmental,

4329285v.5

housing and similar laws, municipal ordinances, orders or requirements affecting the Property from or by any federal, state, county or municipal department, agency, authority or bureau having or asserting jurisdiction (each, a "**Governmental Authority**") which in the aggregate would cost in excess of $25,000.00 to remedy and clear or record or (b) any lien attaching to the Property as a result of the foregoing described in clause (a) (the foregoing described in clauses (a) and (b) being hereafter referred to collectively as the "**Violations**"). To the extent that any such Violations exist, all such Violations shall be remediated and cured of record by Seller at its sole cost and expense prior to Closing. Notwithstanding anything to the contrary, to the extent that Seller fails to remediate and cure all such Violations prior to Closing, then Purchaser shall have the right, but not the obligation, to terminate this Agreement and receive the prompt refund of the Deposit paid hereunder, whereupon neither party hereto shall have any further obligations to the other except for such matters which are expressly set forth in this Agreement to survive termination of this Agreement.

## ARTICLE 4
## APPORTIONMENTS AND PAYMENTS

**SECTION 4.1.**       **Apportionments Relating to the Property**.  The following shall be apportioned between Seller and Purchaser at the Closing with respect to the Property, as of 12:01 a.m. (New York Time) on the Closing Effective Date (the "**Apportionment Date**"), and the net aggregate amount thereof either shall be paid by Purchaser to Seller or credited to Purchaser towards the Purchase Price, as the case may be, at the Closing:

4.1.1. real property taxes, and any assessments (or installments thereof), including with respect to Business Improvement Districts, on the basis of the fiscal year for which payable; if the Apportionment Date shall be prior to the date on which the real property tax rate is fixed, the apportionment of real property taxes shall be made on the basis of the tax rate for the preceding year applied to the latest assessed valuation;

4.1.2. to the extent not metered, water rates and charges, sewer taxes and rents and electricity and other utility charges;

4.1.3. fuel oil and liquid propane gas, if any, at the cost per gallon most recently charged to Seller, based on the supplier's measurements thereof taken within ten (10) days of the Closing Effective Date;

4.1.4. insurance proceeds received by Seller, if any, and payable to Purchaser pursuant to Article 13 hereof to the extent not applied to repair or restore the Property in accordance with the provisions of this Agreement;

4.1.5. unopened and unused supplies purchased and not consumed for the Property, if any; and

4.1.6. annual municipal permit and inspection fees and other fees for licenses.

4329285v.5

**SECTION 4.2.        Taxes and Assessments**.

4.2.1.  If, on the Closing Effective Date, all or any portion of the Real Estate shall be or shall have been affected by assessments (including Business Improvement District assessments) that are, or which may become, payable in annual installments, of which the first installment is then a charge or lien or has been paid or if any of the improvements to be paid for thereby are in place or commenced, then, for purposes of this Agreement only, the installment(s) which shall have been paid or the installment which shall be then due and payable shall be apportioned between Seller and Purchaser and all of the unpaid installments of any such assessments, including those which are to become due and payable after the date hereof, shall continue to be liens upon the Real Estate, it being understood and agreed that Seller and Purchaser shall be responsible for a pro rata share of such assessment, with Purchaser being responsible for the period from and after the Apportionment Date and Seller being responsible for the period prior to the Apportionment Date, regardless of when such installments are due and payable.

4.2.2.  To the extent that any refund of real property taxes, assessments (including Business Improvement District assessments), water rates and charges, sewer taxes and rents or any other utility made after the Closing Effective Date is applicable to a period before the Closing Effective Date, such refund shall be payable to Seller or returned by Purchaser to Seller, net of the actual costs incurred by Purchaser in obtaining same.

4.2.3.  To the extent that the Closing has occurred and any refund of real property taxes, assessments (including Business Improvement District assessments), water rates and charges or sewer taxes and rents made after the Closing Effective Date is applicable to a period after the Closing Effective Date, then such refund shall be payable to Purchaser or returned by Seller to Purchaser, after first deducting the actual costs incurred by Seller in obtaining same.

4.2.4.  From and after the date of this Agreement, (a) Seller shall not, without the prior written consent of Purchaser, which consent may be granted or withheld in Purchaser's sole discretion, withdraw, compromise or settle any certiorari proceedings for any fiscal period subsequent to the period in which the Closing Effective Date is to occur, and (b) Seller shall not, without the prior written consent of Purchaser, which consent shall not be unreasonably withheld or delayed, withdraw, compromise or settle any certiorari proceedings, if any, for any fiscal period in which the Closing Effective Date is to occur.  Any tax savings or refund for any year or years prior to the tax year in which the Closing Effective Date occurs shall belong solely to Seller.  Purchaser or Seller, as the case may be, shall execute all consents, receipts, instruments and documents which may reasonably be requested in order to facilitate in instituting or settling such proceeding, as the case may be, and collecting the amount of any refund or tax savings.  The net refund of taxes, if any, for such fiscal tax year in which the Closing Effective Date occurs shall be divided between Seller and Purchaser in accordance with the

-7-

apportionment of taxes pursuant to the provisions hereof, after deducting therefrom a pro rata share of all reasonable expenses, including reasonable attorneys' fees reasonably and necessarily incurred in obtaining such refund.

**SECTION 4.3.** **Transfer of Utilities**. Purchaser, at its sole cost and expense, shall cause the transfer of all utility services for the Real Estate to Purchaser's or Receiver's name as of the Closing Effective Date and Seller shall cooperate with Purchaser in connection therewith. If utility services shall not have been transferred to Purchaser's or Receiver's name for the Real Estate effective as of the Closing Effective Date, then, subject to the Receivership Agreement, at the Closing, any such charges with respect to services not so transferred shall be prorated as set forth in Section 4.1 above, based upon the per diem charges obtained by using the most recent period for which readings of such utility services shall then be available. Purchaser, at its sole cost and expense, shall promptly thereafter cause such utility services to be transferred to Purchaser's or Receiver's name, and Seller shall cooperate with Purchaser in connection therewith. Purchaser shall make all required deposits on account with utility companies or on account with municipalities and shall reasonably cooperate with Seller in having any deposits currently held by such companies and municipalities, returned to Seller. However, Seller shall be solely responsible for obtaining the return of its own utility company deposits, if any. The provisions of this Section shall survive the Closing.

**SECTION 4.4.** **Transfer Taxes**. Subject to the Sale Order, Seller shall be responsible (either by payment or exemption) for any real property transfer taxes, transfer gains taxes, and other similar taxes and fees imposed on Seller by the State, county or municipality in which the Real Estate is located which are imposed in connection with the sale, assignment, transfer and conveyance of the Real Estate to Purchaser as contemplated by the provisions of this Agreement (collectively, the "**Transfer Taxes**"), except that Purchaser shall pay any New York State, Albany County or any other Sales Tax ("**Sales Tax**") that may be imposed on the sale of any personal property contained within the Real Estate. Seller may pay the Transfer Taxes, if any, from the Purchase Price at the Closing. Purchaser shall be responsible for preparing all Sales Tax returns and filing the same with all appropriate taxing authorities.

**SECTION 4.5.** **Tax Returns**. At the Closing, Purchaser and Seller shall deliver to the Title Company a New York State Transfer Tax Return (TP-584) and Equalization form (RP-5217) (collectively, the "**RE Tax Returns**") and deliver same to the Title Company for delivery to the appropriate authority.

**SECTION 4.6.** **Title Charges**. Purchaser shall pay the cost of Purchaser's title insurance premiums and any title search costs, the cost of a survey for the Property or any update thereto and all recording and filing fees, including, but not limited to, those in connection with the Deed.

**SECTION 4.7.** **Transaction Expenses**. Except as expressly provided herein, each party shall bear its own costs and expenses, including attorney, accountant and other consultant fees, in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated hereby.

**SECTION 4.8.** **Survival**. The provisions of this Article 4 shall survive the Closing.

4329285v.5

## ARTICLE 5
## COVENANTS REGARDING THE PROPERTY

**SECTION 5.1.**    **Maintenance and Operation of the Property**.    Subject to the restrictions imposed upon the Seller as a debtor-in-possession to pay any claims arising or otherwise relating to any period prior to the commencement of the Bankruptcy Case, and subject to the terms of the Receivership Agreement (defined herein and if the same is in effect) the parties agree that between the Petition Date and the Closing Effective Date:   (i) Seller shall use commercially reasonable efforts to maintain and operate the Property in substantially the same manner as the Property is currently being maintained and operated and keep the Property in a condition at least as good as its condition as of the date hereof, reasonable wear and tear, casualty and Condemnation excepted (it being agreed that Seller shall not be obligated to perform any capital improvements unless required by Law as a post-petition obligation of the debtor-in-possession); (ii) Seller shall use commercially reasonable efforts to keep and maintain in force and effect all existing licenses and permits affecting the Property without being obligated to pay any prepetition amounts, other than as provided in Section 3.1.1; (iii) Seller shall not be obligated to construct any improvements upon the Property except those which Seller reasonably determines necessary because of emergency situations or to comply with Laws; and (iv) Seller shall maintain insurance coverages similar to those in effect on the date hereof, including property insurance in an amount equal to the full replacement value of the Property.   Notwithstanding anything to the contrary contained herein, Purchaser acknowledges that Asset Purchaser shall be responsible for certain insurance, repair and maintenance obligations in accordance with the Receivership Agreement, to the extent the same becomes effective.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

**SECTION 6.1.**    **Generally**.    Purchaser represents and warrants to Seller, as follows:

6.1.1.  (a)  Purchaser is a duly formed and validly existing limited liability company under the Laws of the State of New York and is in good standing under the Laws of the State of New York, (b) Purchaser has the full right, authority and limited liability company power to enter into this Agreement, to consummate the transactions contemplated herein and to perform its obligations hereunder and under those Closing Documents to which it is a party, (c) each of the Persons executing this Agreement on behalf of Purchaser is authorized to do so, and (d) this Agreement constitutes a valid and legally binding obligation of Purchaser enforceable against Purchaser in accordance with its terms.

6.1.2.  There are no legal or administrative proceedings pending or, to the best of Purchaser's actual knowledge, without investigation, threatened against or affecting Purchaser that would adversely affect Purchaser's legal authority or financial ability to perform its obligations under the Closing Documents to which it is a party.

6.1.3.  The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the performance by

4329285v.5

Purchaser of its obligations hereunder and under the Closing Documents to which it is a party do not and will not conflict with or violate (a) any Law, rule, judgment, regulation, order, writ, injunction or decree of any court or governmental or quasi-governmental entity having jurisdiction over Purchaser, including the United States of America, the State of New York or any political subdivision of either of the foregoing, or (b) any decision or ruling of any arbitrator to which Purchaser is a party or by which Purchaser is bound or affected, or breach any provisions of, or constitute a default under, any contract, agreement, instrument or obligation to which Purchaser is a party or by which it is bound.

6.1.4.  The execution and delivery of this Agreement by Purchaser does not, and the performance of its obligations hereunder and under the Closing Documents to which it is a party will not, require the consent or approval of any public authority or any other Person other than the New York State Department of Health (with respect to the Asset Agreement only), the Office of the New York State Attorney General, and the Bankruptcy Court.  The Parties understand and agree that approval of the transactions contemplated under this Agreement and the transactions under the Asset Agreement is required to be received from the Office of the New York State Attorney General as a contingency to the fulfillment by the Parties of their obligations hereunder and thereunder. To the extent that such approval is denied or not obtained by Seller within 24 months after the entry of the Sale Order, then, notwithstanding anything to the contrary herein, Purchaser shall have the right, but not the obligation, to terminate this Agreement upon notice to Seller and receive the return of the Deposit paid under this Agreement and the Asset Purchaser shall have the right to terminate the Asset Agreement and shall receive the return of the deposit paid under the Asset Agreement, whereupon no party to this Agreement or the Asset Agreement shall have any further obligations or liabilities to the other hereunder or thereunder.

6.1.5.  Purchaser's Federal Tax Identification Number is 84-3891970.

6.1.6.  With respect to each source of funds to be used by Purchaser to purchase the Property (respectively a "**Source**"), at least one of the following statements shall be accurate as of the Closing: (i) the Source does not include the assets of: (x) an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), which is subject to Title I of ERISA; or (y) a "plan" as defined in Section 4975(a) of the Internal Revenue Code of 1986, as amended ("**Code**"); or (ii) the use of such Source to purchase the Property will not result in a nonexempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code;

6.1.7.  Purchaser (including any owner of any direct or indirect interest in Purchaser) is not now nor shall it be at any time an entity with whom a United States citizen, entity organized under the laws of the United States or its territories or entity having its principal place of business within the United States

or any of its territories (collectively, a "**U.S. Person**"), is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States Law, regulation, executive orders or lists published by the Office of Foreign Assets Control, Department of the Treasury or otherwise;

6.1.8.  Purchaser has at the date hereof, will have at the date of the hearing seeking approval of the Sale Order, and will have at Closing sufficient immediately available funds in order to make all Payments to Seller at Closing. Purchaser shall take such measures as are required by applicable Law to assure that the funds used to pay to Seller the Payments are derived: (i) from transactions that do not violate United States Law nor, to the extent such funds originate outside the United States, do not violate the Laws of the jurisdiction in which they originated; and (ii) from permissible sources under United States Law and to the extent such funds originate outside the United States, under the Laws of the jurisdiction in which they originated;

6.1.9.  <u>Anti-Money Laundering Laws</u>.  To the best of Purchaser's knowledge after making due inquiry, neither Purchaser, Receiver, Asset Purchaser nor any direct or indirect owner of any interest in Purchaser, Receiver, or Asset Purchaser, nor any person or entity providing funds to Purchaser, Receiver or Asset Purchaser (each, a "<u>Purchaser Party</u>"):  (i) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist-related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws (as hereinafter defined in this Section); (ii) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (iii) has had any of its funds seized or forfeited in any action under any Anti Money Laundering Laws.  For purposes hereof, the term "**Anti-Money Laundering Laws**" shall mean all applicable Laws, regulations and sanctions, state and federal, criminal and civil, that: (w) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (x) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (y) require identification and documentation of the parties with whom a financial institution conducts business; or (z) are designed to disrupt the flow of funds to terrorist organizations; and

6.1.10.  Each of Purchaser, Receiver and Asset Purchaser is in compliance with any and all applicable provisions of the USA PATRIOT Act of 2001, Pub. L. No. 107-56.

4329285v.5

**SECTION 6.2.     Closing Conditions.**   The following are conditions precedent to the obligation of Seller to close title under this Agreement, any or all of which may (subject to all required approvals of the Bankruptcy Court) at Seller's option be waived in writing:

6.2.1.   Each of the representations and warranties of Purchaser set forth in this Agreement shall be deemed to have been repeated by Purchaser, at and as of the Closing Date with the same force and effect as if first made on and as of such date.   It shall be a condition to Seller's obligation to close hereunder that all such representations and warranties of Purchaser be true and correct in all material respects as of the Closing Date.

6.2.2.   Purchaser shall have (or with respect to obligations of Purchaser to be performed on the Closing Date, Purchaser shall be ready, willing and able to perform the same on the Closing Date) (a) delivered, or caused to be delivered, all of the Closing Documents to which it is a party and all other documents, instruments and other items required to be delivered by Purchaser at or prior to Closing (including, without limitation, pursuant to Section 9.1.2), (b) tendered the Purchase Price in accordance with the terms of this Agreement, and (c) performed in all material respects all other material obligations on Purchaser's part to be performed on or prior to the Closing Date under this Agreement.

6.2.3.   All other conditions precedent expressly set forth herein and in the Asset Agreement to Seller's obligation to consummate the transaction contemplated hereby and thereby shall have been satisfied (or waived in writing by Seller and any required Bankruptcy Court approval with respect to such waiver shall have been obtained).

6.2.4.   The Bankruptcy Court shall have entered the Sale Order, and such Sale Order shall have become a Final Order, and the Office of the New York State Attorney General shall have issued its consent to the transactions under this Agreement and under the Asset Agreement (collectively, the "**Approvals**") within 24 months after such Sale Order is entered.

6.2.5.   The closing under the Asset Agreement shall occur concurrently with the Closing under this Agreement.

## ARTICLE 7
## REPRESENTATIONS AND WARRANTIES OF SELLER

**SECTION 7.1.          Generally**.   Seller represents and warrants to Purchaser, as follows:

7.1.1.   (a)   It is a duly formed and validly existing not-for-profit corporation under the Laws of the State of New York and, other than as a result of the commencement of the Bankruptcy Case, is in good standing under the Laws of the State of New York, (b) subject to the entry of the Sale Order, it has the right, authority, and power to enter into this Agreement and to consummate the

transactions contemplated herein and to perform its obligations hereunder and under those Closing Documents to which it is a party, all of which have been duly authorized by all necessary actions on the part of Seller, (c) each of the Persons executing this Agreement on behalf of Seller is authorized to do so, and (d) subject to the entry of the Sale Order, this Agreement constitutes a valid and legally binding obligation of Seller enforceable against it in accordance with its terms.

7.1.2.  Subject to the entry of the Sale Order, the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the performance by Seller of its obligations hereunder and under the Closing Documents to which it is a party do not and will not conflict with or violate any Law, rule, judgment, regulation, order, writ, injunction or decree of any court or governmental or quasi-governmental entity having jurisdiction over Seller, including the United States of America, the State of New York or any political subdivision of either of the foregoing, or any decision or ruling of any arbitrator to which Seller is a party or by which Seller is bound or affected, or breach any provisions of, or constitute a default under, any contract, agreement, instrument or obligation to which Seller is a party or by which it is bound.

7.1.3.  Seller's Federal Tax Identification Number is 23-7310663.

**SECTION 7.2.    Property Representations**.    Seller represents and warrants to Purchaser that, as of the date hereof, with respect to the Property:

7.2.1.  There are no leases affecting the Property to which Seller is a party, except the resident agreements of any residents of the skilled nursing facility operated thereon.

7.2.2.  To Seller's actual knowledge, there is no pending, nor has Seller received any, written notice of any contemplated Condemnation proceeding affecting the Real Estate or any part thereof.

7.2.3.  Seller is not a "foreign person" (as defined in the Internal Revenue Code).

7.2.4.  There are no tenancies affecting the Property, except the residents of the skilled nursing facility operated thereon.

7.2.5.  To Seller's actual knowledge, Seller has not received any written notice of any pending assessments against the Property.

7.2.6.  There are no tax certiorari proceedings or tax protest proceedings pending with respect to the Property.

7.2.7.  The Property will be delivered free and clear of all leases and Service Contracts except for Service Contracts that Purchaser or Receiver has elected to continue.

4329285v.5

7.2.8. To Seller's actual knowledge, Seller has no outstanding obligations under the Hill Burton Act.

SECTION 7.3.    **Closing Conditions**.  The following are conditions precedent to the obligation of Purchaser to close title under this Agreement, any or all of which may at Purchaser's option be waived in writing:

7.3.1.  Except to the extent otherwise unnecessary as a result of the Sale Order and except as may be updated by Seller in writing to maintain accuracy due to one or more factual changes arising after the date hereof (it being understood by the parties hereto that Seller shall not have the right to update any of its representations and warranties because of a factual change arising from a breach of Seller's obligations hereunder or a prior material misrepresentation by Seller), each of the representations and warranties of Seller set forth in this Agreement shall be deemed to have been repeated by Seller, at and as of the Closing Date, with the same force and effect as if first made on and as of such date.  It shall be a condition to Purchaser's obligation to close hereunder that all such representations and warranties of Seller, as the same may have been so updated by Seller, be true and correct as of the Closing Date in all material respects.

7.3.2.  Seller shall have delivered all of the documents and other items required pursuant to Section 9.1.1 of this Agreement and shall have performed all other material covenants, undertakings and obligations herein agreed to be performed by it, and complied with all material conditions required by this Agreement to be performed or complied with by Seller at or prior to the Closing.

7.3.3.  At the time of the Closing, the Title Company shall be willing to issue a fee title insurance policy in favor of Purchaser at regular rates subject only to the Permitted Exceptions.

7.3.4.  The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a Final Order or, if not final, not be subject to a stay on its effectiveness.

7.3.5.  The Approvals shall have been received within 24 months after the Sale Order is entered.

7.3.6. The    closing    under    the    Asset    Agreement    shall contemporaneously occur with the Closing under this Agreement.

SECTION 7.4.    **Knowledge of Seller**.  Whenever a representation or warranty is made in this Agreement on the basis of the knowledge of Seller, such representation and warranty is made solely on the basis of the knowledge on the date that such representation and warranty is made, of Laraine Fellagara and Bruce Zarret.

-14-

## ARTICLE 8
## CLOSING DATE

**SECTION 8.1.** **Closing Date**. The consummation of the transactions contemplated by this Agreement (the **"Closing"**) shall take place on the "Closing Date" set forth in the Asset Agreement (the **"Scheduled Closing Date"**). The Scheduled Closing Date or any such other date to which the Closing may be adjourned by Seller and the Asset Purchaser under the Asset Agreement pursuant to the terms of said agreement or by mutual agreement of Seller and Purchaser (it being agreed that neither party shall have any obligation to agree to any other adjournment of the Closing except as expressly permitted pursuant to the terms of the Asset Agreement or this Agreement), is referred to herein as the **"Closing Date"**. The Closing shall be held at the offices of Purchaser's lender or its counsel, or in escrow through the Title Company, as agreed by the parties.

## ARTICLE 9
## CLOSING DOCUMENTS

**SECTION 9.1.** **Closing**.

9.1.1. At the Closing, contemporaneously with Purchaser's delivery to Seller of all of the Closing Documents and all funds required to be delivered by Purchaser hereunder (including any funds released to Seller pursuant to the Escrow Agreement), Seller shall deliver or cause to be delivered to Purchaser, duly executed by Seller in recordable form, where applicable, those Closing Documents to be delivered by Seller as set forth on Schedule IV attached hereto and made a part hereof.

9.1.2. At the Closing, contemporaneously with Seller's delivery to Purchaser of all of the Closing Documents required to be delivered by Seller hereunder, Purchaser shall deliver or cause to be delivered to Seller those Closing Documents to be delivered by Purchaser, duly executed by Purchaser in recordable form, where applicable, as set forth on Schedule V attached hereto and made a part hereof (the documents described in Section 9.1.1 and in this Section 9.1.2 and all other documents required to be delivered hereunder are referred to collectively as the **"Closing Documents"**) and all funds required to be delivered by Purchaser to Seller hereunder (including any funds released to Seller pursuant to the Escrow Agreement).

9.1.3. Purchaser may, upon written notice to Seller given at least three (3) Business Days prior to Closing, elect to have Seller, at no cost or expense to Seller, transfer title at the Closing to a designee of Purchaser which is under common control with Purchaser, pursuant to a separate deed in the same form as the Deed.

**SECTION 9.2.** **Further Assurances**. Seller and Purchaser each agree, at any time and from time to time at or after the Closing, to execute, acknowledge where appropriate, and deliver or cause to be executed, acknowledged and delivered such further instruments and

-15-

documents and to take such other action as the other of them or the Title Company may reasonably request to carry out the intents and purposes of this Agreement.  The provisions of this Section 9.2 shall survive the Closing.

## ARTICLE 10
## NOTICES

**SECTION 10.1.    Notices.**  All notices and other communications under this Agreement shall be in writing and, unless otherwise provided in this Agreement, shall be deemed given (a) when delivered personally by hand, (b) when sent by facsimile (confirmed in writing by mail promptly thereafter dispatched), (c) three (3) days after being mailed by certified or registered mail, postage prepaid, return receipt requested or (d) one (1) Business Day following the day sent by a nationally recognized overnight courier service, in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Seller, to:

Good Samaritan Lutheran Health Care Center, Inc.
c/o The Lutheran Care Network
700 White Plains Road
Scarsdale, New York  10583
Attn:  Ms. Laraine Fellagara

with copies to each of:

Deborah A. Reperowitz, Esq.
Stradley Ronon Stevens & Young, LLP
100 Park Avenue, Suite 2000
New York, NY 10017
Email: dreperowitz@stradley.com
Fax:    646.682.7180

Amalgamated Bank
275 Seventh Avenue
New York, New York 10001
Attention: Melony Hey

Amalgamated Bank
275 Seventh Avenue
New York, New York 10001
Attention: General Counsel

and

4329285v.5

John Mairo, Esq.
Kelly Curtin, Esq.
Porzio Bromberg & Newman P.C.
100 Southgate Parkway
Morristown, NJ 07962-1997
Fax:   973.538.5146

If to Purchaser, to:

Delmar SNF Realty Associates, LLC
4770 White Plains Rd., 3rd Floor
Bronx, New York 10470

with a copy to:

Isidor D. Friedenberg, Esq.
2 Cara Drive
Suffern, New York 10901

If to Escrow Agent, to:

National Granite Title Insurance Agency, Inc.
155 North Main Street
New City, NY 10956

## ARTICLE 11
## BROKER

Seller and Purchaser each represents and warrants to the other that it has not dealt with any broker, agent, finder or like Person in connection with the transaction contemplated by this Agreement.  Purchaser hereby indemnifies Seller and holds Seller harmless from and against any and all claims for commission, fee or other compensation by any broker, agent, finder, or like Person who shall claim to have represented or dealt with Purchaser in connection with this Agreement and for any and all costs incurred by Seller in connection with such claims, including reasonable attorneys' fees and disbursements.  The Sale Order shall provide that Purchaser shall have no liability for any and all claims for commission, fee or other compensation by any broker, agent, finder or like Person who shall claim to have represented Seller in connection with this Agreement.  The provisions of this Article 11 shall survive the Closing or the earlier termination of this Agreement.

## ARTICLE 12
## DEFAULTS; REMEDIES

**SECTION 12.1.**     **Purchaser's Default**.  If prior to Closing Purchaser shall (a) fail or refuse to close as required by the terms of this Agreement, or (b) otherwise be in default under this Agreement, the Asset Agreement, the Receivership Agreement or the Sale Order, which

-17-

default shall continue for twenty (20) Business Days after written notice to Purchaser specifying such default, the parties hereto agree that the damages that Seller would sustain as a result thereof would be substantial, but would be difficult to ascertain.  Accordingly, the parties hereto agree that in the event of such default, failure or refusal by Purchaser, Seller shall solely be entitled, to terminate this Agreement and retain the Deposit and all accrued interest thereon, in which event Escrow Agent shall deliver the Deposit to or at the direction of Seller, plus Seller shall be entitled to receive from Purchaser an additional amount equal to 5% of the Purchase Price, as its liquidated damages, in which event neither party hereto shall have any further obligations or liabilities to the other. Nothing contained in this Section shall limit or diminish Purchaser's obligations or liabilities under Sections 11 and 18.10 hereof.

SECTION 12.2.    Seller's Default.  If prior to Closing Seller shall (a) fail or refuse to close as required by the terms of this Agreement or (b) otherwise be in default under this Agreement, the Asset Agreement, the Receivership Agreement or the Sale Order, which default shall continue for twenty (20) Business Days after written notice to Seller thereof, then Purchaser shall be entitled: (1) to terminate this Agreement and receive a return of the Deposit and all accrued interest thereon or (2) to seek specific performance by Seller of its obligations under this Agreement provided, however, that Purchaser may only pursue such specific performance after the entry of the Sale Order approving the transactions contemplated by this Agreement.  If Purchaser shall not have commenced an action for specific performance within sixty (60) days after the expiration of twenty (20) Business Days after written notice to Seller of its default, Purchaser shall have waived such right and shall have been deemed to have elected clause (1) above.  Purchaser expressly agrees however, that Purchaser shall not have the right to seek or recover any actual, consequential or punitive damages or any similar additional sums or amounts against Seller for any breach occurring prior to Closing.  Nothing herein shall limit or diminish Seller's obligations or liabilities under Article 11 or Section 18.10 hereof.

SECTION 12.3.    Cross-Defaults.  Subject to the  opportunity to cure defaults or breaches set forth in this Agreement: (i) a default, prior to closing under the Asset Agreement, in any material respect by Seller under the Asset Agreement, the Receivership Agreement or the Sale Order shall be deemed a default by Seller under this Agreement, and a default in any material respect by Seller under this Agreement prior to Closing hereunder shall be deemed a default by Seller under the Asset Agreement, the Receivership Agreement and the Sale Order; (ii) a default, prior to closing under the Asset Agreement, in any material respect by the Asset Purchaser or the Receiver under the Asset Agreement, the Receivership Agreement or the Sale Order shall be deemed a default by Purchaser under this Agreement and a default in any material respect by Purchaser under this Agreement prior to Closing hereunder shall be deemed a default by Asset Purchaser or the Receiver, as applicable, under the Asset Agreement, the Receivership Agreement and the Sale Order.  In addition, (x) if prior to closing the Asset Purchaser is entitled to cancel or terminate the Asset Agreement and does so or has the right to receive the return of the deposit paid under the Asset Purchase Agreement in accordance with its terms, then Purchaser under this Agreement shall be entitled (i) to terminate this Agreement simultaneously therewith upon notice to Seller and (ii) to pursue its rights and remedies as provided in this Agreement and the Sale Order, including but not limited to the right to receive the prompt return of the Deposit plus accrued interest thereon, or (y) if prior to closing the Seller is entitled to terminate the Asset Agreement and does so or has the right to receive the deposit paid under the Asset Agreement in accordance

-18-

with its terms, then Seller shall be entitled to terminate this Agreement simultaneously therewith upon notice to Purchaser and shall have the right to receive the Deposit plus accrued interest thereon pursuant to the terms of this Agreement.  In all events, if prior to Closing any of this Agreement or the Asset Agreement shall terminate, the other agreements shall also simultaneously terminate.

SECTION 12.4 **Survival**. The provisions of this Article 12 shall survive termination of this Agreement.

### ARTICLE 13
### CASUALTY; CONDEMNATION

SECTION 13.1.   **Casualty**.   Notwithstanding anything to the contrary at law or otherwise, Purchaser and Seller acknowledge and agree that in the event that prior to the Closing Effective Date, all or any portion of the Property shall be "materially damaged" (as defined below), whether or not such damage or casualty is covered by insurance, such that the Property cannot be utilized as a skilled nursing facility with 120 duly licensed beds and such damage is not attributable to any act or omission of Purchaser or Receiver, then Purchaser shall have the right to cancel or terminate this Agreement and receive the return of the Deposit.  If the Receivership Agreement is not then in effect and the Property is materially damaged by fire or the elements or by any cause beyond either party's reasonable control and Seller shall not have restored the same such that the Property can be utilized as a skilled nursing facility with 120 duly licensed beds by the Closing Effective Date, Purchaser shall have the right, upon notice to Seller delivered no later than the earlier of the Scheduled Closing Date or fifteen (15) Business Days after the Closing Effective Date, not to consummate the transactions contemplated hereby, in which event this Agreement shall be terminated and of no further force and effect, the Deposit shall be returned to Purchaser and neither of the parties hereto shall have any rights or obligations to the other hereunder except those expressly stated to survive the termination of this Agreement; provided; however, that in the event of such a termination by Purchaser, Seller shall have the right, within 10 days after such notice from Purchaser, to notify Purchaser of Seller's election to restore the damage to the Property, in which event this Agreement shall not terminate and the Scheduled Closing Date shall be adjourned so long as Seller is diligently performing repairs to the Property.  In the event Purchaser shall fail to timely deliver such notice of termination, Purchaser shall be obligated to consummate the transaction contemplated hereunder and Seller shall not be obligated to perform any repairs to the Property.  If (i) Seller does not make the repairs necessary to restore the Property for use as a skilled nursing facility with 120 duly licensed beds and (ii) Purchaser nonetheless consummates the transactions contemplated hereby, then Purchaser shall be entitled to receive all insurance proceeds (after deducting any reasonable costs which Seller actually and reasonably incurred to obtain such proceeds, including reasonable attorneys' fees and disbursements and any out-of-pocket costs of restoration actually incurred by Seller) in connection with any such casualty which occurs prior to the Closing Date, and Purchaser shall receive a credit against the Purchase Price in the amount of any deductible under Seller's insurance (Seller hereby assigning without representation, covenant or recourse to Purchaser all of Seller's right, title and interest in and to any such net insurance proceeds).  For the purposes of this Section 13.1, "materially damaged" shall mean damage to the Property which would cost more than $500,000.00 to restore and there is insufficient insurance proceeds available to restore the damaged Property or causes the Property

-19-

to be unable to be used as a skilled nursing facility with 120 duly licensed beds.  This paragraph shall survive the Closing.  The provisions of this Section 13.1 are intended to constitute an "express provision to the contrary" as provided in Section 227 of the Real Property Law of the State of New York (exclusive of Sections 227(a) through (f) thereof).

SECTION 13.2.    **Condemnation**.  If, prior to the Closing, all or a Material Part (as hereinafter defined) of the Property is taken by eminent domain, Purchaser may, by notice to Seller given within fifteen (15) Business Days after notice from Seller to Purchaser of the taking, elect to cancel this Agreement.  In the event that Purchaser shall so timely elect, the Deposit shall be paid to Purchaser and neither of the parties hereto shall have any rights or obligations to the other hereunder except those expressly stated to survive the termination of this Agreement.  Unless this Agreement is so canceled, or if less than a Material Part of the Property is taken by eminent domain, this Agreement shall remain in full force and effect in which event Seller shall, on the Closing Date, and upon Seller's receipt of the balance of the Purchase Price from Purchaser, pay to Purchaser any sums of money collected by Seller as an award for any taking by eminent domain, after deducting any reasonable amount which Seller may have agreed or been obligated to pay in obtaining such award, including reasonable attorneys' fees and disbursements.  Seller shall not compromise or settle any such award without Purchaser's prior consent, which consent shall not be unreasonably withheld, conditioned or delayed.  In addition, at Closing, Seller shall assign, transfer and set over to Purchaser without representation, covenant or recourse all of Seller's right, title and interest in and to any portion of any condemnation award not yet received by Seller.  For purposes of this Section 13.2, **"Material Part"** shall mean a taking of more than five (5%) percent of the Property or the taking of any portion which causes the Property to be unable to be used as a skilled nursing facility with 120 duly licensed beds.  The provisions of this Article 13 are intended to constitute an "express provision to the contrary" within the meaning of Section 5-1311 of the New York General Obligations Law.  This provision shall survive the Closing.

SECTION 13.3.    **Survival**. The provisions of this Article 13 shall survive the Closing or the earlier termination of this Agreement.

## ARTICLE 14
## AS-IS; WHERE-IS;
## DISCLAIMER; WAIVER OF CLAIMS

SECTION 14.1.    **Disclaimers; As-Is, Where-Is Condition**.

14.1.1. PURCHASER ACKNOWLEDGES THAT IT IS A SOPHISTICATED PURCHASER, WITH EXPERIENCE IN OWNING AND OPERATING REAL PROPERTY IN THE NATURE OF THE PROPERTY.  PURCHASER REALIZES THE NATURE OF THIS TRANSACTION, UNDERSTANDS AND IS FREELY TAKING ALL RISKS, IF ANY, INVOLVED IN CONNECTION WITH THIS TRANSACTION AND ACKNOWLEDGES THAT THE SAME IS REFLECTED IN THE PURCHASE PRICE AND THE TERMS UPON WHICH PURCHASER IS WILLING TO PURCHASE AND SELLER IS WILLING TO SELL.

14.1.2. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, THE PROPERTY IS BEING SOLD BY SELLER AND PURCHASER AGREES TO ACCEPT THE PROPERTY IN "AS-IS" AND "WHERE-IS" PHYSICAL CONDITION ON

-20-

THE DATE HEREOF SUBJECT TO REASONABLE WEAR AND TEAR AND SELLER'S OBLIGATIONS HEREIN TO MAINTAIN THE PROPERTY AS PROVIDED FOR IN THIS AGREEMENT. PURCHASER ACKNOWLEDGES, REPRESENTS AND WARRANTS THAT (I) PURCHASER HAS HAD AN OPPORTUNITY TO MAKE AN INDEPENDENT INVESTIGATION AND EXAMINATION OF THE PROPERTY (AND ALL MATTERS RELATED THERETO), AND TO BECOME FULLY FAMILIAR WITH THE PHYSICAL CONDITION OF THE PROPERTY, AND (II) EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER AND SELLER-RELATED PARTIES HAVE NOT MADE AND SHALL NOT MAKE ANY VERBAL OR WRITTEN REPRESENTATIONS, WARRANTIES OR STATEMENTS OF ANY NATURE OR KIND WHATSOEVER TO PURCHASER, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO THE ABOVE, AND, IN PARTICULAR, EXCEPT AS EXPRESSLY SET FORTH HEREIN, NO REPRESENTATIONS OR WARRANTIES HAVE BEEN MADE OR SHALL BE MADE WITH RESPECT TO (A) THE PHYSICAL CONDITION OR OPERATION OF THE PROPERTY, (B) THE REVENUES OR EXPENSES OF THE PROPERTY, (C) THE ZONING AND OTHER LEGAL REQUIREMENTS APPLICABLE TO THE PROPERTY OR THE COMPLIANCE OF THE PROPERTY THEREWITH, (D) THE NATURE AND EXTENT OF ANY MATTER AFFECTING TITLE TO THE REAL ESTATE OR TO ANY FIXTURES, (E) THE QUANTITY, QUALITY, OR CONDITION OF THE FIXTURES, OR (F) ANY OTHER MATTER OR THING AFFECTING OR RELATING TO THE PROPERTY, OR ANY PORTION THEREOF, THE INTERESTS THEREIN TO BE CONVEYED TO PURCHASER PURSUANT TO THE TERMS OF THE TRANSACTIONS CONTEMPLATED HEREBY.

14.1.3. EXCEPT AS SET FORTH IN THIS AGREEMENT, SELLER HEREBY SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY, ORAL OR WRITTEN, EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW OR OTHERWISE, WITH RESPECT TO THE MATTERS REFERRED TO IN SECTION 14.1.2 ABOVE AND ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IN RESPECT TO THE PROPERTY. PURCHASER DECLARES AND ACKNOWLEDGES THAT THIS EXPRESS DISCLAIMER SHALL BE CONSIDERED A MATERIAL AND INTEGRAL PART OF THIS SALE AND IS REFLECTED IN THE CONSIDERATION PAYABLE BY PURCHASER HEREUNDER AND, AS AN INDUCEMENT FOR SELLER TO PROCEED WITH THIS TRANSACTION, PURCHASER FURTHER DECLARES AND ACKNOWLEDGES THAT THIS DISCLAIMER HAS BEEN BROUGHT TO THE ATTENTION OF PURCHASER AND EXPLAINED IN DETAIL AND THAT PURCHASER HAS VOLUNTARILY AND KNOWINGLY CONSENTED THERETO.

**SECTION 14.2.**      **Survival**.  The provisions of this Article 14 shall survive the Closing.

**ARTICLE 15**
**ENVIRONMENTAL STUDY; ASSUMPTION OF OBLIGATIONS**

**SECTION 15.1.**      **Environmental Study**.  Seller and Purchaser acknowledge that Purchaser is performing a Phase I Environmental Assessment with respect to the Property (the "**Environmental Study**"). In the event that the Environmental Study recommends that a Phase II Environmental Assessment and/or related tests be conducted on the Property, Seller agrees that

-21-

Purchaser may conduct such Phase II Environmental Assessment and tests of the Property. In the event that the Environmental Study or the Phase II Environmental assessment and/or related tests disclose the presence of Hazardous Substances or environmental conditions that require remediation then, to the extent that the aggregate cost of such remediation exceeds $100,000, Seller shall be responsible for and pay all remediation costs in excess of $100,000, and Purchaser shall be responsible for and pay the remediation costs up to a maximum of $100,000. To the extent that Seller shall fail to pay its portion of such remediation costs then Purchaser shall have the option to either (i) terminate this Agreement and receive the immediate refund of the Deposit plus any remediation costs it incurred, whereupon neither party to this Agreement shall have any further obligations to the other, or (ii) receive a credit against the balance of the Purchase Price due under this Agreement for the amount of Seller's share of the remediation costs which were not paid for by Seller, and the purchaser under the Asset Agreement shall receive a credit against the purchase price due thereunder to the extent that Seller's share of the remediation costs exceed the balance of the Purchase Price payable under this Agreement; provided, that in no event shall the aggregate of such credits under this Agreement and the Asset Agreement exceed the amount of Seller's share of the remediation costs. All remediation work shall be conducted by such licensed contractors as may be selected by Purchaser.

SECTION 15.2.    **Survival**.    The provisions of this Article 15 shall survive the termination of this Agreement.

## ARTICLE 16
## ESCROW

SECTION 16.1.    **Escrow Terms**.    The Deposit shall be held in escrow by Escrow Agent in accordance with the terms of the Escrow Agreement which shall, notwithstanding anything to the contrary in this Agreement, be binding upon Seller, Purchaser and Escrow Agent in all respects.

## ARTICLE 17
## BANKRUPTCY COURT MATTERS

SECTION 17.1.    **Bankruptcy Court Approval**.    Except for the Escrow Agreement for the Deposit which is binding pursuant to its terms, this Agreement, the Asset Agreement and the Receivership Agreement are subject to approval by the Bankruptcy Court. To the extent that any of the terms of this Agreement, the Asset Agreement or the Receivership Agreement are modified in connection with or as a result of the Bankruptcy, then any such modification shall in all events be subject to the approval of Purchaser. To the extent that Purchaser does not approve any such modification, then, notwithstanding anything to the contrary, Purchaser shall have the right, but not the obligation, to terminate and cancel this Agreement and receive the immediate refund of the Deposit, and upon such termination the Asset Agreement shall automatically terminate and the Asset Purchaser shall receive the immediate refund of the Escrowed Funds paid under the Asset Agreement. This provision shall survive termination of this Agreement.

SECTION 17.2.    Intentionally Omitted.

SECTION 17.3.    **Bankruptcy Court Filings**.    As promptly as practicable following the execution of this Agreement, Seller shall, at its sole costs and expense, file with and seek the

4329285v.5

approval of the Bankruptcy Court for the transactions contemplated herein.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, including furnishing affidavits or other Documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  In the event the entry of the Sale Order shall be appealed, each party shall use its respective commercially reasonable efforts to defend against such appeal.

SECTION 17.4.    **Notice of Sale**.  Notice of the sale of the Property contemplated in this Agreement shall be served in accordance with all applicable sections of the Bankruptcy Code, Bankruptcy Rules, and local rules of the Bankruptcy Court.

# ARTICLE 18
# MISCELLANEOUS

SECTION 18.1.    **Entire Agreement**.  The Sale Order, this Agreement, the Exhibits and Schedules annexed hereto, the Escrow Agreement, the Asset Agreement, the Receivership Agreement, and any other contemporaneously executed agreements, are the entire agreement between Seller and Purchaser concerning the sale of the Property, and all understandings and agreements heretofore had or made between the parties hereto are merged in such agreements which alone fully and completely expresses the agreement of the parties hereto.

SECTION 18.2.    **Modification**.  Except as otherwise provided herein, this Agreement may not be changed, modified, supplemented or terminated, except by an instrument executed by the parties hereto and approved by the Bankruptcy Court.  Either party hereto may waive any of the terms and conditions of this Agreement made for its benefit, provided such waiver is in writing and signed by the party waiving such term or condition and, if required, approved by the Bankruptcy Court.

SECTION 18.3.    **Binding Agreement**.  Subject to the provisions of this Agreement and the Sale Order, the terms, covenants, agreements, conditions, representations and warranties contained in this Agreement shall inure to the benefit of and be binding upon the respective parties hereto.  This Agreement shall not inure to the benefit of or be enforceable by any other Person.

SECTION 18.4.    **Assignment**.  Subject to the approval of the Bankruptcy Court, without the express written consent of Seller (which may be granted or withheld in Seller's sole discretion), this Agreement may not be assigned by Purchaser, including any assignment by operation of law.  Except as provided for hereunder, any assignment by Purchaser without Seller's prior written consent and Bankruptcy Court approval shall be deemed null and void ab initio and shall be a material default entitling Seller, at its option, to exercise any of its powers, privileges, rights or remedies under this Agreement or at law or in equity.  If Seller shall consent to an assignment, any such assignee shall assume all duties and obligations of Purchaser pursuant to this Agreement; provided, however, that any such assignment of Purchaser's interest in this Agreement shall not relieve the original Purchaser of any duties, obligation or liabilities hereunder.  Any change in control of Purchaser or of any of the direct or indirect ownership interests in Purchaser, at any level or tier of ownership, whether in one transaction or a series of transactions, shall

-23-

constitute an assignment for purposes of this Section 18.4. Notwithstanding the foregoing, Purchaser may not assign its interest in this Agreement to any entity unless such entity can satisfy the requirements of adequate protection of future performance for the assignment of any contracts or leases as required by section 365 of the Bankruptcy Code.

**SECTION 18.5.    Illegality**.   If any term or provision of this Agreement or the application thereof to any Person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term and provision of this Agreement shall be valid and enforced to the fullest extent permitted by Law.

**SECTION 18.6.    Choice of Law**.   EXCEPT IN SUCH MATTERS AS ARE GOVERNED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE EXHIBITS AND SCHEDULES ANNEXED HERETO, SHALL BE GOVERNED BY, INTERPRETED UNDER, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

**SECTION 18.7.    Construction**.   The headings and captions of the various Articles and Sections of this Agreement have been inserted solely for purposes of convenience, are not part of this Agreement, and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Agreement.  Unless stated to the contrary, all references to Articles, Sections, paragraphs or clauses herein shall be to the specified Article, Section, paragraph or clause of this Agreement, and all references to Exhibits and Schedules shall be to the specified Exhibits and Schedules attached hereto.  All Exhibits and Schedules attached hereto are made a part hereof. All terms defined herein shall have the same meaning in the Exhibits and Schedules, except as otherwise provided therein.  All references in this Agreement to "**this Agreement**" shall be deemed to include the Exhibits and Schedules attached hereto.  The terms "**hereby**", "**hereof**", "**hereto**", "**hereunder**" and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used. Whenever in this Agreement provision is made for the payment of attorneys' fees, such provision shall be deemed to mean reasonable attorneys' fees and paralegals' fees.  The term "**including**" when used herein shall mean "**including, without limitation**."  Wherever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.

**SECTION 18.8.    Binding Effect; Successors and Assigns.**  This Agreement shall apply to, be binding in all respects upon and inure to the benefit of the parties and their respective successors, administrators and permitted assigns.  A successor to Seller shall include Seller as a reorganized debtor.   Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement.  This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their respective successors, administrators and permitted assigns.

4329285v.5

**SECTION 18.9.    Ambiguities**.  Each party acknowledges that it and its counsel have reviewed this Agreement, and the parties hereby agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

**SECTION 18.10.    Expenses**.  If any legal action or other proceeding is brought for the enforcement of this Agreement or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover its fees and costs, including reasonable attorneys' fees, court costs and other costs incurred in such action or proceeding, in addition to any other relief to which it or they may be entitled.  The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

**SECTION 18.11.    Counterparts**.  This Agreement may be executed in counterparts, each of which together shall be deemed to be an original and all of which shall constitute one and the same Agreement.  Any counterpart may be executed by facsimile or PDF signature and such facsimile or PDF signature shall be deemed an original.

**SECTION 18.12.    Waiver of Trial by Jury**.  THE RESPECTIVE PARTIES HERETO SHALL AND THEY HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, OR FOR THE ENFORCEMENT OF ANY REMEDY UNDER ANY STATUTE, EMERGENCY OR OTHERWISE.   THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

**SECTION 18.13.    Third Party Beneficiaries**.  Except as expressly set forth herein, no Person other than the parties hereto, shall have any rights or claims under this Agreement.

**SECTION 18.14.    Jurisdiction**.

18.14.1. FOR THE PURPOSES OF ANY SUIT, ACTION OR PROCEEDING INVOLVING THIS AGREEMENT, PURCHASER AND SELLER EACH HEREBY EXPRESSLY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT AND PURCHASER AND SELLER EACH AGREES THAT SUCH COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY SUCH SUIT, ACTION OR PROCEEDING COMMENCED BY EITHER PARTY.

18.14.2. PURCHASER AND SELLER EACH HEREBY IRREVOCABLY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT BROUGHT IN THE BANKRUPTCY COURT AND HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH SUIT, ACTION

4329285v.5

OR PROCEEDING BROUGHT IN THE BANKRUPTCY COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

        18.14.3. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

        **SECTION 18.15.   No Recording**.  Purchaser covenants and agrees that it has no right and in no event will Purchaser record or cause to be recorded this Agreement, or any memorandum hereof or affidavit relating to this Agreement, prior to the Closing and, if Purchaser breaches the provisions of this Section, there shall be no cure period (notwithstanding anything to the contrary contained in Section 12.1 hereof), and Seller shall have the right to terminate this Agreement and retain the Deposit as its liquidated damages.

        **SECTION 18.16.   Not an Offer**.  Notwithstanding anything herein to the contrary, it is to be strictly understood and agreed that (a) the submission by Seller to Purchaser of any drafts of this Agreement or any correspondence with respect thereto shall (i) be deemed submission solely for Purchaser's consideration and not for acceptance and execution, (ii) have no binding force or effect, (iii) not constitute an option for the purchase of the Property or a lease or conveyance of the Property by Seller to Purchaser and (iv) not confer upon Purchaser or any other party any title or estate in the Property, (b) the terms and conditions of this Agreement shall not be binding upon either party hereto in any way unless and until it is unconditionally executed and delivered by both parties in their respective sole and absolute discretion and all conditions precedent to the effectiveness thereof including, but not limited to, the delivery of the Deposit to Escrow Agent, shall have been fulfilled or waived and the approval of the Bankruptcy Court obtained, and (c) if this Agreement is not so executed and delivered and approved for any reason whatsoever (including, without limitation, either party's willful or other refusal to do so or bad faith), neither party shall be liable to the other with respect to this Agreement on account of any written or parole representations, negotiations, any legal or equitable theory (including, without limitation, part performance, promissory estoppel, or undue enrichment) or otherwise.

        **SECTION 18.17.   Failure of Deposit**.  If the payment made on account of the Deposit is by check, and if such check fails collection in due course, there shall be no cure period (notwithstanding anything to the contrary contained in Section 12.1 hereof), and Seller, at its option, may immediately declare this Agreement null, void and of no force and effect, and may pursue its remedies against Purchaser upon such check or in any other manner permitted by law, such remedies being cumulative.

        **SECTION 18.18.   No Waiver**.  The failure of either party hereto to seek redress for any breach, or to insist upon the strict performance, of any covenant or condition of the Agreement by the other shall not be, or be deemed to be, a waiver of the breach or failure to perform (unless the time specified herein for the exercise of such right, or satisfaction of such condition, has expired), nor prevent a subsequent act or omission in violation of, or not strictly complying with, the terms hereof from constituting a default hereunder.

        **SECTION 18.19.   Severability**.  If any term, condition or provision of this Agreement or the application thereof to any circumstance or party hereto, is invalid or unenforceable as against

4329285v.5

any person or under certain circumstances, the remainder of this Agreement and the applicability of such term, condition or provision to other persons or circumstances shall not be affected thereby. Each term, condition or provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

     **SECTION 18.20.  No Survival**.  The delivery and acceptance of the deed at the Closing shall be deemed to constitute full compliance by Seller with all of the terms, conditions and covenants of this Agreement on Seller's part to be performed, and, except as expressly set forth in this Agreement, the representations, warranties, covenants or other obligations of Seller set forth in this Agreement shall not survive the Closing, and no action based thereon shall be commenced after the Closing.

<div align="center">

**THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.
SIGNATURES FOLLOW ON THE NEXT PAGE.**

</div>

4329285v.5

IN WITNESS WHEREOF, the parties have executed this Purchase and Sale Agreement as of the day and year first above written.

SELLER:

GOOD SAMARITAN LUTHERAN HEALTH
CARE CENTER, INC.

By: _____
     Name: Thomas Koenke
     Title: Director

PURCHASER:

DELMAR SNF REALTY ASSOCIATES, LLC

By: _____
     Name:  Daryl Hagler
     Title:   Managing Member

-28-

4329285v.5

IN WITNESS WHEREOF, the parties have executed this Purchase and Sale Agreement as of the day and year first above written.

SELLER:

GOOD SAMARITAN LUTHERAN HEALTH
CARE CENTER, INC.

By:    _____
     Name:
     Title:

PURCHASER:

DELMAR SNF REALTY ASSOCIATES, LLC

By:    _____
     Name:  Daryl Hagler
     Title:   Managing Member

4329285v.5

## SCHEDULE I

## DEFINITIONS

For all purposes of this Agreement, the following terms shall have the respective meanings specified below:

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise..

"**Agreement**" means this Agreement, the Exhibits and Schedules and all amendments, modifications and extensions hereto and thereto.

"**Apportionment Date**" shall have the meaning set forth in Section 4.1.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Law to close.

"**Closing**" shall have the meaning set forth in Section 8.1.

"**Closing Date**" shall have the meaning set forth in Section 8.1.

"**Closing Documents**" shall have the meaning set forth in Section 9.1.2.

"**Closing Effective Date**" shall have the meaning set forth in the Asset Agreement.

"**Condemnation**" shall have the meaning set forth in Section 2.1.

"**Deed**" means the deed to the Real Estate to be delivered by Seller to Purchaser pursuant to Schedule IV.

"**Deposit**" shall have the meaning set forth in Section 2.2.3.

"**Environment**" shall mean soil, surface waters, ground waters, land, stream sediments, surface or subsurface strata and ambient air.

"**Environmental Laws**" shall mean all federal, state or local laws, regulations, guidelines, codes, permits, rules, administrative and judicial decisions, directives, decrees, orders, ordinances, and any other legal requirements relating to the protection of human health and safety or the Environment whenever in effect, including those identified below in the definition of "Hazardous Substances".

"**Environmental Study**" shall have the meaning set forth in Section 15.1.

4329285v.5

"**Escrow Agent**" shall mean National Granite Title Insurance Agency, Inc.

"**Escrow Agreement**" shall have the meaning set forth in Section 2.2.3.

"**Existing Lender**" shall have the meaning set forth in Section 3.4.

"**Existing Mortgage**" shall have the meaning set forth in Section 3.4.

"**Final Order**" shall mean an order, ruling, or judgment of the Bankruptcy Court (a) that is in full force and effect; (b) that is not stayed; (c) as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired, and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing is then pending; and (d) is no longer subject to review, reversal, modification, or amendment by appeal or writ of certiorari; provided, however, that an order will be deemed a Final Order notwithstanding the filing of a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or other applicable rules.

"**Fixtures**" shall have the meaning set forth in Section 2.1.1.

"**Governmental Authority**" shall have the meaning set forth in Section 3.3.7.

"**Hazardous Substances**"  shall mean all materials and substances now or hereafter subject to any Environmental Laws, including (i) all substances which are designated pursuant to Section 311(b)(2)(A) of the Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. § 1251, et seq., (ii) any element, compound, mixture, solution, or substance which is designated pursuant to Section 102 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, et seq., (iii) any hazardous waste having the characteristics which are identified under or listed pursuant to Section 3001 of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq., (iv) any toxic pollutant listed under Section 307(a) of FWPCA, (v) any hazardous air pollutant which is listed under Section 112 of the Clean Air Act, 42 U.S.C. § 7401, et seq., (vi) any imminently hazardous chemical substance or mixture with respect to which action has been taken pursuant to Section 7 of the Toxic Substances Control Act, 15 U.S.C. § 2601, et seq., (vii) "hazardous materials" within the meaning of the Hazardous Materials Transportation Act, 49 U.S.C. § 5101, et seq., (viii) any element or compound contained in the list of hazardous substances adopted by the United States Environmental Protection Agency ("EPA") or by the New York Department of Environmental Conservation ("DEC"), (ix) petroleum or petroleum by-products, (x) asbestos in any form which is or could become friable, (xi) any radioactive material or substance, (xii) lead based paint, (xiii) transformers or other equipment which contain polychlorinated biphenyls, (xiv) all toxic wastes, hazardous wastes and hazardous substances as defined by, used in, controlled by, or subject to all implementing regulations adopted and publications promulgated pursuant to the foregoing statutes, (xv) any other hazardous or toxic substance or pollutant identified in or regulated under any other applicable federal, state or local Environmental Laws and (xvi) any chemical, material, gas or substance that does or may pose a hazard to the Environment, health or safety.

"**Law**" means any law, rule, code, regulation, ordinance, moratorium, injunctive proceeding, restriction or similar matter imposed by any federal, state, municipal or local

government or any public or quasi-public board, authority, commission, agency or department thereof.

"**Liens**" shall have the meaning set forth in Section 3.1.1.

"**Material Part**" shall have the meaning set forth in Section 13.2.

"**Net Proceeds**" shall have the meaning set forth in Section 3.1.1.

"**Non-Permitted Exceptions**" shall have the meaning set forth in Section 3.2.1.

"**Notices**" shall have the meaning set forth in Section 10.1.

"**Permitted Exceptions**" shall have the meaning set forth in Section 3.3.

"**Person**" means an individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, association, joint stock company, trust, unincorporated organization or the federal government or any state or local government or any agency or political subdivision thereof.

"**Property**" shall have the meaning set forth in Section 2.1.1.

"**Purchase Price**" shall have the meaning set forth in Section 2.2.1.

"**Purchaser**" shall have the meaning set forth in the introductory paragraph.

"**Purchaser-Related Parties**" means, individually and collectively, and to the extent applicable, (i) Purchaser, (ii) Affiliates of Purchaser, and (iii) the shareholders, officers, directors, employees, members and constituent partners of Purchaser and/or of any direct or indirect partner or member of or corporate joint-venturer with Purchaser, and/or of any Affiliate of Purchaser.

"**Real Estate**" shall have the meaning set forth in Section 2.1.1.

"**Receiver**" shall have the meaning set forth in the Recitals.

"**Receivership Agreement**" shall have the meaning set forth in the Recitals.

"**RE Tax Returns**" shall have the meaning set forth in Section 4.5.

"**Sale Order**" means an order of the Bankruptcy Court approving the transactions contemplated by, and the terms contained in, this Agreement, the Asset Purchase Agreement and the Receivership Agreement, which order shall be made on notice to the Existing Lender with an opportunity to object and to be heard, and shall include such other Bankruptcy Court orders which modify any of terms contained in this Agreement, the Asset Purchase Agreement or the Receivership Agreement, and which order(s) shall in all events be in such form and substance as are acceptable to Purchaser. To the extent that Purchaser does not approve the Sale Order, it shall have the right to terminate this Agreement and received the prompt refund of the Deposit.

"**Scheduled Closing Date**" shall have the meaning set forth in Section 8.1.

"**Seller**" shall have the meaning set forth in the introductory paragraph.

"**Seller-Related Parties**" means individually and collectively, Seller and its officers, directors, members, employees, agents, representatives and contractors and Affiliates of Seller.

"**Service Contracts**" means any written or oral service, maintenance, landscaping, operating, repair, equipment lease, supply, construction or other similar contract or agreement relating to the operation or maintenance of the Property, together with all amendments and modifications thereof in effect on the date hereof.

"**Title Company**" shall have the meaning set forth in Section 3.1.

"**Transfer Taxes**" shall have the meaning set forth in Section 4.4.

"**Unavoidable Delay**" shall mean any delays due to strikes, acts of God, governmental restrictions, enemy action, civil commotion, fire, unavoidable casualty or other causes similarly beyond the control of Seller; provided, however, that any lack of funds shall not be deemed a cause beyond the control of Seller.

"**Violations**" shall have the meaning set forth in Section 3.5.

4329285v.5

## SCHEDULE II

## PROPERTY DESCRIPTION

**Tax Map Parcel 86.11-1-1.1**

ALL THAT CERTAIN PIECE OR PARCEL OF LAND situate in the Town of Bethlehem, Albany County, State of New York, being a portion of the premises conveyed to Good Samaritan Nursing HomeE Co. Inc. by Deed dated September 25, 1973, recorded in the Albany County Clerk's Office in Book 2071 of Deeds at page 517, being bounded and described as follows:

BEGINNING at a point in the northerly line of Rockefeller Road distant 1298.74 feet northeasterly, measured along the northerly line of said Rockefeller Road from its intersection with the northeasterly line of Kenwood Avenue; thence, northwesterly along the division line between lands conveyed to George W. Ehrcke by Deed dated January 10, 1945, recorded in the Albany County Clerk's Office in Book 972 of Deeds at page 158 on the west and the parcel herein described on the East, the following two (2) courses:

1. N 35 deg. 37' 00" W, 343.81 feet; and
2. N 06 deg. 20' 09" W, 417.94 feet, to a point in the southerly line of lands of Delaware and Hudson Railroad Company; thence, southeasterly along the southerly line of said railroad along a curve to the right having a radius of 1380.79 feet, a central angle of 13 deg. 19' 08", an arc length of 320.98 feet and chord of S 86 deg. 19' 46" E, 320.26 feet to a point; thence, continuing along said line S 63 deg. 48' 32" E, 107.93 feet to the northwesterly corner of lands designated as the Samaritan Homes Senior Housing Project; thence, southeasterly along the division line between said lands of the Samaritan Homes Senior Housing Project on the northeast and the lands herein described on the southwest, the following twenty-three (23) courses:

1. S 26 deg. 11' 28" W, 62.08 feet;
2. S 41 deg. 45' 01" W, 71.05 feet;
3. S 58 deg. 06' 41" E, 5.27 feet;
4. S 80 deg. 55' 53" E, 47.31 feet;
5. .N 31 deg. 53' 19" E, 56.65 feet;
6. S 58 deg. 06' 41" E, 48.91 feet;
7. S 09 deg. 08' 12" W, 51.50 feet;
8. S 80 deg. 51' 48" E, 58.92 feet;
9. N 09 deg. 08' 12" E, 2.98 feet;
10. S 80 deg. 51' 48" E, 6.76 feet;
11. S 09 deg. 08' 12" W, 2.98 feet;
12. S 80 deg. 51' 48" E, 19.09 feet;
13. S 09 deg. 01' 02" W, 127.06 feet;
14. S 70 deg. 04' 39" W, 1.14 feet;
15. S 19 deg. 55' 21" E, 7.81 feet;
16. N 70 deg. 04' 39" E, 1.17 feet;
17. S 50 deg. 53' 13" E, 126.92 feet;
18. S 39 deg. 12' 20" W, 19.13 feet;
19. S 50 deg. 47' 40" E, 2.96 feet;
20. S 39 deg. 12' 20" W, 6.75 feet;
21. N 50 deg. 47' 40" W, 2.96 feet;
22. S 39 deg. 12' 20" W, 17.74 feet; and
23. S 20 deg. 53' 09" E, 80.87 feet to a point in the northerly line of Rockefeller Road; thence, southwesterly along the northerly line of Rockefeller Road S 69 deg. 06' 51" W, 402.51 feet to the point and place of beginning.

4329285v.5

## <u>SCHEDULE III</u>

## <u>ESCROW AGENT'S WIRING INSTRUCTIONS</u>

To be provided.

4329285v.5

### SCHEDULE IV

### CLOSING DOCUMENTS TO BE DELIVERED BY SELLER

1.      Subject to Section 9.1.3, statutory form of bargain and sale deed(s) with covenants (the **"Deed"**) substantially in the form attached hereto as <u>Exhibit B</u> containing the covenant required by Section 13 of the Lien Law, and properly executed and acknowledged so as to convey the title required to be conveyed by Seller under this Agreement.

2.      Unless prohibited by an order of the Bankruptcy Court, bank or certified check(s), payable to the direct order of the appropriate tax collecting agencies or officials, in the amount of all documentary stamp and transfer and transfer gains taxes, and other taxes, fees and charges, payable by reason of or in connection with the conveyance and transfer of the Property by Seller to Purchaser.

3.      Unless prohibited by an order of the Bankruptcy Court, copies of any required real property transfer tax returns properly executed and acknowledged by Seller and Purchaser, as applicable.

4.      All documents, as shall be reasonably necessary to evidence that Seller has proper authority to sell the Property and deliver the documents required to be delivered by Seller pursuant to this Agreement.

5.      All keys and security codes to entrance doors to, and equipment and utility rooms located in, the Property and in Seller's possession.

6.      A certificate of a duly authorized representative of Seller, sworn to under penalties of perjury, setting forth Seller's U.S. tax identification number and stating that Seller is a **"United States person"** within the meaning of Sections 1445(f)(3) and 7701(a)(30) of the Code.

7.      To the extent such are in the possession or control of Seller or its managing agent, original copies of all guarantees and warranties then in effect in respect of the Property.

8.      To the extent such are in the possession or control of Seller or its managing agent, original licenses and permits to be transferred hereunder, except to the extent the same are required to be and located at or are affixed to the Property.

9.      Certificate of an authorized representative of Seller with respect to the authority of the person(s) executing this Agreement and the other Closing Documents on behalf of Seller.

10.      A Bill of Sale, without warranty, recourse or representation, conveying the Fixtures to Purchaser substantially in the form attached hereto as <u>Exhibit C.</u>

11.      All existing surveys and building plans for the Property and the improvements thereon to the extent in Seller's possession.

## SCHEDULE V

## PURCHASER'S CLOSING DOCUMENTS

1.    Copies of any required real property transfer tax returns properly executed and acknowledged by Purchaser and Seller; copy of any sales tax return required by this transaction; and any sales tax due.

2.    All documents as shall be reasonably necessary to evidence that Purchaser has proper authority to purchase the Property and deliver the documents required to be delivered by Purchaser pursuant to this Agreement.

3.    Certificate of an authorized representative of Purchaser with respect to the authority of the person(s) executing this Agreement and the other Closing Documents on behalf of Purchaser.

4329285v.5

## SCHEDULE VI

## PERMITTED EXCEPTIONS

1.    Right Of Ways and Easements in favor of Bethlehem Sewer District and the Town of Bethlehem, Albany County, New York, recorded in Liber 2057 page 653 and in Liber 2070 page 871, as approximately shown on Survey.

2.    Right of Ways and Easements in favor of the Town of Bethlehem, Albany County, New York, recorded in Liber 2070 page 877, as approximately shown on Survey, and in Liber 2565 page 417.

3.    Easements in favor of Niagara Mohawk Power Corporation and New York Telephone Company recorded in Liber 2106 page 437, as approximately shown on Survey, and Liber 2448 page 1124, and Liber 1861 page 115.

4.    Rights, easements, and conditions set forth in Declaration For Reciprocal Easements For Utilities And Roads And Right Of Way And The Maintenance, Operation And Use Thereof At Premises Owned By Good Samaritan Nursing Home Co., Inc. And The Samaritan Homes Senior Housing Project, In The Town Of Bethlehem, County Of Albany And State Of New York recorded in Liber 2405 page 229.

5.    Rights, easements, and conditions set forth in Declaration For Reciprocal Easements For Utilities And Roads And Parking And Right Of Way And The Maintenance, Operation And Use Thereof At Premises Owned By Good Samaritan Lutheran Health Care Center, Inc., Formerly Known as Good Samaritan Nursing Home Co., Inc. and Owned By Samaritan Lutheran Home, Inc., In The Town Of Bethlehem, County Of Albany And State Of New York recorded in Liber 2560 page 964, as approximately shown on Survey.

6.    As To (Tax Map Parcel 86.11-1-34)
Easements in favor of Niagara Mohawk Power Corporation and NYNEX Telephone Company recorded in Liber 2569 page 983.

7.    Water Main Easements in favor of the Town of Bethlehem, Albany County, New York, recorded in Liber 2575 page 257, as approximately shown on Survey.

8.    Drainage, sanitary sewer and storm sewer easements in favor of the Town of Bethlehem, Albany County, New York, recorded in Liber 2575 page 266, Liber 2575 page 271 and Liber 2575 page 276, as approximately shown on Survey.

9.    Easement Deed by Court Order in Settlement Of Landowner Action recorded in Liber 3067 page 674.

10.    Easements in favor of Niagara Mohawk Power Corporation recorded in Liber 1254 page 187.

11.    Subject to covenants set forth in deed recorded in Liber 2560 page 962.

4329285v.5

12.     Notes and any depiction of facts shown on map filed in the Albany County Clerk's Office as Map No. 10349.

13.     Survey's made by Edward W. Boulelle and Son, dated April 16, 2004, Drawing No., 4050-100.dwg and survey dated April 20, 2004, Drawing No. 4050-101.dwg (collectively herein "Survey") shows the following which are exceptions from coverage;

**Drawing No., 4050-100.dwg**

i)      Macadam Parking Area, light poles, signs and concrete walk encroach the easement area granted in Liber 2106 page 437.  The Company insures against loss or damage sustained by the Insured by reason of the legally enforced removal of the encroaching improvements,

ii)     Part of concrete pad with fence encroach undetermined distance onto easterly abutting premises.  The Company insures against loss or damage sustained by the Insured by reason of the legally enforced removal of the encroaching improvements,

iii)    Macadam Parking Area, and concrete walk encroach the easement area granted in Liber 2575 page 257.  The Company insures against loss or damage sustained by the Insured by reason of the legally enforced removal of the encroaching improvements,

iv)     Macadam Parking Area encroaches the easement area granted in Liber 2070 page 871.  The Company insures against loss or damage sustained by the Insured by reason of the legally enforced removal of the encroaching improvement,

v)      Macadam Parking Area, shed and planter encroach the easement area granted in Liber 2575 page 276.  The Company insures against loss or damage sustained by the Insured by reason of the legally enforced removal of the encroaching improvements,

vi)     Macadam Parking Area encroaches the easement area granted in Liber 2106 page 437.  The Company insures against loss or damage sustained by the Insured by reason of the legally enforced removal of the encroaching improvements,

**Drawing No., 4050-101.dwg**

i)      Macadam walk encroaches the easement area granted in Liber 2575 page 271.  The Company insures against loss or damage sustained by the Insured by reason of the legally enforced removal of the encroaching improvement,

ii)     Water line traverses the Land described in Schedule A near its southwesterly corner.  No utility easement found of record.  Policy excepts rights of the appropriate utility company to maintain and/or relocate utility service.  The Company insures against loss or damage sustained by the Insured by reason of damage to the existing improvements resulting from the future exercise of any right to maintain and/or relocate utility service.

iii)    Guy wire encroachment near southerly recorded line.  No utility easement found of record.  The Company insures against loss or damage sustained by the Insured by

- 38 -

reason of damage to the existing improvements resulting from the future exercise of any
right to maintain and/or relocate utility service.

## EXHIBIT A

## ESCROW AGREEMENT

[See Attached]

4329285v.5

**ESCROW AGREEMENT**

**BY AND AMONG**

**GOOD SAMARITAN LUTHERAN HEALTH CARE CENTER, INC**.

and

**DELMAR SNF REALTY ASSOCIATES, LLC**

**AND**

**NATIONAL GRANITE TITLE INSURANCE AGENCY, INC., AS ESCROW AGENT**

December 10, 2019

4329285v.5

**ESCROW AGREEMENT**

**ESCROW AGREEMENT** ("<u>AGREEMENT</u>") is made as of December 10, 2019 by and among **Good Samaritan Lutheran Health Care Center, Inc.**, a New York not-for-profit corporation ("<u>Seller</u>"), **Delmar SNF Realty Associates, LLC**, a New York limited liability company ("<u>Purchaser</u>"), and National Granite Title Insurance Agency, Inc.,  with offices at 155 North Main Street, New City, New York 10956 (the "<u>Escrow Agent</u>").  All capitalized terms used but not defined herein shall have the meaning assigned to them in the Purchase Agreement (as defined below).

Recitals:  The following recitals are hereby incorporated into this Agreement:

A.     Purchaser and Seller have entered into a Purchase and Sale Agreement, dated as of the date hereof (the "<u>Purchase Agreement</u>"), pursuant to which, among other things, Purchaser shall deposit FIVE HUNDRED AND TEN THOUSAND Dollars ($510,000) (the "<u>Deposit</u>") into escrow with Escrow Agent within one (1) business day of the entry of the Sale Order.  The amount in the Escrow Account (defined below) from time to time, including the Deposit and all earnings thereon, is referred to herein as the "<u>Escrow Fund.</u>"

NOW, THEREFORE, the parties hereto agree as follows:

1.     <u>Deposit and Acknowledgment of Receipt.</u>

1.1     Within one (1) business day after the delivery by Seller to Purchaser of a copy of the court entered Sale Order, Purchaser shall deliver to Escrow Agent, and Escrow Agent shall acknowledge receipt of, Purchaser's wire transfer in the amount of the Deposit.

1.2     Intentionally Omitted.

1.3     Escrow Agent hereby agrees to hold the Escrow Fund in an interest-bearing account for the benefit of Seller and Purchaser (the "Escrow Account") pending the disbursement of the Escrow Fund in accordance with the terms of this Agreement.

1.4     The Escrow Fund, until released by the Escrow Agent in accordance with this Agreement, shall not be subject to lien or attachment by any creditor of any party hereto and shall be used solely for the purposes set forth in this Agreement.  Amounts held in the Escrow Account shall not be available to, and shall not be used by, Escrow Agent to set off any obligations of either Purchaser or Seller owing to Escrow Agent in any capacity.

2.     <u>Terms of Escrow.</u>

2.1     Upon the Closing, Escrow Agent shall disburse the Escrow Fund to Seller or as otherwise directed by Seller, without further instruction from Purchaser.

2.2     Escrow Agent shall, subject to Section 2.1, disburse amounts from the Escrow Fund, upon delivery, by Seller and Purchaser to Escrow Agent, of joint written instructions executed by an authorized officer of both parties directing Escrow Agent to deliver to Seller or Purchaser, as the case may be, an amount equal to the amount to which such party is

entitled pursuant to those joint written instructions.  Each of Seller and Purchaser agrees to execute and deliver such joint written instructions as are required to cause the Escrow Fund to be disbursed as contemplated by the Purchase Agreement.  Upon receipt of the joint written instructions, Escrow Agent shall release by wire transfer to an account or accounts designated by Seller or Purchaser, as the case may be, the amount specified in the joint written instructions.

2.3    Notwithstanding anything to the contrary, in the event that the Sale Order is not entered by March 31, 2020 (including if the Sale Order is issued in form or substance that is not acceptable to Purchaser) and if Purchaser has previously paid the Deposit, then upon Purchaser's termination of the Purchase Agreement and written demand to the Escrow Agent, the Escrow Agent shall refund and pay over the Escrow Fund to Purchaser.

2.4    Notwithstanding anything to the contrary contained in this Agreement, in the event of a dispute concerning the Escrow Fund, the Escrow Agent shall not disburse any amounts from the Escrow Fund until its receipt of (a) joint written instructions from Seller and Purchaser as set forth hereinabove or (b) an order of the United States Bankruptcy Court for the Northern District of New York (the "Bankruptcy Court") directing the disbursement of the Escrow Fund.

2.5    Upon the completion of the disbursements as set forth above, Escrow Agent shall have no further duties hereunder.

3.    Obligations and Liabilities of Escrow Agent.

3.1    The duties and obligations of Escrow Agent shall be determined solely by the express provisions of this Agreement.

3.2    Escrow Agent shall not be responsible in any manner whatsoever for any failure or inability of Purchaser or Seller to perform or comply with any of the provisions of the respective agreements between them.

3.3    Escrow Agent shall not be bound by any modification, cancellation or rescission of this Escrow Agreement unless in writing, signed by Purchaser and Seller and expressly consented to in writing by Escrow Agent.

3.4    Escrow Agent's duties hereunder are as a depository only, ministerial in nature, and Escrow Agent shall incur no liability whatsoever hereunder for any error of judgment, or any action taken or omitted hereunder, except for damages directly resulting from Escrow Agent's gross negligence or willful misconduct as determined by a final and non-appealable judgment of the Bankruptcy Court.

3.5    Delivery of the Escrow Fund by Escrow Agent pursuant to the provisions of this Agreement shall constitute a complete discharge and satisfaction of all obligations of Escrow Agent hereunder.

3.6    Nothing contained herein shall be deemed to preclude Escrow Agent at any time and for any reason from (a) depositing the Escrow Fund into the Bankruptcy Court upon prior notice to the parties hereto and (b) abiding by the determination of the Bankruptcy

4329285v.5

Court with respect thereto.  In such event, such delivery shall constitute a complete discharge and release of Escrow Agent of its obligations hereunder.

3.7    Escrow Agent shall be entitled to rely conclusively upon any written notice, waiver, receipt, or other document which Escrow Agent believes in good faith to be genuine, including, without limitation, a written statement by Purchaser or Seller that they have complied with the terms of the Purchase Agreement with respect to a demand for payment.

3.8    In the event of any controversy or dispute under this Escrow Agreement or with respect to any question as to the construction hereof or any action to be taken or omitted by Escrow Agent, Escrow Agent shall be entitled to consult with counsel of its own choosing.

4.    <u>Expenses of Escrow Agent</u>.  Escrow Agent shall serve without compensation.

5.    <u>Indemnification of Escrow Agent</u>.  Purchaser and Seller agree, jointly and severally, to indemnify Escrow Agent and hold Escrow Agent harmless from any loss, liability and expenses which it incurs in connection with or arising out of its compliance with the terms of this Agreement, including the fees, costs and expenses of defending itself against any claims of liability hereunder, except for a loss, liability or expense arising solely from Escrow Agent's own gross negligence, willful misconduct or breach of fiduciary duty as determined by a final and non-appealable judgment of the Bankruptcy Court.

6.    <u>Successor Escrow Agent</u>.  In the event Escrow Agent is no longer able or willing to serve, Escrow Agent shall have the right, after consultation with Seller and Purchaser, to appoint a successor Escrow Agent who shall be bound by the terms and conditions set forth herein.

7.    <u>Notices.</u>

7.1    All notices and other communications under this Agreement shall be in writing and, unless otherwise provided in this Agreement, shall be deemed given (a) when delivered personally by hand, (b) when sent by facsimile (confirmed in writing by mail promptly thereafter dispatched), (c) three (3) days after being mailed by certified or registered mail, postage prepaid, return receipt requested or (d) one (1) Business Day following the day sent by a nationally recognized overnight courier service, in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Seller:

Good Samaritan Lutheran Health Care Center, Inc.
c/o The Lutheran Care Network
700 White Plains Road
Scarsdale, New York  10583
Attn:  Ms. Laraine Fellagara

3

4329285v.5

With copies to each of:

Deborah A. Reperowitz, Esq.
Stradley Ronon Stevens & Young, LLP
100 Park Avenue, Suite 2000
New York, NY 10017
Email: dreperowitz@stradley.com
Fax:    646.682.7180

Amalgamated Bank
275 Seventh Avenue
New York, New York 10001
Attention: Melony Hey

and

John Mairo, Esq.
Kelly Curtin, Esq.
Porzio Bromberg & Newman P.C.
100 Southgate Parkway
Morristown, NJ 07962-1997
Fax:    973.538.5146

If to Escrow Agent:

National Granite Title Insurance Agency, Inc.
155 North Main Street
New City, New York 10956
Attn: Joseph Deutsch, Esq.

If to Purchaser:

Delmar SNF Realty Associates, LLC
4770 White Plains Road, 3rd floor
Bronx, New York 10470

With a copy to:

Isidor D. Friedenberg, Esq.
2 Cara Drive
Suffern, New York 10901

8.    <u>Binding Effect; Further Assurances.</u>

8.1    This Agreement shall inure to the benefit of and shall be binding upon the respective heirs, personal representatives, successors, and assigns of the parties hereto.

4

8.2     Seller and Purchaser hereto covenant that they will execute all instruments and documents and will take all steps which may be necessary in order to implement the provisions of this Agreement.

9.      <u>Governing Law; Forum.</u>

9.1     This Agreement shall be construed under and governed by the laws of the State of New York, without regard to its principles of conflicts of laws.

9.2     Each party to this Agreement irrevocably consents and agrees that any dispute arising out of or in any way connected to this Agreement shall only be adjudicated by the Bankruptcy Court.  Each of the parties hereto hereby (a) irrevocably submits with regard to any such legal proceeding to the exclusive personal jurisdiction of the Bankruptcy Court in the event any dispute arises out of this Agreement or any transaction contemplated hereby, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from the Bankruptcy Court or that such action is brought in an inconvenient forum and (c) agrees that it shall not bring any action relating to this Agreement or any transaction contemplated hereby in any court other than the Bankruptcy Court. Each of the parties hereto further agrees to accept and acknowledge service of any and all process which may be served in any such legal proceeding in the Bankruptcy Court and agrees that service of process upon such party by a method permitted by the applicable Laws of the State of New York to such party's address as set forth in Section 7.1 hereto, will be deemed in every respect effective service of process upon such party, in any legal proceeding.

10.     <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts (whether facsimile or original), each of which when taken together shall be deemed one and the same original instrument.

11.     <u>Prevailing Party</u>.  In the event of a dispute between the Purchaser and Seller in connection with the Escrow Funds, the prevailing party shall be entitled to recover from the non-prevailing party the reasonable legal fees and costs incurred by the prevailing party in connection with such dispute.

[Remainder of Page Intentionally Left Blank]

4329285v.5

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Escrow Agreement as of the day and year first above written.

GOOD SAMARITAN LUTHERAN HEALTH
CARE CENTER, INC.

By: _____
    Name: Thomas Roemke
    Title: Director

DELMAR SNF REALTY ASSOCIATES, LLC

By: _____
    Name: Daryl Hagler
    Title: Managing Member

NATIONAL GRANITE TITLE INSURANCE
AGENCY, INC.

By: _____
    Name:
    Title:

6

4329285v.5

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Escrow Agreement as of the day and year first above written.

GOOD SAMARITAN LUTHERAN HEALTH CARE CENTER, INC.

By: _____
      Name:
      Title:

DELMAR SNF REALTY ASSOCIATES, LLC

By: _____
      Name:  Daryl Hagler
      Title:   Managing Member

NATIONAL GRANITE TITLE INSURANCE AGENCY, INC.

By: _____
      Name:  Joseph Deutsch
      Title:   VP & Counsel

*Good Sam RE escrow*

6

## EXHIBIT B

## DEED

[See Attached]

**THIS INDENTURE**, made the _____ day of _____, 20__,  BETWEEN

GOOD SAMARITAN LUTHERAN HEALTH CARE CENTER, INC., a New York not-for-profit corporation, with offices at _____  _____,
party of the first part, and

DELMAR SNF REALTY ASSOCIATES, LLC, a New York limited liability company, with an address c/o Isidor D. Friedenberg, Esq., 2 Cara Drive, Suffern, New York 10901, party of the second part.

**WITNESSETH**, that the party of the first part, in consideration of Ten Dollars and other valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

**THE CERTAIN PREMISES AND IMPROVEMENTS SITUATED THEREON AS MORE PARTICULARLY DESCRIBED ON SCHEDULE A ANNEXED HERETO AND MADE A PART HEREOF**

**TOGETHER** with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above-described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

**AND** the party of the first part covenants that the consideration for this conveyance will be subject to the trust fund provisions of Section 13 of the Lien Law.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

**IN WITNESS WHEREOF**, the party of the first part has duly executed this indenture as of the day and year first above written.

GOOD SAMARITAN LUTHERAN HEALTH CARE CENTER, INC.

By:_____
     Name:
     Title:

STATE OF NEW YORK)

                             ) ss:

COUNTY OF_____)

      On the _____ day of _____, 20__, before me, the undersigned, a Notary Public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on this instrument, the individual, or person upon behalf of which the individual acted, executed the instrument.

                                                _____

                                                Notary Public

## SCHEDULE A

**Tax Map Parcel 86.11-1-1.1**

ALL THAT CERTAIN PIECE OR PARCEL OF LAND situate in the Town of Bethlehem, Albany County, State of New York, being a portion of the premises conveyed to Good Samaritan Nursing HomeE Co. Inc. by Deed dated September 25, 1973, recorded in the Albany County Clerk's Office in Book 2071 of Deeds at page 517, being bounded and described as follows:

BEGINNING at a point in the northerly line of Rockefeller Road distant 1298.74 feet northeasterly, measured along the northerly line of said Rockefeller Road from its intersection with the northeasterly line of Kenwood Avenue; thence, northwesterly along the division line between lands conveyed to George W. Ehrcke by Deed dated January 10, 1945, recorded in the Albany County Clerk's Office in Book 972 of Deeds at page 158 on the west and the parcel herein described on the East, the following two (2) courses:

1. N 35 deg. 37' 00" W, 343.81 feet; and
2. N 06 deg. 20' 09" W, 417.94 feet, to a point in the southerly line of lands of Delaware and Hudson Railroad Company; thence, southeasterly along the southerly line of said railroad along a curve to the right having a radius of 1380.79 feet, a central angle of 13 deg. 19' 08", an arc length of 320.98 feet and chord of S 86 deg. 19' 46" E, 320.26 feet to a point; thence, continuing along said line S 63 deg. 48' 32" E, 107.93 feet to the northwesterly corner of lands designated as the Samaritan Homes Senior Housing Project; thence, southeasterly along the division line between said lands of the Samaritan Homes Senior Housing Project on the northeast and the lands herein described on the southwest, the following twenty-three (23) courses:

1.  S 26 deg. 11' 28" W, 62.08 feet;
2.  S 41 deg. 45' 01" W, 71.05 feet;
3.  S 58 deg. 06' 41" E, 5.27 feet;
4.  S 80 deg. 55' 53" E, 47.31 feet;
5.  .N 31 deg. 53' 19" E, 56.65 feet;
6.  S 58 deg. 06' 41" E, 48.91 feet;
7.  S 09 deg. 08' 12" W, 51.50 feet;
8.  S 80 deg. 51' 48" E, 58.92 feet;
9.  N 09 deg. 08' 12" E, 2.98 feet;
10. S 80 deg. 51' 48" E, 6.76 feet;
11. S 09 deg. 08' 12" W, 2.98 feet;
12. S 80 deg. 51' 48" E, 19.09 feet;
13. S 09 deg. 01' 02" W, 127.06 feet;
14. S 70 deg. 04' 39" W, 1.14 feet;
15. S 19 deg. 55' 21" E, 7.81 feet;
16. N 70 deg. 04' 39" E, 1.17 feet;
17. S 50 deg. 53' 13" E, 126.92 feet;
18. S 39 deg. 12' 20" W, 19.13 feet;
19. S 50 deg. 47' 40" E, 2.96 feet;
20. S 39 deg. 12' 20" W, 6.75 feet;
21. N 50 deg. 47' 40" W, 2.96 feet;
22. S 39 deg. 12' 20" W, 17.74 feet; and
23. S 20 deg. 53' 09" E, 80.87 feet to a point in the northerly line of Rockefeller Road; thence, southwesterly along the northerly line of Rockefeller Road S 69 deg. 06' 51" W, 402.51 feet to the point and place of beginning.

*INDENTURE*

**Without Covenant Against Grantor's Acts**

**GOOD SAMARITAN LUTHERAN HEALTH CARE CENTER, INC.**

*TO*

**DELMAR SNF REALTY ASSOCIATES, LLC**

*PREMISES:*

**125 ROCKEFELLER ROAD
BETHLEHEM, ALBANY COUNTY, NEW YORK**

**BLOCK: \_\_\_**
**LOT: \_\_\_**

*RECORD AND RETURN TO:*

_____

4329285v.5

**EXHIBIT C**

**FORM OF BILL OF SALE**

[See attached]

## BILL OF SALE

THIS BILL OF SALE is made and executed as of the _____ day of _____, 20__ from GOOD SAMARITAN LUTHERAN HEALTH CARE CENTER, INC., having an address at _____, ("Seller"), to DELMAR SNF REALTY ASSOCIATES, LLC

having an address c/o Isidor D. Friedenberg, Esq., 2 Cara Drive, Suffern, New York 10901 ("Purchaser").

FOR AND IN CONSIDERATION of good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Seller does hereby bargain, sell, convey, deliver, assign, transfer, set over and grant to Purchaser, and to Purchaser's successors and assigns, all right, title and interest of Seller in and to any and all fixtures not owned by any tenant or other occupant of the Property (the "Fixtures") affixed or attached to, installed or placed in or upon and to be used for or usable in any present or future enjoyment, occupancy or operation of the building and related improvements comprising the property located at and commonly known as 125 Rockefeller Road, Town of Bethlehem, County of Albany, New York (the "Property").

Title to all the Fixtures shall pass to Purchaser upon delivery of this Bill of Sale. Any sales tax, if any, payable in respect of the Fixtures shall be the sole responsibility of Purchaser.

Seller makes no warranties or representations whatsoever, including, without limitation, with respect to quality, fitness or merchantability of the Fixtures; the Fixtures are being transferred in "AS IS, WHERE IS, WITH ALL FAULTS" physical condition and this Bill of Sale is made without recourse to or covenant by Seller. The Fixtures shall be transferred from Seller to Purchaser free and clear of any liens or encumbrances to the extent provided for in the Sale Order (as defined in that certain Purchase and Sale Agreement dated as of December 10, 2019, between Purchaser and Seller).

This Bill of Sale shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, Seller has executed this Bill of Sale as of the day and year first written above.

GOOD SAMARITAN LUTHERAN HEALTH
CARE CENTER, INC.


By:_____
      Name:
      Title:

4329285v.5

*Execution Copy*

## RECEIVER AGREEMENT – NURSING HOME

**RECEIVER AGREEMENT – NURSING HOME** (this "Agreement"), dated as of December 10, 2019, by and between GOOD SAMARITAN LUTHERAN HEALTH CARE CENTER, INC., a New York not-for-profit corporation ("Seller"), and DELMAR SNF OPERATIONS ASSOCIATES, LLC, a New York limited liability company (the "Receiver").

## RECITALS

WHEREAS, Seller, along with certain of its Affiliates (collectively, the "Debtors"), will be filing for bankruptcy protection to become debtors-in-possession under Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), and will be filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") in the United States Bankruptcy Court for the Northern District of New York (the "Bankruptcy Court");

WHEREAS, Seller operates a 120 bed skilled nursing and residential health care facility under the name "Bethlehem Commons Residential Care Center" (the "Facility") at the premises known as 125 Rockefeller Road, Bethlehem, Albany County, New York (the "Premises);

WHEREAS, (a) Seller and Receiver are entering into an Asset Purchase Agreement, dated as of the date hereof (the "Asset Purchase Agreement"), pursuant to which Receiver has agreed to purchase substantially all of the assets of Seller related to the operation of the Facility other than the Premises and (b) Seller and Delmar SNF Realty Associates, LLC, a New York limited liability company and an Affiliate of Receiver (the "Real Estate Buyer"), are entering into a Purchase and Sale Agreement, dated as of the date hereof (the "Real Estate Contract" and, together with the Asset Purchase Agreement, the "Purchase Agreements"), pursuant to which the Real Estate Buyer has agreed to purchase the Premises from Seller;

WHEREAS, Seller wants to ensure the continuity of the Facility's operations pending the closing of the transactions contemplated by the Purchase Agreements and will request that the New York Department of Health (the "Department") approve the assumption of the operation of the Facility by Receiver on an interim basis pursuant to the provisions of this Agreement; and

WHEREAS, Seller recognizes that Receiver will, with the approval of the Department, be appointed as an interim operator of the Facility, and Seller is desirous of ultimately effectuating a transfer of the operation of the Facility to Receiver as the new established operator of the Facility pursuant to the terms of the Asset Purchase Agreement.

NOW, THEREFORE, in consideration of the promises and covenants herein contained, it is mutually agreed by and between the signatories to this Agreement as follows:

# ARTICLE I

# RECEIVERSHIP

Section 1.01    Required Approvals.

(a)    The parties are entering into this Agreement subject to the approval of the Bankruptcy Court and entry of a sale order confirming that Receiver, Real Estate Buyer and Seller are permitted to consummate the transactions contemplated by the Purchase Agreements and this Agreement in accordance with the terms hereof and thereof, which order (i) shall be in form and substance acceptable to Seller and Purchaser, and (ii) shall be made on notice to Amalgamated Bank, as the holder of liens on Seller's assets, including the current mortgage on the Premises (the "Mortgage"), with an opportunity to object and to be heard (the "Sale Order").

(b)    Seller hereby confirms its request to the Department to approve the assumption of the operation of the Facility by Receiver and agrees that Receiver's obligations under this Agreement, as approved by the Department and the Sale Order, are contingent upon the Purchase Agreements being in full force and effect.

Section 1.02    Subject to the entry of the Sale Order and receipt of the Department approval requested under Section 1.01 and Receiver having complied with all of the requirements of the Department, Receiver is hereby appointed as receiver of the Facility to commence its operations as receiver at 12:01 a.m. on the date which is 10 days after the Department's approval (the date on which Receiver is authorized to act as the receiver of the Facility is hereinafter sometimes referred to as the "Receivership Date"). Receiver accepts its appointment as receiver of the Facility effective as of the Receivership Date and has executed this Agreement in the appropriate space provided on the signature page attached hereto to evidence such acceptance. Receiver shall accept use of the real property occupied by the Facility and use of the furniture, fixtures and equipment located at the Facility in their then present "as is" condition. Receiver shall, during the Term of Receivership (hereinafter defined) while it acts as the receiver of the Facility, fund all operations of the Facility, ensuring that the Facility has sufficient funds to satisfy its operating expenses, including only the monthly interest on the mortgage debt currently due to Amalgamated Bank as of the date hereof in the monthly aggregate amount of $22,658.49 for a 31 day month or $21,927.57 for a 30 day month (based on interest of $730.92 per day) ("Debt Service"), with credits for any payments made from other parties or sources.  Furthermore, for the removal of doubt, Receiver shall have no obligations in connection with any financing(s) that Seller may consummate after the date hereof.  Receiver shall be required to fund, in a timely manner, all sums necessary to maintain the Facility in good repair during the Term of Receivership, including the monthly installments of the Debt Service on the first business day of each month. Without limiting the foregoing, Receiver (i) shall keep the Facility in a condition at least as good as its condition as of the date hereof, reasonable wear and tear, casualty and condemnation excepted (it being agreed that Receiver shall not be obligated to perform any capital improvements unless required by applicable law); (ii) shall use commercially reasonable efforts to keep and maintain in force and effect all existing licenses and permits affecting the Facility, without being obligated to pay any Excluded Liabilities (defined below); (iii) shall not be obligated to construct any improvements upon the Premises except those which Receiver reasonably determines necessary because of emergency situations or to comply with applicable laws; and (iv) shall

2

maintain insurance coverages similar to those in effect on the date hereof, including property insurance in an amount equal to the full replacement value of the Premises.

Section 1.03    Term.

(a)    The duration of the appointment of Receiver as receiver of the Facility (sometimes hereinafter referred to as the "Term of Receivership") shall commence on the Receivership Date and shall continue until March 31, 2022 (the "Outside Date"), subject to renewal, extension or earlier termination as provided below. If the Purchase Agreements are terminated for any reason, this Agreement shall automatically terminate upon the occurrence of such contingency and be of no further force and effect except as otherwise set forth hereinafter. This Agreement shall also automatically terminate upon the closing of the transactions contemplated by the Purchase Agreements. The Department may, with the consent of Seller (not to be unreasonably withheld or delayed), extend the duration of the appointment of Receiver until the appointment of a new receiver acceptable to the Department or the issuance of an operating certificate to a new established operator of the Facility. In such event, Seller shall join with Receiver to seek Department approval to renew or extend the appointment of Receiver for a period or periods, each of which shall not exceed an additional six (6) months. Any such renewals or extensions shall be on the same terms and conditions as set forth herein or such other terms and conditions as may be agreed upon in writing by the parties.  The Term of Receivership may be terminated, anything in this Agreement to the contrary notwithstanding, if (i) Receiver is in material breach of any of its obligations under this Agreement or the Purchase Agreements (including Receiver's failure to timely pay Debt Service in accordance herewith), and such breach cannot be cured or has not been cured within twenty (20) business days after the giving of written notice by Seller (or, in the case of a failure to pay Debt Service, Amalgamated Bank) to Receiver of such breach; (ii) the Department determines, in its sole discretion, that deficiencies have occurred at the Facility during the Term of Receivership which warrant the removal of Receiver, upon prior written notice thereof being provided to Seller; (iii) if Receiver has been convicted of a felony; or (iv) if the Department determines, with respect to matters other than deficiencies as set forth in clause (ii) above, in its sole discretion, that Receiver is not in substantial compliance with the terms and provisions of this Agreement; provided, however, that in such event the Department will have provided Receiver and Seller with written notification of the nature and extent of Receiver's non-compliance, and Receiver shall have failed, in the Department's opinion, to make sufficient progress toward attaining compliance. Seller agrees that, in the event Receiver has pending an application for establishment under Section 2801-a of the Public Health Law (the "Establishment Application"), approval of which is required for consummation of the transactions contemplated by the Purchase Agreements, Seller will consent to extensions of the receivership to the Receiver, subject to Department approval, including further renewals, if necessary, for as long as the Establishment Application is pending and has not been proposed for disapproval by the Public Health and Health Planning Council on the basis of character and/or competence. Whether such Establishment Application has been proposed for disapproval on the basis of character and/or competence shall be determined by reference to the minutes of the applicable meeting of the Public Health and Health Planning Council and the staff reports on the agenda.  The Term of Receivership shall automatically terminate upon the closing of the transactions contemplated by the Purchase Agreements.

(b)    Receiver waives any right to a hearing under any section of the Public Health Law relative to revocation of an operating certificate, and agrees to surrender the operating certificate issued to it upon expiration or termination of this Agreement, or expiration or termination of any renewal or extension thereof, subject to the terms of this Receiver Agreement.

(c)    The Asset Purchase Agreement requires Receiver to submit the Establishment Application within the later of thirty (30) days after the date of the Purchase Agreements or two (2) business days after Purchaser's receipt of notice from Seller that the Sale Order was entered by the Bankruptcy Court approving Receiver as the receiver pursuant to the terms set forth in this Agreement, to approve Receiver as the purchaser pursuant to the terms set forth in the Asset Purchase Agreement and approving the Real Estate Buyer as the purchaser pursuant to the terms set forth in the Real Estate Contract. Seller represents that it will not interfere with the application of Receiver, or its designee, to become the new established operator of the Facility.

Section 1.04    Seller agrees to promptly and diligently execute all documents necessary to transfer to Receiver the operation of the Facility, the Property and the Purchased Assets, including, but not limited to, use of all security deposits and prepayments of residents, if any, held by Seller for services to be provided on and after the Receivership Date, all for the possession and use by Receiver in the operation of the Facility during the Term of Receivership in accordance with this Agreement and applicable laws, it being understood by the parties that (a) legal title to such assets and property shall not pass from Seller to Receiver unless and until all transactions contemplated by the Purchase Agreements close, (b) nothing in this Agreement permits the Receiver to dispose of, encumber and/or sell the Seller's assets, including the Facility and the Property unless in the ordinary course of business, and (c) all such assets are subject to liens in favor of Amalgamated Bank. Upon the closings under the Purchase Agreements, Receiver shall retain the Property and the Purchased Assets purchased by it under the Purchase Agreements in accordance with their respective terms.  Nothing herein shall transfer to Receiver any right to own or use any Excluded Asset (as defined in the Asset Purchase Agreement) during the Term of Receivership or otherwise.

Section 1.05    Seller irrevocably agrees, as partial consideration for the undertaking of the appointment of Receiver as receiver, if, as and when all of the conditions precedent to Seller's obligations to close on the sale of the Purchased Assets under the Asset Purchase Agreement have been satisfied or waived, to promptly and diligently execute and deliver any and all documents required to transfer the operations, and all assets and property belonging to or leased to Seller (other than the Excluded Assets), to Receiver, or to any successor receiver or established operator of the Facility or its designee, as the new established operator of the Facility to the extent provided in the Asset Purchase Agreement.

Section 1.06    Provided that the Facility has a Title XIX provider agreement, Receiver shall be reimbursed as an operator through the Medicaid program pursuant to 10 N.Y.C.R.R. Subpart 86-2. The Department shall not be responsible for any expenses incurred by Receiver and related to the operation of the Facility which are not reimbursed pursuant to Subpart 86-2 or by any other payor.

Section 1.07    Seller, in connection with the appointment by the Department of Receiver, waives the right to terminate this Agreement or contest the appointment of the Receiver, except

for (a) a termination of this Agreement in accordance with Section 1.03(a) hereof or (b) claims related to the Department's alleged failure to honor its obligations or its breach or default under this Agreement. No such claim of the Department's failure, breach or default hereunder may be made by Seller until after Seller has provided the Department with written notice of its alleged failure, breach or default and such failure, breach or default shall not have been cured within a reasonable time after receipt of such notice. Ten (10) business days shall be deemed a reasonable time to cure any monetary defaults and twenty (20) business days shall be deemed a reasonable time to cure other defaults.

Section 1.08   To the extent permitted by applicable law, Receiver shall have the right to use Seller's Medicare and Medicaid program provider numbers with respect to the Facility during the Term of Receivership, and Seller shall execute and deliver to Receiver such documents as may be required to assign such numbers and its provider agreements to Receiver.

Section 1.09   Termination; Substitute Receiver.

(a)   Seller agrees that this Agreement shall not be terminated without the prior approval of the Department or the Bankruptcy Court, other than a termination in accordance with Section 1.03(a) hereof or Section 1.07 hereof. If, for any reason other than the closing of the transactions contemplated by the Purchase Agreements, this Agreement expires or is terminated, including but not limited to termination ordered by the Commissioner of Health for failure of Receiver to operate the Facility in conformance with 10 N.Y.C.R.R., or the Medicare/Medicaid requirements for skilled nursing and residential health care facilities, the Public Health Law and/or this Agreement, the parties agree that the operation of the Facility will, subject to the prior approval of the Department and the Bankruptcy Court, immediately revert to the control of Seller or its designee, unless Seller consents, not to be unreasonably withheld or delayed, to the appointment of another voluntary receiver (the "Substitute Receiver"). The appointment of a Substitute Receiver shall be subject to approval by the Department and the Bankruptcy Court. In such event, Seller, the Department and the Substitute Receiver shall enter into a substitute receiver agreement substantially similar to this Agreement.

(b)   In the event the Substitute Receiver is terminated or the substitute receiver agreement expires, the Facility will revert to the control of Seller or its designee, unless Seller consents to the appointment of another Substitute Receiver that is approved by the Department and the Bankruptcy Court.

Section 1.10   Receiver or Seller may apply to the Department and/or the Bankruptcy Court for such rulings as from time to time they may deem necessary in delineating the extent of the authority of Receiver.

Section 1.11   Operation of the Facility.

(a)   So long as it is the receiver of the Facility, Receiver shall operate the business conducted at the Facility during the Term of Receivership for its own account and shall be entitled to and responsible for all profits and losses and capital requirements during the Term of Receivership and shall manage the revenues and expenses of the business conducted at the Facility during the Term of Receivership on and in accordance with the terms and subject to the

conditions set forth in this Agreement. Receiver shall be entitled to use in the operation of the Facility all revenues and accounts receivable relating to the operation of the business conducted at the Facility before and during the Term of Receivership, notwithstanding that such revenues and accounts receivable shall remain the property of Seller and shall be subject to the liens, claims and encumbrances of the Debtors' pre-petition and post-petition creditors (including Amalgamated Bank) which liens, claims and encumbrances shall not prevent Receiver from utilizing the revenues and accounts receivable as contemplated under this Agreement. Except as otherwise expressly provided in this Agreement, Receiver shall, while being the receiver of the Facility, be liable for only those accounts payable and other liabilities arising out of or relating to the operation of the business conducted at the Facility during the Term of Receivership, including but not limited to Debt Service, taxes, employee compensation and benefit obligations, and payments payable in connection with or upon the termination of employees of Seller during the Term of Receivership. Notwithstanding the foregoing, all profits and losses generated during the Term of Receivership shall be for the account of Receiver, subject to the terms set forth in Section 2.08 of this Agreement.

(b)     Notwithstanding any provision of this Agreement to the contrary, subject, however, to the provisions of Section 2.09 and Section 3.08 hereof, Receiver shall be obligated to pay only those expenses and liabilities arising out of, and relating to, the operation of the business located at the Facility during the Term of Receivership and during which period Receiver acts as the receiver under this Agreement, including, but not limited to, the monthly Debt Service due Amalgamated Bank. Except for Healthcare Program Liabilities (as defined in the Asset Purchase Agreement), in no event shall Receiver be liable for any accounts payable or other obligations or liabilities arising out of, or relating to, the operation of the Facility at any time prior to the Receivership Date and such accounts payable and other obligations and liabilities shall remain the liability and responsibility of Seller (collectively, the "Excluded Liabilities"), to the extent not discharged in the Bankruptcy Case.

## ARTICLE II

## REPRESENTATIONS, WARRANTIES AND AGREEMENTS OF RECEIVER

Receiver represents, warrants and agrees as follows:

Section 2.01    It shall not act as an agent of the Department nor represent or hold itself out as an agent for the Department in any matter nor shall it hold itself out as a political subdivision of the State.

Section 2.02    It shall act in good faith and shall not delegate its duties and responsibilities to any other individual or entity, except that it may hire its own administrators, consultants and staff.

Section 2.03    It shall operate the Facility in substantial compliance with all applicable laws, rules and regulations, including, but not limited to, the requirements for participation in the Medicare/Medicaid programs, the Sale Order and all other orders of the Bankruptcy Court.

Section 2.04    In its operation of the Facility as Receiver, it shall not engage in any practice that may result, directly or indirectly, in any financial gain to itself in its capacity as receiver,

except as expressly provided under the terms of this Receiver Agreement; provided, however, that Receiver may be paid monthly fees for services as Receiver which, if annualized, would yield the highest annual amount permitted by applicable law (currently $50,000 per annum), it being understood that the reimbursability of such fee shall be in accordance with 10 N.Y.C.R.R, Subpart 86-2.

Section 2.05    Subject to the provisions of this Agreement, Receiver shall hold the assets of Seller in trust for Seller and shall, subject to the terms of this Agreement, take no action which would result in material diminution of the assets entrusted to it by Seller absent the prior entry of an Order by the Bankruptcy Court specifically authorizing such material diminution, which Order shall have been entered after proper notice and a hearing if deemed necessary by the Bankruptcy Court. It is also agreed to by the parties that Receiver shall not (a) be responsible for any Excluded Liabilities or (b) knowingly pay any Excluded Liability unless Receiver has given Seller (i) notice of the intended payment and (ii) an opportunity to obtain relief from such Excluded Liability in the Bankruptcy Case.

Section 2.06    Subject to the provisions of this Agreement, in the event of the expiration or termination of the appointment of Receiver as receiver, Receiver shall promptly execute and deliver such assignments, reassignments, conveyances, releases and other documents as may be required to restore the parties to the *status quo ante* and/or to transfer the assets held in trust by Receiver, liabilities and operation of the Facility, and divest itself of all incidents of ownership thereof to Seller or to such person(s) or entities as Seller shall designate, subject to the approval of the Department and the Bankruptcy Court.  Without limiting the foregoing, upon such expiration or termination, Receiver shall provide to Seller such documents and information in Receiver's possession or under its control with respect to the business of the Facility during the Term of Receivership as Seller may reasonably request, including information needed for the filing of Cost Reports for periods commencing on and after the Closing Effective Date.

Section 2.07    Within thirty (30) days after the end of each month during the Term of Receivership while the Receiver acts as such, Receiver shall provide Seller and the Department with (a) a resident census for the Facility, and (b) a financial statement summarizing Receiver's operation of the Facility during the previous month.  Within fifteen (15) days after the end of each month during the Term of Receivership, or as otherwise directed by the Bankruptcy Court, Receiver shall, while acting as receiver, provide a report to the Bankruptcy Court on behalf of Seller containing such information as is required by the Bankruptcy Court, which report shall be submitted to Seller for Seller's review and approval no later than five (5) days prior to the date such report is due to the Bankruptcy Court. Nothing herein contained shall be construed so as to limit the provisions of Section 4.03 hereof.

Section 2.08    All funds contributed by Receiver or any Substitute Receiver, as may be applicable, to cover shortfalls in Facility operations, and any revenues or profits generated by the Facility during the Term of Receivership, or any subsequent receivership period, shall (i) be paid by or retained by Receiver or any Substitute Receiver, as the case may be, if applicable, and (ii) only be utilized to fund the Facility's operations as provided under this Agreement and for reimbursement to the Receiver of Advances (hereinafter defined) as permitted under this Section 2.08. All profits and losses generated by the Facility during the Term of the Receivership (determined on an accrual basis in accordance with generally-accepted accounting principles,

consistently applied) shall be for the account of Receiver. Receiver may reimburse itself from revenues generated by the Facility during the Term of Receivership to cover any sums advanced or expended by Receiver to or on behalf of the Facility and its operations for customary and reasonable expenses necessary to operate the Facility during the Term of Receivership, including, but not limited to the monthly Debt Service due Amalgamated Bank (collectively, "Advances"). Subject to its obligation to cover losses incurred by the Facility during the Term of Receivership, Receiver shall be entitled to the repayment of all outstanding Advances upon termination of this Agreement other than as a result of an uncured breach by the Receiver under this Agreement or under the Purchase Agreements or other than as a result of the closing under the Asset Purchase Agreements. Upon such termination, Receiver shall also be entitled to receive distributions or payments of sums equal to the aggregate of any liabilities incurred by Receiver during the Term of Receivership that are Excluded Liabilities which were not paid by Seller or reimbursed to Receiver by Seller or were not discharged in the Bankruptcy Case, and if any Excluded Liabilities are owed to Receiver under this Agreement at the time of Closing under the Purchase Agreement, the amount of such Excluded Liabilities (but not any losses incurred during the Term of Receivership) shall, at Receiver's election, be an offset to the Purchase Price otherwise payable by Receiver (as purchaser under the Asset Purchase Agreement) in lieu of Seller's payment thereof. This Section 2.08 shall survive any expiration or termination of this Agreement and/or the Purchase Agreements.

Section 2.09   Immediately upon the expiration or termination of this Agreement (other than a termination of this Agreement resulting from the closing of the transactions contemplated by the Purchase Agreements): (a) any instructions or agreements in place between the parties and any banking institutions, or otherwise, that provide Receiver with control over or access to Seller and/or Facility bank accounts shall automatically terminate and be of no further force and effect; (b) Seller or any Substitute Receiver shall cause all outstanding customary and reasonable expenses incurred during the Term of Receivership to be paid from and to the extent of any cash on hand, accounts receivable accrued during the Term of Receivership and/or any profits generated by the Facility during the Term of Receivership ("Available Funds"), and Receiver shall pay or reimburse Seller or Substitute Receiver, as applicable, for any such expenses that cannot be paid out of the Available Funds; and (c) if such termination of this Agreement is for reasons other than a breach of this Agreement by Receiver, (i) any remaining profits of the Facility earned during the Term of Receivership after the payment of such customary and reasonable expenses shall be promptly distributed to Receiver; (ii) Seller shall promptly reimburse Receiver for any Advances that remain outstanding on the date of termination, other than Advances that are needed to cover losses incurred by the Facility during the Term of Receivership; and (iii) Receiver shall also be entitled to receive from Seller the prompt distributions or reimbursement of amounts equal to the aggregate outstanding balance of any liabilities incurred and/or paid by Receiver that are Excluded Liabilities which were not discharged in the Bankruptcy Case. This Section 2.09 shall survive any expiration or termination of this Agreement and/or the Purchase Agreement.

Section 2.10   Receiver shall not incur any new obligation or make any new borrowings secured by any assets of Seller, or undertake any transaction which would place a new encumbrance upon the assets of Seller during the Term of Receivership, without the prior written approval of Seller, the Department, Amalgamated Bank and the Bankruptcy Court (by Order authorizing such borrowing after proper notice). In the event any execution or attachment is issued against Seller, Receiver, the Facility or any of their property relating to obligations which first

accrued during the Term of Receivership, such encumbrance shall be cured or removed within twenty-one (21) days after notice in writing to Receiver of such encumbrance or cured or removed within a reasonable time in the event that the same cannot be cured or removed with reasonable diligence within such twenty-one (21) day period. In no event shall any such lien or encumbrance be permitted to continue for more than sixty (60) days. The restrictions upon the Receiver as set forth herein shall not apply to any obligations, borrowings or encumbrances arising from or related to replacements or repairs or other physical building improvements related to the Facility or capital improvements that are reimbursable under Medicare, Medicaid, any other federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)), or any state sponsored reimbursement program. Notwithstanding the foregoing, the parties agree that during the Term of Receivership (a) Receiver may place liens on any furniture, equipment and other personal property purchased by Receiver for its own account, and (b) Receiver may lease furniture and equipment in its own name and grant security interests in connection therewith.

Section 2.11    Receiver is authorized to execute and perform this Agreement and neither the execution nor delivery of this Agreement nor compliance with its terms and conditions will constitute a breach or violation of any agreement or instrument to which it is bound.

Section 2.12    Receiver shall cooperate at no cost to Seller and lend its name to such administrative and/or judicial rate appeals as Seller, as the real party in interest, deems appropriate to file (including under the Medicaid, Medicare, or any other third party reimbursement or insurance program). Receiver shall in good faith cooperate with Seller, in preparing, filing and prosecuting such appeals before the appropriate administrative or judicial bodies. It is expressly understood that Receiver, at its own cost and expense, may file such rate appeals as it may deem appropriate arising from, or relating to, its operation of the Facility. Monies generated by all appeals are subject to the terms and conditions of this Agreement, with the effect that all monies generated by appeals shall be used to fund operations during the Term of Receivership and shall, by virtue of the Closing under the Asset Purchase Agreement, belong to the Receiver upon such Closing except to the extent that they are Excluded Assets under the Asset Purchase Agreement.

Section 2.13    Intentionally Omitted.

Section 2.14    It shall be deemed an event of default hereunder, if (i) Receiver shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or shall file any petition or answer seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future Federal, State or other statute or law, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of Receiver, and such appointment shall not have been vacated or stayed, on appeal or otherwise, or if within thirty (30) days after the expiration of any such stay, such appointment shall not have been vacated, or (ii) Receiver shall, subject to the applicable notice and cure provisions, fail to perform any of its obligations under this Agreement or the Purchase Agreements.

Section 2.15    It shall be deemed an event of default hereunder, if Receiver is convicted of a felony in connection with any activity or program subject to the regulations, supervision or administration of the New York State Department of Health or in violation of the New York State Public Officers Law, in a court of competent jurisdiction or (ii) a crime outside of the State of New York which, if committed within the State, would have been such a felony.

9

Section 2.16    Seller, Amalgamated Bank and, subject to the provisions of the Sale Order, any committee formed in accordance with 11 USC 1102 shall be entitled to reasonable access to all of the books and records relating to the Excluded Assets and the obligations of Seller, at the Facility, during normal business hours upon reasonable notice to Receiver upon the condition that such access does not interfere in any material respect with the operation of the Facility.

Section 2.17    Receiver shall devote whatever time is necessary, including on-site presence, to accomplish its duties and responsibilities.

Section 2.18    Receiver shall promptly comply with all of its obligations under this Agreement, the Purchase Agreements and all related agreements.

Section 2.19    Receiver shall be free to negotiate such contracts, leases and agreements for the Facility as it may determine (the "New Contracts") and shall comply with all such New Contracts and all Assumed Contracts as defined in the Sale Order, and shall indemnify and defend Seller and hold it harmless from any action, lawsuit, arbitration, etc., and from any loss it may sustain, including reasonable attorneys' fees, which may result from Receiver's failure to comply with such New Contracts and/or the Assumed Contracts and/or the terms of and Receiver's obligations under this Agreement; provided, however, that any contracts and agreements may be canceled by Receiver if it can do so without penalty and without cost or expense to Seller or the Facility and without violation of any laws or regulations. Receiver shall enter into New Contracts only for its own account and shall not hold itself out as the agent of Seller for the purposes of entering into any New Contract or other obligation.

Section 2.20    Notwithstanding any provision of this Agreement to the contrary, Receiver shall have no obligations or liabilities for any breaches or failures under any Leases or Contracts that are rejected in the Bankruptcy Case, and the same shall be included in the definition of Excluded Liabilities for purposes of this Agreement and the Asset Purchase Agreement. Notwithstanding any provision of this Agreement to the contrary, the parties agree that nothing contained in this Agreement or in the Asset Purchase Agreement shall be construed as requiring Receiver hereunder, or as the Purchaser under the Asset Purchase Agreement, to assume any union agreements or CBAs (as such term is defined in the Asset Purchase Agreement) or any terms or conditions contained therein, and the parties agree and confirm that this Agreement and the Asset Purchase Agreement do not require Receiver to assume any union agreements or CBAs, which union agreements and CBAs shall be rejected pursuant to the Sale Order or another Order of the Bankruptcy Court so that the Receiver hereunder and as the Purchaser under the Asset Purchase Agreement shall not, in any event, ever be responsible or liable for or otherwise bound by any union agreement or any CBA related to the Facility. If the Sale Order or another Order of the Bankruptcy Court does not expressly void or reject all such union agreements and CBAs, then (i) Receiver shall have the right to void this Agreement and the Asset Purchase Agreement and receive the immediate refund of any deposit paid under the Asset Purchase Agreements, and (ii) the Real Estate Buyer under the Real Estate Contract shall also be entitled to cancel such contract and receive the immediate refund of any deposit paid thereunder.

Section 2.21    During the Term of Receivership, Receiver shall obtain the Department's written approval before transferring any ownership interest in Receiver to a person or entity other than an original member of Receiver. Notwithstanding the foregoing, Receiver may add members

10

in Receiver as part of its CON Application; provided, however, that Receiver at all times shall be controlled by Kenneth Rozenberg, and Receiver may substitute members in Receiver consistent with the terms of the Asset Purchase Agreement.

## ARTICLE III

### REPRESENTATIONS, WARRANTIES AND AGREEMENTS OF SELLER

Seller represents, warrants and agrees as follows:

Section 3.01    Seller has full power and authority to execute and perform this Agreement.

Section 3.02    During the Term of Receivership, Seller hereby makes available to Receiver for its use under this Agreement (i) all items of tangible personal and real property and equipment belonging to or leased by Seller on the Receivership Date and used in the operation of the Facility and (ii) all permits and licenses relating to the Facility, and all of Seller's possessory interest therein, to the extent permitted by applicable law, including, but not limited to, all prepayments received by Seller with respect to services to be rendered by the Facility on or after the Receivership Date, and (iii) the use of the Premises (which Premises are owned by Seller); provided that nothing herein shall require Seller to make available to Receiver the Excluded Assets. On the Receivership Date Seller shall turn over to Receiver, to be held in trust for the residents, all personal funds of residents of the Facility in Seller's possession. Receiver shall not pay Seller any rent or other sums for use of any Facility related assets or property during the Term of Receivership, including, but not limited to the Premises and the real property upon which the Facility is located.

Section 3.03    Other than the continuation and extension of Amalgamated Bank's liens, and any refinancing and payment in full of Seller's indebtedness to Amalgamated Bank, Seller shall not incur any new obligations or make new borrowings secured by the Facility or any part of the Facility or Seller's or the Facility's assets or undertake any transaction which would cause a new lien, security agreement or other encumbrance to be placed upon the assets of Receiver, the Facility or Seller used in the operation of the Facility during the Term of Receivership without the prior written approval of Receiver, Seller, Amalgamated Bank, the Department, and the Bankruptcy Court. In the event any execution or attachment is issued against the Receiver and/or the Facility, Seller or its or their property pursuant to a new lien that is not associated with a refinancing of existing indebtedness of Seller or not related to the operation of the Facility and relates to obligations of Seller, whether accrued prior to or after the Receivership Date, such encumbrance shall be cured or removed by Seller within twenty-one (21) days after notice in writing to the Facility of such encumbrance, or cured or removed within a reasonable time in the event that the same cannot be cured or removed with reasonable diligence within such twenty-one (21) day period. In no event shall any such new lien or encumbrance be permitted to continue for more than sixty (60) days.

Section 3.04    Seller shall not be entitled to any compensation for entering into this Agreement or the receivership arrangement contemplated herein, other than the Purchase Price under the Purchase Agreements.

Section 3.05    Seller and its officers and directors shall not retain any authority over the operation of the Facility during the Term of Receivership, and shall not attempt to exercise any direction over Receiver with respect to such operation. Without limiting the foregoing, during the Term of Receivership, Seller shall have no authority to hire or fire employees or modify the terms and conditions under which employees are employed.  During the Term of Receivership, Receiver shall on behalf of Seller timely file all Medicare and Medicaid cost reports required to be filed with respect to periods prior to the Receivership Date and during the Term of Receivership.

Section 3.06    Nothing in this Agreement shall be construed to diminish any rights that any person or entity not a party to this Agreement may have to proceed against Seller with respect to financial obligations arising out of transactions occurring prior to the Receivership Date.

Section 3.07    Intentionally Omitted.

Section 3.08    If during the Term of Receivership Receiver receives notice of the assessment of any Healthcare Program Liabilities (as such term is defined in the Asset Purchase Agreement) of Seller relating to the Facility for any period prior to the Receivership Date, Receiver shall promptly provide such notice to Seller, and shall pay any such Healthcare Program Liabilities as and when due on behalf of Seller. If Receiver pays any such Healthcare Program Liabilities or has any funds to which it is entitled reduced as a result of such Seller Healthcare Program Liabilities, the amount of such Seller Healthcare Program Liabilities paid by Receiver and/or the amount of the funds withheld from the Receiver as a result of such Seller Healthcare Program Liabilities shall be for the sole account of Receiver and shall not be a credit to Receiver against the Purchase Price otherwise due under the Asset Purchase Agreement; *provided*, however, in the event that this Agreement expires or is terminated for any reason other than due to a breach hereunder or under the Purchase Agreements, in either case by Receiver or the Real Estate Buyer, then such Healthcare Program Liabilities paid by or funds withheld from Receiver, as applicable, shall be "Excluded Liabilities" and shall be reimbursed and/or paid to Receiver in accordance with Section 2.09.

Section 3.09    Notwithstanding any provision of this Agreement to the contrary, Seller, subject to any discharge provided by the Bankruptcy Case, shall remain liable for any and all Excluded Liabilities, which shall be for the account of Seller.

Section 3.10    Other than third party payor agreements which shall all be assumed by Seller in the Bankruptcy Case, Receiver shall be permitted to direct Seller as to which contracts, leases and other agreements relating to the Facility will be assumed or rejected in the Bankruptcy Case.

Section 3.11    Seller shall comply with all of its obligations under this Agreement and the Purchase Agreements and related agreements.

Section 3.12    Seller represents that it owns the Premises and that the Premises are not now subject to any lease agreement and that the Receiver may during the Term of Receivership use the same without any rental or use and occupancy payments.

Section 3.13    It is acknowledged that neither party will have an adequate remedy at law in the event of a breach or threatened breach by the other party of any of its obligations hereunder,

and the non-breaching party shall be entitled to such equitable and injunctive relief as may be available to restrain a violation or threatened violation of the provisions of this Agreement, or to compel compliance with and enforce the provisions hereof. Nothing herein shall be construed as prohibiting a party from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of damages, or as a waiver of any legal claims as may be held by a party hereto. Recovery of damages shall include penalties, fines, costs and expenses of investigation and defense of any claim, damages for personal injury or property and fees incurred for the services of attorneys, consultants, contractors or experts. The prevailing party in any dispute concerning this Agreement shall be entitled to the reimbursement of its reasonable counsel fees incurred in connection with such dispute.

Section 3.14   On the Receivership Date and at all times during the Term of Receivership, the Seller shall turn over to the Receiver for its use under this Agreement all Facility assets (other than cash existing in Seller's bank accounts as of 11:59 PM on the day prior to the Receivership Date), including, but not limited to, (i) resident personal accounts along with an accounting thereof, (ii) Facility bank accounts, provided that Seller may first remove all cash existing therein as of 11:59 PM on the day prior to the Receivership Date, and (iii) electronic access codes for billing and methods relating to the same, for which the Receiver shall have sole custody and control over all such assets.   Seller further agrees to fully and timely cooperate with the Receiver in implementing the provisions of this Agreement, including, but not limited to, providing Receiver's representatives with authorizations to communicate with the Department in connection with this Agreement.

Section 3.15   The Agreements, representations, warranties and obligations of Seller set forth in this Agreement shall survive the expiration or termination of this Agreement and the closings under the Purchase Agreements.

## ARTICLE IV

## POWERS, DUTIES, RIGHTS AND OBLIGATIONS OF RECEIVER

During the Term of Receivership, except as limited in this Agreement with respect to its fees, the powers, rights, duties, and obligations of Receiver shall include those accorded a receiver appointed in an action to foreclose a mortgage on real property and in equity, and Receiver shall also have the powers, duties, rights and obligations as if appointed under Section 2810(2) of the Public Health Law, including, but not limited to, the following:

Section 4.01   Receiver may sue and be sued in its capacity as receiver for the Facility.

Section 4.02   Receiver shall use reasonable care, diligence and prudence in the use and maintenance of the Facility and the building in which the Facility is located.

Section 4.03   Receiver shall maintain an appropriate system of financial accounts with respect to the operation of the Facility, shall meet all reporting requirements of the Department, and the Bankruptcy Court, and shall itemize receipts and expenditures in a current and business-like manner in accordance with New York State rules and regulations as well as the New York State RHCF Accounting and Reporting Manual. Receiver shall have full control over and take full

responsibility for all accounts and bookkeeping for the Facility while it acts as receiver during the Term of Receivership.

Section 4.04   Subject to Section 2.19, Receiver may enter into, amend and terminate contracts and may incur expenses for the improvement, maintenance and operation of the Facility; provided, however, that Receiver may not assign any of its obligations hereunder.

Section 4.05   Receiver shall not be required to obtain a bond.

Section 4.06   Receiver shall collect incoming accounts receivable for services rendered by the Facility during the Term of Receivership from all sources and apply them (other than any such payments as shall constitute Excluded Assets) to the costs incurred in the performance of its functions hereunder. All payments on accounts receivable received from an obligor during the Term of Receivership shall be applied to the receivable specifically designated by such obligor; provided that in the event that the obligor does not specifically designate a receivable, the payment shall be applied in the order of the age of the accounts receivable of such obligor, starting with the oldest such accounts receivable. Subject to Amalgamated Bank's lien, all accounts receivable for services rendered by the Facility before the Receivership Date which are paid to Receiver during the Term of Receivership and any Universal Settlement funds received by the Facility during the Term of the Receivership shall be retained by the Receiver for its use under this Agreement and, upon the consummation of the Closing under the Asset Purchase Agreement, shall be the property of Purchaser as provided in the Asset Purchase Agreement.

Section 4.07   In the event that (a) the Department determines that deficiencies exist at the Facility and (b) in accordance with applicable law, the Department imposes a civil penalty on Receiver, such penalty may be assessed against Receiver in its personal capacity only if the Department, in its discretion, determines either that the deficiencies arose subsequent to the Receivership Date or that the deficiencies arose prior to the Receivership Date but were not corrected within a reasonable period of time. Receiver shall provide Seller with prompt notice of any and all deficiencies at the Facility identified by the Department and Seller shall promptly provide Amalgamated Bank with a copy of such notice.

Section 4.08   Receiver may hire and fire such personnel, including professional consultants, as from time to time it may deem necessary or advisable, except as prohibited by law or regulation. Such consultants shall be required to keep and maintain accurate records of the time they devote to the management and operation of the Facility indicating in reasonable detail the nature and extent of the matters on which they worked so that their time may properly be allocated to appropriate cost centers. The Department at this time takes no position as to the reimbursability of such expenses under the Medicaid program.

Section 4.09   Receiver shall, at its own expense, secure all insurance it determines necessary in the conduct of the Facility's business during the Term of Receivership  in Receiver's own name and/or it may elect to be added by endorsement to Seller's and/or the Facility's insurance policies, at Receiver's own expense. The Department at this time takes no position with respect to the reimbursability of such expenses under the Medicaid program.

Section 4.10   Prior to making any capital or leasehold improvement, Receiver shall, except in the case of an emergency, notify Seller of its plans but shall not be obligated to obtain any consent from Seller therefor, and the cost of all such capital or leasehold improvements shall be an expense of Receiver that is not subject to reimbursement pursuant to Section 2.09 hereof.  In connection with such improvements, Receiver shall comply with all requirements, codes, rules, laws, regulations, statutes and any requirements of regulatory agencies having jurisdiction, including but not limited to the Department.  At the end of the Term of Receivership or such earlier termination as provided in this Agreement, unless due to a closing under the Purchase Agreements, Receiver shall return the Premises to the condition they were in prior to the Receivership Date, ordinary wear and tear excluded.

Section 4.11   Receiver represents that it has no employment, consulting agreements or other business agreements of any kind whatsoever with Seller (except for the Purchase Agreements and related agreements), and no other agreement of such kind will be entered into during the Term of Receivership; provided, however, Receiver or an affiliate of Receiver may negotiate and enter into agreements for the acquisition of assets of affiliates of Seller during the Term of Receivership.

## ARTICLE V

## OPERATION OF THE FACILITY

Section 5.01   The Department shall not be responsible for any debts and obligations incurred in the operation of the Facility by Receiver during the receivership.

Section 5.02   Receiver shall operate the Facility and enter into the functions and responsibilities hereunder on the Receivership Date as provided in this Receivership Agreement.

Section 5.03   The books and records of Seller relating to the Facility shall be in the possession and control of Receiver during the Term of Receivership, and Seller shall have reasonable access to same. Nothing herein shall be deemed to transfer ownership of the books and records of Seller to Receiver. Upon termination of the Receivership, Receiver shall have reasonable access and a right to a copy of the aforesaid books and records of its Receivership.

Section 5.04   Receiver and Seller, to the extent each has such documents, shall make all books and records, accounts, agreements and documents of whatsoever nature, or copies thereof, relating to the Facility available to the Department upon demand. There will be no charge to the Department for any copies made.

## ARTICLE VI

## SPECIAL PROVISIONS RELATING TO THE FACILITY

Section 6.01   No provision contained herein shall be deemed to relieve Seller from any civil or criminal liability incurred or imposed by law by reason of acts or omission of Seller prior to the Receivership Date. Seller waives no right with respect to disputing or contesting any asserted liability.

## ARTICLE VII

## RELATING TO THE DEPARTMENT

Section 7.01   A provisional operating certificate with respect to the Facility shall be deemed to have been issued to Receiver as of the Receivership Date. Such provisional operating certificate shall be issued and delivered to Receiver by the Department as soon as practicable and shall remain in effect during the Term of Receivership. Upon termination of the appointment of Receiver as receiver pursuant to this Agreement, Receiver shall surrender such provisional operating certificate to the Department.

Section 7.02   If requested by Receiver, (i) the Department shall promulgate a Medicaid reimbursement rate for Receiver in accordance with Subpart 86-2; and (ii) the Department, provided all conditions of participation in Title XVIII and Title XIX are met by Receiver, agrees to recommend to the United States Department of Health and Human Services that a Title XVIII Provider Agreement be issued to Receiver and that a Title XIX Provider Agreement be issued to Receiver.

## ARTICLE VIII

## BANKRUPTCY COURT PROVISIONS

Section 8.01   This Agreement shall only become effective after approval of the Department and entry of the Sale Order.  This Agreement shall be subject to the Sale Order and/or one or more other orders of the Bankruptcy Court (all in such forms and with such contents as are satisfactory to Receiver) (i) approving this Agreement, the Asset Purchase Agreement, the Real Estate Contract and all provisions contained in such agreements, authorizing Seller, the Receiver and the Real Estate Buyer to execute any and all such documents and take all actions necessary to effectuate the transactions contemplated under such agreements in accordance with their terms; (ii) providing that under this Agreement the receivables and revenues generated at any time by the Facility whether before or during the Term of Receivership (the "Revenues") shall be available for Receiver's use under this Agreement to operate the Facility during the Term of Receivership; (iii) declaring that the Receiver shall pay the U.S. Bankruptcy Trustee fees on behalf of Seller and shall on behalf of Seller comply with all reporting requirements on behalf of Seller as specified in this Agreement, the Purchase Agreements or the Sale Order; and (iv) rejecting all union agreements and CBA's related to the Facility .

## ARTICLE IX

## INDEMNIFICATION

Section 9.01   Indemnification.

(a)   Receiver shall indemnify, defend and hold harmless Seller and Seller's Affiliates, successors and assigns, from and against any and all debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all fines, penalties, interest,

costs and expenses relating thereto, including, without limitation, reasonable attorney's fees (collectively, "Losses") that are actually incurred by Seller, to the extent that such Losses arise from or relate to any failure by Receiver to perform its obligations under or its breach of this Agreement. The Receiver's indemnification responsibilities under this provision shall be personally guaranteed by Kenneth Rozenberg.

(b)    In the event Seller receives notice of a potential or actual third party claim or the commencement of any judicial, administrative or arbitral action, suit, alternative dispute resolution proceeding (public or private), or claim or any proceeding by or before any governmental body (collectively, a "Legal Proceeding") involving Seller and arising from or relating to any failure by Receiver to perform its obligations under this Agreement or otherwise arising from or related to the operations of the Facility during the Term of Receivership, then Seller shall promptly (i) notify Receiver of such claim or Legal Proceeding, (ii) provide copies to Receiver of any correspondence Seller receives with respect to such claims or Legal Proceedings, and (iii) fully cooperate with Receiver (at Receiver's sole expense for any reasonable third party costs actually incurred by Seller in providing such cooperation) in connection with the defense and/or settlement of such claim or Legal Proceeding.  Furthermore, Seller shall take no action with regard to any such claim or Legal Proceeding that is inconsistent with Receiver's sole and exclusive right to litigate, defend, negotiate, and/or resolve any such claim or Legal Proceeding, including, but not limited to, making any payments in respect of any such claim or Legal Proceeding not expressly authorized in writing by Receiver.  Receiver shall, at its own expense, promptly dispute or satisfy any claim against Seller for which Seller is entitled to indemnification hereunder.

(c)    If Seller fails to promptly notify Receiver and provide copies to Receiver of any correspondence it receives concerning claims or Legal Proceedings for which Seller would be entitled to indemnification from Receiver under this Section 9.01, then, provided that Receiver is not already aware of such claim and/or Legal Proceeding and/or did not otherwise receive the foregoing correspondence, Seller shall not be entitled to indemnification from Receiver under this Section 9.01 for that portion of the Losses that are directly attributable to Seller's failure to promptly notify Receiver. If Seller makes any payments in respect of any Losses with respect to which Seller would be entitled to indemnification from Receiver under this Section 9.01 which payments are not expressly authorized in writing by Receiver, then Seller shall not be entitled to indemnification from Receiver under this Section 9.01 for any such Losses.

(d)    Seller shall indemnify, defend and hold harmless Receiver and Receiver's Affiliates, successors and assigns, from and against any and all Losses that are actually incurred by Receiver, to the extent that such Losses arise from or relate to (i) any failure by Seller to perform its obligations under or its breach of this Agreement, and (ii) Excluded Liabilities.

(e)    In the event Receiver receives notice of a potential or actual third party claim or the commencement of any Legal Proceeding involving Receiver arising from or relating to any failure by Seller to perform its obligations under or its breach of this Agreement or with respect to Excluded Liabilities, then Receiver shall promptly (i) notify Seller of such claim or Legal Proceeding, (ii) provide copies to Seller of any correspondence Receiver receives with respect to such claims or Legal Proceedings, and (iii) fully cooperate with Seller (at Seller's sole expense for any reasonable third party costs actually incurred by Receiver in providing such

17

cooperation) in connection with the defense and/or settlement of such claim or Legal Proceeding. Furthermore, Receiver shall take no action with regard to any such claim or Legal Proceeding that is inconsistent with Seller's sole and exclusive right to litigate, defend, negotiate, and/or resolve any such claim or Legal Proceeding, including, but not limited to, making any payments in respect of any such claim or Legal Proceeding not expressly authorized in writing by Seller. Seller shall, at its own expense, promptly dispute or satisfy any claim against Receiver for which Receiver is entitled to indemnification hereunder. If Receiver fails to promptly notify Seller and provide copies to Seller of any correspondence it receives concerning claims or Legal Proceedings for which Receiver would be entitled to indemnification from Seller under this Section 9.01, then, provided that Seller is not already aware of such claim and/or Legal Proceeding and/or did not otherwise receive the foregoing correspondence, Receiver shall not be entitled to indemnification from Seller under this Section 9.01 for that portion of the Losses that are directly attributable to Receiver's failure to promptly notify Seller. If Receiver makes any payments in respect of any Losses with respect to which Receiver would be entitled to indemnification from Seller under this Section 9.01 which payments are not expressly authorized in writing by Seller, then Receiver shall not be entitled to indemnification from Seller under this Section 9.01 for any such Losses.

(f)    This Section 9.01 shall survive any expiration or termination of this Agreement and/or the Purchase Agreements.

## ARTICLE X

## MISCELLANEOUS

Section 10.01  This Agreement may be executed in any number of counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one agreement. Any counterpart may be executed by facsimile signature, or by electronic mail in "portable document format" (".pdf"), and such facsimile or .pdf signature shall be deemed an original. Copies of this Agreement shall be effective as an original for all purposes.

Section 10.02  Subject to Bankruptcy Court approval and approval by the Department, this Agreement shall be binding upon the parties hereto. Nothing contained in this Agreement is intended to or shall be construed to confer any rights or remedies on any person or entity not a party to this Agreement, including as a third party beneficiary, except for Amalgamated Bank.

Section 10.03  In case any one or more of the provisions contained in this Agreement shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not be affected or impaired thereby in any manner.

Section 10.04  The parties agree to promptly execute and deliver any and all other documents necessary to give full force and effect to this Agreement.

Section 10.05  Article headings in this Agreement are for convenience only and are not a part of this Agreement. Such headings shall not affect the meaning or construction of any provision herein. Inappropriate gender references in this Agreement shall be deemed to be correct.

Section 10.06  All notices and other communications under this Agreement shall be in writing and, unless otherwise provided in this Agreement, shall be deemed given (a) when

delivered personally by hand, (b) when sent by facsimile (confirmed in writing by mail promptly thereafter dispatched), (c) three (3) days after being mailed by certified or registered mail, postage prepaid, return receipt requested or (d) one (1) Business Day following the day sent by a nationally recognized overnight courier service, in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Receiver, to it at the Facility, with a copy (which shall not constitute notice) to:

      Isidor D. Friedenberg, Esq.
      2 Cara Drive
      Suffern, New York 10901

If to Seller, to:

      Good Samaritan Lutheran Health Care Center, Inc.
      c/o The Lutheran Care Network
      700 White Plains Road
      Scarsdale, New York  10583
      Attn:  Ms. Laraine Fellagara

with copies (which shall not constitute notice) to each of:

      Deborah A. Reperowitz, Esq.
      Stradley Ronon Stevens & Young, LLP
      100 Park Avenue, Suite 2000
      New York, NY 10017
      Email: dreperowitz@stradley.com
      Fax:    646.682.7180

If to the Department, to:

      Richard J. Zahnleuter
      General Counsel
      New York State Department of Health
      Nelson A. Rockefeller Empire State Plaza
      Erastus Corning Tower
      24th Floor, RM 2482
      Albany, New York 12237
      Attn: Mark Furnish, Esq.

      Section 10.07 Nothing herein contained shall be deemed to change the Medicaid reimbursement policies, rules and regulations of the New York State Department of Health.

Section 10.08  Nothing herein shall be construed to mean that, as of the date of this Agreement, the Department has approved the Asset Purchase Agreement or any other asset purchase agreement relating to the Facility.

Section 10.09  This Agreement constitutes the entire Agreement among Seller, Receiver and the Department relative to the receivership of the Facility. Any agreement between Seller and Receiver relative to the receivership of the Facility entered into subsequent to the date of this Agreement shall be null and void as to the Department unless approved by the Department.

Section 10.10  Nothing contained herein shall be construed in any way to alter or abridge the right and authorities of the Department or the Public Health Council as provided for in the Public Health Law, except to the extent that the Department has expressly agreed to be bound herein.

Section 10.11  This Agreement shall be construed and enforced in accordance with the laws of the State of New York, without regard to its principles of conflicts of laws. The Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, or any breach or default hereunder. Any and all legal proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Receiver, Seller and the Department hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court.  Receiver, Seller, and the Department hereby (a) irrevocably submit with regard to any such legal proceeding to the exclusive personal jurisdiction of the Bankruptcy Court in the event any dispute arises out of this Agreement, (b) agree that they shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from the Bankruptcy Court or that such action is brought in an inconvenient forum, and (c) agree that they shall not bring any action relating to this Agreement in any court other than the Bankruptcy Court.

Section 10.12. Capitalized terms used herein shall, unless otherwise defined herein, have the meanings set forth in the Asset Purchase Agreement or, if no meaning is set forth for such term in the Asset Purchase Agreement, then in the Real Estate Contract.

[Remainder of this Page Intentionally Left Blank]

20

**IN WITNESS WHEREOF**, the parties hereto have caused this Receiver Agreement – Nursing Home to be duly executed as of the day and year first above written.

GOOD SAMARITAN LUTHERAN HEALTH CARE CENTER, INC.

Dated: December _____, 2019          By: _____

Name: Thomas Roemke

Title: Director

DELMAR SNF OPERATIONS ASSOCIATES, LLC

Dated: December _____, 2019          By: _____

Name:  Kenneth Rozenberg

Title:  Managing Member

Acknowledged and Approved:

NEW YORK STATE DEPARTMENT OF HEALTH

Dated: _____          By: _____

Name:

Title:

     **IN WITNESS WHEREOF**, the parties hereto have caused this Receiver Agreement – Nursing Home to be duly executed as of the day and year first above written.

<div style="margin-left: 40%;">

GOOD SAMARITAN LUTHERAN HEALTH CARE CENTER, INC.

</div>

Dated: December _____, 2019     By: _____
         Name:
         Title:

<div style="margin-left: 40%;">

DELMAR SNF OPERATIONS ASSOCIATES, LLC

</div>

Dated: December _____, 2019     By: _____
         Name:  Kenneth Rozenberg
         Title:  Managing Member

<div style="margin-left: 40%;">

Acknowledged and Approved:

NEW YORK STATE DEPARTMENT OF HEALTH

</div>

Dated: _____     By: _____
         Name:
         Title: